UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

)<br>
PAUL O'MARA and NEAL O'MARA,   )<br>
)<br>
    Plaintiffs,   )<br>
)<br>
    v.   )<br>
)<br>
MARK J. DONNELLY,   )<br>
SEBAGO PARTNERS, INC, and   )<br>
UCOMPAREHEALTHCARE, LLC   )<br>
)<br>
    Defendants.   )<br>
)

</td><td>

C.A. No: 05-11824-REK

</td></tr>
</table>

## ANSWER, COUNTERCLAIM, AND JURY DEMAND

Defendants Mark J. Donnelly ("Mr. Donnelly"), Sebago Partners, Inc. ("Sebago") and UCompareHealthCare, LLC (the "Company"), (collectively, the "Defendants") hereby answer the Complaint in this action as follows:

To the introductory statement in the Complaint set out in an unnumbered paragraph, no response is required.

1.    The allegations in the first sentence of paragraph 1 are admitted, on information and belief. As to the allegations in the second sentence of paragraph 1, Defendants admit that Paul O'Mara is a self-described software designer and developer who purports to have experience in Technical Writing and Programming, but deny that he is "highly skilled."

2.    The allegations in the first sentence of paragraph 2 are admitted, on information and belief. As to the allegations in the second sentence of paragraph 2, Defendants admit that Neal O'Mara is a self-described software programmer, but deny that he is "highly skilled."

3.    Admitted.

4.     Admitted.

5.     Admitted.

6.     Paragraph 6 states conclusions of law that require no response.

7.     Paragraph 7 states conclusions of law that require no response.

8.     Defendants admit only that, in or about June 2004, Mr. Donnelly gave Paul

O'Mara the opportunity to prove himself by developing that so-called Laundry Management

Software and that the receipt of any compensation for same was expressly conditioned on Mr.

O'Mara successfully producing working, usable software, which Mr. O'Mara failed to do.

Defendants further admit that Mr. Donnelly, at all times, made it clear that any split of profits on

an 80-20 basis as alleged in this paragraph was, at all times, expressly contingent on the Mr.

O'Mara helping to develop a saleable, usable, quality-oriented product, which he failed to do.

Except as aforesaid, denied.

9.     Defendants admit that Mr. Donnelly worked approximately 20 hours on the

Laundry Management Software.  Except as aforesaid, denied.

10.     Defendants admit only that Mr. Donnelly and Paul O'Mara met on September 16,

2004. Except as aforesaid, denied.

11.     The first sentence of paragraph 11 is admitted.  As to the allegations in the second

sentence of paragraph 11, Mr. Donnelly denies that he represented that he would present any

alleged draft agreement memorializing any alleged agreement regarding the Laundry

Management Software and, accordingly, admits that he did not prepare or present such an

alleged draft agreement.  As to the allegations in the third sentence of paragraph 11, Mr.

Donnelly admits only that the meeting was devoted to discussions regarding the creation of the

Company and that the only discussion regarding the Laundry Management Software was that

Plaintiff Paul O'Mara had failed to create a working program but, except as aforesaid, denied. With respect to the final sentence of paragraph 11, Defendants admit only that Mr. Donnelly stated that the UCHC venture was a larger opportunity.

12.    Admitted.

13.    Denied.

14.    Denied.

15.    Admitted, on information and belief.

16.    As to the allegations in the first sentence of paragraph 16, Defendants admit only that Plaintiff Paul O'Mara ceased working on the Laundry Management Software after he failed to develop working software but, except as a foresaid, denied. The second sentence of paragraph 16 is denied.

17.    Admitted.

18.    Denied.

19.    The allegations in the first and second sentences of paragraph 19 are admitted. The document speaks for itself and the characterization of the contents of that document in the third sentence of paragraph 19 are denied. The allegations in the fourth sentence of paragraph 19 are admitted. The allegations in the final sentence of paragraph 19 are denied.

20.    The Sebago Partners, Inc. Document speaks for itself. Further answering, the quotation in paragraph 20 does not appear to be accurately drawn from this document.

21.    Denied.

22.    Admitted.

23.    The allegations in the first and second sentences of paragraph 23 are admitted. The allegations in the third sentence of paragraph 23 are admitted except that the specification

referred to speaks for itself, and it clearly stated that the company's copyrights had to be included in the source code that Plaintiff, Neal O'Mara was to be writing.

24.    The first sentence of paragraph 24 is admitted. As to the allegations in the second sentence of paragraph 24 the Sebago Partners, Inc. Documents speaks for itself and the characterizations of the same in this paragraph are denied.

25.    The Sebago Partners, Inc. Document speaks for itself. Further answering the quotation in paragraph 25 does not appear to be accurately drawn form this document.

26.    Admitted

27.    Denied.

28.    Admitted.

29.    Denied.

30.    Denied.

31.    The allegations in the first sentence of paragraph 31 are admitted. The allegations in the second sentence of paragraph 31 are denied.

32.    Denied.

33.    The allegation of the first sentence of paragraph 33 that "the final design components were made available to Donnelly is denied," but admitted that Mr. Donnelly sent an email attaching documents, all of which speak for themselves. The remainder of paragraph 33 concerns the email, which speaks for itself.

34.    The documents attached to the email speak for themselves. The attempts in this paragraph to characterize the attached documents are denied.

35.    Admitted.

36.    The Memorandum referenced in paragraph 36 speaks for itself. Further answering, the attempts to characterize the contents of this document are denied.

37.    Defendants admit only that Plaintiffs Paul and Neal O'Mara requested changes to the proposed documents and, except as aforesaid, denied. The remaining allegations of paragraph 37 are denied.

38.    The June 1, 2005 email referenced in paragraph 38 speaks for itself. Attempts to characterize the contents of that email are denied.

39.    Defendants admit only that they maintain that Plaintiffs are not entitled to any compensation. Except as aforesaid, denied.

40.    Defendants admit only that the Company has not paid any money to Plaintiff Paul O'Mara. The remaining allegations and characterizations in paragraph 40 are denied.

41.    Defendants admit only that the Company paid Plaintiff Neal O'Mara $5,000. The remaining allegations and characterizations in paragraph 41 are denied.

42.    The June 9, 2005 letter referenced in Paragraph 42 speaks for itself.

43.    The June 9, 2005 letter referenced in Paragraph 43 speaks for itself.

44.    The June 22, 2005 letter speaks for itself. Further answering, the attempts to characterize the contents of this letter in paragraph 44 are denied.

45.    The July 5, 2005 letter referenced in paragraph 45 speaks for itself. Further answering, Defendants admit that Sebago is the sole and exclusive owner of the Works and that the Defendants' counsel has explained this position to Plaintiffs.

## COUNT I

46.    Defendants incorporate all the above and below paragraphs.

47.    Defendants admit only that the works are copyrightable subject matter under the laws of the United States. Except as aforesaid, denied.

48.    Denied.

49.    Defendants admit that each of the Works is an original work, copyrightable under the Copyright Act, but deny any express or implied allegation that any of the Works are copyrightable by Plaintiffs.

50.    Admitted.

51.    Admitted that the agreements by which Plaintiffs assigned all copyrights to Defendants do not contain the words "work-made-for-hire," but any express or implied allegations that the Works were not work-made-for-hire, or that the agreements assigning all rights to the Works to Defendants were insufficient to effectively assign such rights, are denied.

52.    Defendants deny that Plaintiffs have, or ever had, any authority over the Works and, since this allegation forms the predicate of paragraph 52, Defendants deny the allegations in paragraph 52. Further answering, to the degree Plaintiffs ever had any authority over the Works, all such authority was validly transferred and assigned to Sebago pursuant to the Detailed Confidentiality Agreements. Except as aforesaid, denied.

53.    With respect to the allegation in the first sentence of paragraph 53 (embodied in the phrase "their Works") that Defendants have any rights to the Works, that allegation is denied. Since this allegation forms the predicate of the first sentence of paragraph 53, Defendants deny the first sentence of paragraph 53 except that, on information and belief, Defendants admit that Plaintiffs fraudulently filed registration applications concerning the Works. Defendants admit the allegations in the second sentence of paragraph 53, on information and belief. Defendants

6

are without information sufficient to form a belief as to the allegations in the third sentence of paragraph 53.

54.     Admitted that an actual controversy exists with respect to the Works, but denied that the controversy is accurately or "fully set forth above" in paragraph 1-53 of Plaintiffs' Complaint.

55.     Paragraph 55 sets forth a conclusion of law to which no response is required.

56.     Defendants deny that Plaintiffs are entitled to any of the declarations they request in paragraph 56.

## COUNT II

57.     Defendants incorporate all of the above and below paragraphs.

58.     Denied.

59.     Denied.

60.     Denied.

## COUNT III

61.     Defendants incorporate all of the above and below paragraphs.

62.     Denied.

63.     Denied.

64.     Denied.

## COUNT IV

65.     Defendants incorporate all of the above and below paragraphs.

66.     Admitted only that Defendants permitted Plaintiffs to attempt to produce quality work for UCompareHealthCare, LLC. Except as aforesaid, denied.

7

67.    Defendants deny that Plaintiffs performed any services that benefited Defendants in any way and, since this allegation forms the predicate of paragraph 67, Defendants deny the allegations in paragraph 67.

68.    Denied.

### COUNT V

69.    Defendants incorporate all of the above and below paragraphs.

70.    Denied.

71.    Denied.

72.    Denied.

73.    Denied.

74.    Denied.

WHEREFORE, Defendants deny that they are entitled to any relief whatsoever.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted against Defendants.

### SECOND AFFIRMATIVE DEFENSE

The conduct the Complaint alleges on the part of Defendants, even if not patently false, was not wrongful.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs have suffered no damages.

### FOURTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs have suffered any damages, Plaintiffs have failed to mitigate those damages.

## FIFTH AFFIRMATIVE DEFENSE

To the extent Plaintiffs have suffered any damages, they are attributable in whole or in part to Plaintiffs' own negligent and/or intentional misconduct.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs are estopped by their own conduct from bringing their claims.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs have waived their claims.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred from recovery by the doctrine of unclean hands.

## NINTH AFFIRMATIVE DEFENSE

Platiniffs' claims are barred by their own breaches of contract.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' declaratory judgment action fails because Plaintiffs are not the valid owners of the works they wrongfully sought to copyright.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because Plaintiffs are unable to establish the requisite causation between any alleged conduct by Defendants and any alleged damages to Plaintiffs.

## TWELVTH AFFIRMATIVE DEFENSE

Any allegation of fraudulent or deceitful conduct on the part of Defendants should be dismissed because it is not plead with the requisite particularity.

## THIRTEENTH AFFIRMATIVE DEFENSE

Defendants reserve the right to add such other and further defenses as become apparent during discovery and also reserve the right to file a motion to dismiss on any of the above grounds.

## COUNTERCLAIM

1.      Plaintiff-in-Counterclaim Mark J. Donnelly ("Mr. Donnelly") is an individual residing at 406 Windsor Drive, Framingham, Massachusetts. Mr. Donnelly is the President of Sebago Partners, Inc. and is the manager, sole member, and sole owner of UCompareHealthCare, LLC ("UCHC").

2.      Plaintiff-in-Counterclaim Sebago Partners, Inc. ("Sebago") is a corporation with a principal place of business in Framingham, Massachusetts.

3.      Plaintiff-in-Counterclaim UCHC is a limited liability company with a principal place of business in Framingham, Massachusetts and is the assignee of certain assets from Sebago related to the UCHC business.

4.      Defendant-in-Counterclaim Paul O'Mara is an individual residing at 31 Boudreau Avenue, Marlborough, Massachusetts.

5.      Defendant-in-Counterclaim Neal O'Mara is an individual residing at 12221 Papaya Ct. NE, Albuquerque, NM 87111.

## FACTS

6.      In or around June 2004, Mr. Donnelly gave Paul O'Mara the opportunity to begin working as an independent contractor for Sebago. Mr. O'Mara, a recent (2001) college graduate with limited experience in software design and programming, nevertheless represented to Mr. Donnelly that he had considerable abilities in the field and was eager to prove himself to Mr.

Donnelly by assisting him with his internet, marketing, and business ventures in connection with software he was developing that were referred to as the Laundry Management Software.

7.      While Mr. Donnelly was reluctant to give Mr. O'Mara this opportunity in light of Mr. O'Mara's lack of experience, Mr. Donnelly was willing to let Mr. O'Mara try to produce something of value for Sebago with the Laundry Management Software and, if he did so, Sebago would compensate him for valuable and usable work product produced for the company.

8.      The initial project on which Mr. O'Mara worked, the Laundry Management Software, was a complete failure. Not only was Mr. O'Mara unable to produce a working program, his attempt to run the program on Mr. Donnelly's computer infected the computer with a virus, causing damage to Sebago. Ultimately, by a memo dated September 27, 2004, Mr. Donnelly reiterated to Mr. O'Mara the problems with his work and directed him to cease all activities with the Laundry Management Software.

9.      Despite this failure, Mr. Donnelly was willing to give Mr. O'Mara another opportunity to prove himself. Specifically, Mr. Donnelly allowed Mr. O'Mara to become part of the team that was working to develop an online healthcare service to permit consumers to compare doctors and other medical services.

10.      As part of commencing work on this new venture, known as UCHC, Mr. O'Mara was presented with a Confidentiality/Proprietary Information Agreement (the "General Confidentiality Agreement"), which he executed on September 16, 2004. A copy of the Confidentiality Agreement is attached as Exhibit 1 to the Complaint.

11.      Among the material provisions of the General Confidentiality Agreement is paragraph 2, which reads as follows:

> Paul O'Mara shall not disclose to any third party any Proprietary Information of [Sebago's] for a period of three years from the latter of the date of this Agreement or the

11

date on which such Proprietary Information is disclosed for any purpose other than evaluation of its interest in entering into a business arrangement with [Sebago].

12.     Proprietary Information is defined in the General Confidentiality Agreement as follows:

any secret, or private, or confidential information of [Sebago] concerning the intellectual property, design, manufacture, marketing methods, customers lists, use, purchase or sale of its products, services or materials such as may be contained in but not limited to [Sebago's] business methods, processes, techniques, research, development, marketing plans, mailing lists, customer lists, and proposals, all to the extent that (i) such information is not readily disclosed by inspection of [Sebago's] products and (ii) such party has expressly or impliedly protected such information from unrestricted use by others.  Proprietary information shall include information regarding business plans.

13.     On November 16, 2004, Paul O'Mara, like all other members of the UCHC team, executed an Employee/Contractor Confidentiality Agreement (the "Detailed Confidentiality Agreement") in which he agreed to assign all inventions he developed as part of the UCHC team to UCHC.  The Detailed Confidentiality Agreement affords Mr. O'Mara the opportunity to exclude any preexisting inventions from the agreement by identifying them on an attached sheet. A copy of the Detailed Confidentiality Agreement executed by Paul O'Mara is attached as Exhibit 2 to the Complaint.  He claimed no exclusions whatsoever.

14.     Based on the recommendations of Defendant-in-Counterclaim Paul O'Mara, Sebago agreed, in or around November 17, 2004, to retain Mr. O'Mara's brother, Defendant-in-Counterclaim Neal O'Mara, to perform certain programming work for the feasibility phase of the project.

15.     Specifically, Neal O'Mara was to create the so-called "front end" of the website relating to the UCHC project as defined in a document entitled "Contractual Development Feasibility Prototype" and according to the VB.NET programming requirements.

16.     As part of Neal O'Mara commencing this work as an outside contractor, as with all others involved with UCHC, he executed a Detailed Confidentiality Agreement on November 26, 2004 that was identical to the one executed by Paul O'Mara. A copy of the Detailed Confidentiality Agreement, as executed by Neal O'Mara, is attached as Exhibit 3 to the Complaint. He subsequently executed a General Confidentiality Agreement on February 22, 2005 that was identical to the one executed by Paul O'Mara as well. A copy of the General Confidentiality Agreement, as executed by Neal O'Mara, is attached as Exhibit 4 to the Complaint.

17.     Both Paul and Neal O'Mara, as with all members of the UCHC team, had the opportunity to review the General and Detailed Confidentiality Agreements with counsel of their choosing before executing these agreements.

18.     Upon Neal O'Mara's completion of approximately 75% of the required work on this discrete programming work as an outside contractor, Sebago paid him the full amount of $5,000. Neal was permitted to continue working, along with Paul, as part of the team working on the development and launch of UCHC.

19.     Paul and Neal O'Mara worked with the other members of the team on the start-up of UCHC with the same arrangements and understandings of several other members of the team – namely, that they were not to be paid, but rather were to perform services in exchange for equity in the event that the venture turned out to be successful, they discharged their obligations, and their efforts contributed materially to the overall success. All members of the UCHC group agreed that, inasmuch as Mr. Donnelly was underwriting the entire cost of the venture, he was the final arbiter of whether, and to what extent, each group member's efforts merited equity.

20.     As further confirmation that Paul O'Mara understood and agreed to the terms under which all members of the UCHC team were working on the business concept, it was Paul O'Mara who recommended to Mr. Donnelly that another team member, Brian Richardson, be removed from the team. Mr. O'Mara further recommended to Mr. Donnelly that Mr. Richardson be denied any equity interest or compensation for any of the services he performed because, in Mr. O'Mara's view, Mr. Richardson was not a team player and had not provided any value to the venture.

21.     After several months of working on the UCHC concept, several members of the team, based on poor performance and the lack of any usable work product, began to question whether the O'Maras had the commitment and expertise necessary to ever provide anything of value to the UCHC venture.

22.     In an effort to address these concerns, Paul O'Mara prepared a document entitled "Critical Mistakes So Far," which highlighted many of the errors that he, Neal O'Mara, and others had committed while, at the same time, acknowledging their lack of experience and expertise in certain critical areas.

23.     The production of this document prompted Mr. Donnelly to retain external professionals to review the work the O'Maras had performed. This review confirmed what Mr. Donnelly and other members of the UCHC team had begun to suspect – that the work the O'Maras had done was largely useless and would have to be completely redone at significant out-of-pocket expense for UCHC if the venture was to remain on schedule.

24.     Despite the poor quality of the work of the O'Maras, Mr. Donnelly was still willing to let them work to try to develop their skills and prove themselves going forward as

confirmed by the initial draft of the UCompareHealthCare, LLC Operating Agreement (the "Draft Operating Agreement").

25.     Emails exchanged between the O'Maras from as late as May 24, 2005 (a week before their connection to UCHC was terminated), confirm that the O'Maras recognized that there was then no agreement of any kind relating to their receiving any equity or compensation.

26.     For example, on May 24, 2005 at 1:55 p.m., Paul O'Mara wrote an email to his brother in which he tries to recall what they had demanded of UCHC ("What did we say our minimum requirements were?").  He also expressly emphasizes that there is no deal, writing "[l]et's try not to commit to anything unless it's exactly what we asked for."  Unfortunately, the email – as with many of the O'Maras' communications – is replete with word choices (including foul language) that are, at best, highly unprofessional.

27.     This same email also includes a reference to Paul O'Mara's plan to demand from UCHC "100K each and they can have the rights to everything we've done so far" – rights which, of course, the O'Maras had already expressly agreed to assign in the Detailed Confidentiality Agreement.

28.     The email from Neal O'Mara to which the above email from Paul O'Mara responds states, among other things, that one of their problems with the Draft Operating Agreement that he expressed to Mr. Donnelly was that "we don't get crap for four years (and he has the power to get rid of us) and that we would prefer vesting over time."  The May 24, 2005 exchange of emails between the O'Maras is attached as Exhibit A to this Answer and Counterclaim.

29.     Two days later, in an exchange of emails on May 26, 2005 between Paul O'Mara and Mr. Donnelly, Mr. O'Mara expressly acknowledges that no one working on the UCHC team

was going to face even the possibility of receiving compensation until at least six more months

(and might never receive compensation) and seeks to negotiate a different arrangement whereby

he might begin receiving a salary sooner. He also acknowledges that he might just "have to

leave UCHC." The May 26, 2005 exchange of emails between Paul O'Mara and Mr. Donnelly

is attached as Exhibit B to this Answer and Counterclaim.

30.     Thereafter, the O'Maras, through their counsel, demanded a series of

unreasonable and unwarranted changes to the Draft Operating Agreement and, for the first time

ever, claimed ownership of intellectual property which, given the Detailed Confidentiality

Agreements they signed, the O'Maras knew they had no right to claim.

31.     In response, Mr. Donnelly and UCHC, through their counsel, terminated the

relationship of the O'Maras with the UCHC team.

32.     In plain violation of the General and Detailed Confidentiality Agreements, the

O'Maras have filed registration applications for various inventions (as that term is defined in the

Detailed Confidentiality Agreement) in which they know they have no rights. The O'Maras

have, thus, willfully misrepresented their ownership of these works and stolen them from UCHC.

33.     In addition, in further breach of the General and Detailed Confidentiality

Agreements, the O'Maras have also refused to return to UCHC highly confidential and

proprietary information containing UCHC's trade secrets.

34.     These highly confidential and proprietary trade secrets include but are not limited

to (a) binders containing detailed information on the UCHC business concept, intellectual

property strategy, sales plans, corporate module strategy, market and  competition analyses, data

on healthcare institutions, and pricing structures; (b) UCHC-specific programming manuals and

specific concept and description and information relating to the UCHC uniquely modified Levy-

Jennings chart and the specific, unique services to be offered to customers; and (c) other

corporate records and electronic files that may have been removed from UCHC by the O'Maras

without UCHC's permission.

**COUNT I – Declaratory Judgment**

35.    Plaintiffs-in-Counterclaim incorporate all of the above and below paragraphs.

36.    There exists an actual controversy as to who owns the works and other inventions

to which the O'Maras in any way contributed during their time working with UCHC and after

their execution of the General and Detailed Confidentiality Agreements.

37.    Plaintiffs-in-Counterclaim are interested parties under 28 U.S.C. § 2201 and seek

a declaration of their rights pursuant to that section.

38.    Plaintiffs-in-Counterclaim respectfully request that this Court declare the General

and Detailed Confidentiality Agreements to be valid and enforceable, declare that UCHC is the

owner of all confidential information, inventions, or works to which the O'Maras in any way

contributed, and order that the O'Maras immediately transfer all such materials (and any

copyrights with respect to same) to UCHC.

**COUNT II – Copyright Infringement**

39.    Plaintiffs-in-Counterclaim incorporate all of the above and below paragraphs.

40.    Under the Detailed Confidentiality Agreement that each of the O'Maras executed,

the term "INVENTIONS" "means any discoveries, improvements, programs or program

architecture and ideas, whether patentable or not."

41.    Pursuant to the Detailed Confidentiality Agreements, each of the O'Maras agreed,

among other things, as follows:

> 3.    [T]o disclose promptly to [Sebago] all INVENTIONS that are related tot
> the actual or anticipated activities of [Sebago] conceived or made by me

17

whether or not during the course of my rendering services on behalf of [Sebago] or with the use of [Sebago's] facilities, materials, or personnel, either solely or jointly with another or others at any time during my engagement as an independent contractor or otherwise by [Sebago]. Related to the actual or anticipated business or activities of [Sebago], or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of [Sebago], I assign and agree to assign my entire right, title, and interest therein to [Sebago].

4.    I shall, whenever requested to do so by [Sebago], execute any applications, assignments or other instruments which [Sebago] shall consider necessary, to apply for and obtain letters of patent, trademarks, service marks, or the like in the United States, or any foreign country, or to protect otherwise [Sebago's] interests. These obligations shall continue beyond the termination of my engagement with [Sebago] with respect to INVENTIONS conceived or made by me during my period of relationship, and shall be binding upon my executors, administrators, or other legal representatives.

5.    I will not assert any rights under any inventions as having been made or acquired by me prior to my being employed by [Sebago] unless such INVENTIONS are identified on a sheet attached hereto and signed by me as of the date of this assignment.

42.    Neither O'Mara identified any INVENTIONS on any attached sheet to the Detailed Confidentiality Agreement that each executed.

43.    The Detailed Confidentiality Agreement was and is valid to transfer and assign any and all interest that either O'Mara had to any Inventions, as defined under the Detailed Confidentiality Agreement, to Sebago (and its successor UCHC) under the Copyright Act.

44.    According to paragraph 53 of their Complaint, the O'Maras have obtained copyright registrations for certain inventions identified in that paragraph and the O'Maras state that "[a]dditional registrations are currently pending."

45.    While Plaintiffs-in-Counterclaim dispute that Defendants-in-Counterclaim were the creators or developers of any of the works or inventions they have copyrighted or sought to copyright as set forth in paragraph 53 of their Complaint, there can be no dispute that Plaintiffs-

18

in-Counterclaim Sebago (UCHC) are the rightful owners of those copyrights pursuant to the terms of the Detailed Confidentiality Agreement.

46.     Defendants-in-Counterclaim have infringed these copyrights by, among other things, wrongfully claiming to be owners of registered copyrights of which Sebago (UCHC) is the rightful owner pursuant to the Detailed Confidentiality Agreement and by wrongfully copying these registered copyrights, thereby causing Plaintiffs-in-Counterclaim damages.

<strong>COUNT III – Breach Of Contract</strong>

47.     Plaintiffs-in-Counterclaim incorporate all of the above and below paragraphs.

48.     By the conduct alleged above, including but not limited to the O'Maras willful and intentional refusal to abide by its agreement to "not assert any rights under any inventions as having been made or acquired by me prior to my being employed by [Sebago] unless such INVENTIONS are identified on a sheet attached hereto and signed by me as of the date of this agreement," have breached the General and Detailed Confidentiality Agreement they had with Sebago.

49.     As a direct and proximate result of the O'Maras' breaches of their contracts, Sebago (and its successor, UCHC) have suffered damages in any amount to be proven at trial.

<strong>COUNT IV – Breach Of Covenant Of Good Faith And Fair Dealing</strong>

50.     Plaintiffs-in-Counterclaim incorporate all of the above and below paragraphs.

51.     The duty of good faith and fair dealing inheres in all contracts under Massachusetts law.

52.     As alleged above, the O'Maras engaged in conduct that breached the implied covenant of good faith and fair dealing applicable to the agreements between the parties.

53.     As a direct and proximate result of the O'Maras' breaches of the duty of good faith and fair dealing, Sebago (and its successor, UCHC) has suffered damages in an amount to be proven at trial.

## COUNT V – Misappropriation of Trade Secrets

54.     Plaintiffs-in-Counterclaim incorporate all of the above and below paragraphs.

55.     Pursuant to the General Confidentiality Agreements and the Detailed Confidentiality Agreements, Plaintiff-in-Counterclaim Sebago (and its successor, UCHC) had a confidential relationship with the O'Maras.

56.     Solely within the context of that confidential relationship, Plaintiffs-in-Counterclaim disclosed to the O'Maras numerous trade secrets relating to the business concept of UCHC and the proprietary technology and marketing information that is to form the basis of the UCHC business.

57.     By the conduct described above, the O'Maras have misappropriated these trade secrets by seeking to copyright these trade secrets in their own name and by using the trade secrets in a plan to compete with UCHC.

58.     As a direct and proximate result of the O'Maras' misappropriation of trade secrets, Sebago (and its successor, UCHC) has suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT VI - Conversion

59.     Plaintiffs-in-Counterclaim incorporate all of the above and below paragraphs.

60.     By the conduct described above, the O'Maras by, among other things, falsely claiming ownership of various inventions belonging to UCHC and taking copies of UCHC's

intellectual property, have wrongfully converted assets rightfully belonging to UCHC and are liable to UCHC for the monetary value of what they have taken.

WHEREFORE, Plaintiffs-in-Counterclaim respectfully request that this Court:

    a.    Enter a preliminary injunction compelling Defendants-in-Counterclaim to return all of UCHC's confidential and proprietary documents and intellectual property;

    b.    Enter judgment in its favor and against Defendants-in-Counterclaim on all counts of the Counterclaim;

    c.    Issue the declaratory relief requested in Count I of the Counterclaim and order Defendants-in-Counterclaim to transfer all copyrights to inventions belonging to UCHC pursuant to the Detailed Confidentiality Agreement to UCHC and order Defendants-in-Counterclaim to return all other confidential materials to UCHC;

    d.    Award Plaintiffs-in-Counterclaim their actual damages; and

    e.    Award Plaintiffs-in-Counterclaim such other and further relief as it deems appropriate.

## **JURY DEMAND**

Defendants/Plaintiffs-in-Counterclaim demand a trial by jury on all claims so triable in

the Complaint and Counterclaim.

MARK J. DONNELLY, SEBAGO PARTNERS,
INC, and UCOMPAREHEALTHCARE, LLC,

By their attorneys,


_____/s/ TYLER E. CHAPMAN_____
Kevin T. Peters, BBO#550522
Tyler E. Chapman, BBO#637852
TODD & WELD LLP
28 State Street
Boston, MA 02109
(617) 720-2626

November 21, 2005

**<u>EXHIBIT A</u>**

M18

**From:** Neal O'Mara [nomara@uchc1.com]
**Sent:** Tuesday, May 24, 2005 1:58 PM
**To:** 'Paul OMara'
**Subject:** RE: Office

. . . meeting with these Allegiance dude in an hour. What are we going to need them to do in terms of network administration? Back-up our stuff for us? Do updates? Check security? What? I really have no clue, I've never worked in an office before and I don't know what needs to be done. Please let me know what we will be needing them to do.

- Neal

---

**From:** Paul OMara [mailto:pomara@uchc1.com]
**Sent:** Tuesday, May 24, 2005 1:55 PM
**To:** Neal O'Mara
**Subject:** RE: Office

Ugh. This is so annoying. My email to Mark was a reaction to him declaring that I am too judgmental about everything when I really think he should consider how judgmental he and Jeff and Ryan were about Chris and Nicholas (the Tricet guy). I'm glad you explained the crap to him. I thought he already talked to Jeff about not giving outsiders information. I know I did before the last Jonathan incident but whatever. I am so sick of this bullshit.

I agree that we should use Dell and All Covered and that Mark fucked us up by making initial contact. I think Jeff will object strongly to Dell because he thinks their computers are crappy. I think we need to get this fucking show on the road so we can start developing. Even if we need to change something it won't cost us too much and at least we'll have most of what we need..

. . . t did we say our minimum requirements were? 2.5% equity on launch, vested immediately, incremental vesting fc . . . dditional equity (achieved at 1.37 million mark), golden parachute, and maybe an employment agreement? If they want to buy us out I say $100k each and they can have the rights to everything we've done so far.

Please keep me posted on further developments. I have a feeling there's going to be a lot of bullshit tonight for us to deal with. Let's try not to commit to anything unless it's exactly what we asked for.

Later,
Paul

*Neal O'Mara <nomara@uchc1.com> wrote:*

> Jeff and Mark were here, but they are both at lunch now. The mood got tense for a while when Mark and I discussed the deal and you and Jeff.
>
> I told him that our main problem was with the agreement and that the most important part was that we don⊔t get crap for four years (and he has the power to get rid of us) and that we would prefer vesting over time. It sounds like he is going to consider it.
>
> He showed me the email you wrote him which I have to admit was kind of caustic, but I wasn⊔t here to judge what he said to you to incite it. I explained where we are coming from on the Jeff/Jon thing and showed him the emails that show that Jeff clearly told Jon what you expressly told him not to. I also told him that it probably keeps getting brought up because they keep bringing up me working for Sterling. Mark wants to figure out all of this tonight and make sure . . . at you and Jeff can get along and move past this.
>
> . . . nave some guy from Allegiance Systems coming in today at 3. I guess they do general network administration

stuff like backups, updates, etc. Do you have any questions you□d like to ask him? What duties exactly would we like Allegiance to perform for us?

~sday some old dude with a lot of experience is going to come in. He used SPOC the other day and wants to work ⌐s. He even said he□d like to work for equity, but Mark said no. This guy is going to go over our code and designs. I told Mark that he will be most helpful after we write our technical specifications for the full product, but he may be able to help point me or you in the right direction in a few areas.

The whole hardware thing is annoying me. We thought that they would be providing us with network diagrams and solutions when in fact all they do (except for possibly All Covered) is pick computers for us. HP and IBM told us we need to get our shit together. We were looking for them to provide us with help in terms of network planning while they expected us to already have it. I guess this is what we get for having Mark talk to them initially and then me from thereon out. I didn□t figure out until the last call with IBM that they don□t do network planning shit, which they said they told Mark at the beginning.

We should just go with the Dell stuff (only 80 something grand with software, right?) and have All Covered install it for us (3 grand). We will have the ETL Server off the network and the web server on one subnet (the DMZ), the WebDB Server on another subnet, and the internal network on the final subnet. It is the best way and cheapest way to do this and I am sick of talking to people whose job it is to pick out computers for us.

I think I am going to go to lunch now

---

**From:** Paul OMara [mailto:pomara@uchc1.com]
**Sent:** Tuesday, May 24, 2005 10:52 AM
**To:** Neal O'Mara
**Subject:** Office

are jeff and mark at the office too? how is the mood?

**EXHIBIT B**

$\mathcal{P} \mathcal{A}$

## Ryan Donnelly

**From:** Paul OMara [pomara@uchc1.com]
**Sent:** Thursday, May 26, 2005 2:10 PM
**To:** Mark Donnelly; 'Ryan Donnelly'; 'Jeff LaPointe'; 'Neal O'Mara'
**Subject:** RE: Burn Period

I'm just following your advice to hope for the best but plan for the worst! I think that we'll probably be fine, but I don't want to have to leave UCHC to get another job if things don't go quite as well as we're hoping during the first year. I am 90% confident that we'll be pulling money in within 6 months of launch, but I still have to know what I'm gonna do if things don't go quite so fast...

*Mark Donnelly <mdonnelly@uchc1.com>* wrote:

> You are assuming that we will not be successful in the duration of your burn rate!  I would look at it more optimistically and say I bet we have $250,000 in sales within 4 months of launch. At that point I am sure we could start to pay everyone something.
>
> I don't think it will be an all or nothing type of situation.
>
> I hope that you are not loosing confidence in the product and concept!
>
> Mark
>
> **From:** Paul OMara [mailto:pomara@uchc1.com]
> **Sent:** Thursday, May 26, 2005 1:48 PM
> **To:** Mark Donnelly; 'Ryan Donnelly'; 'Jeff LaPointe'; 'Neal O'Mara'
> **Subject:** RE: Burn Period
>
> I think that Ryan, Neal and Jeff are pretty much in the same boat as me, everyone will eventually reach a point where they can't pay the rent/mortgage any more!
>
> *Mark Donnelly <mdonnelly@uchc1.com>* wrote:
>
> > Dear Paul:
> >
> > The example that you have provided encompasses two basic issues. 1) The burn period for you is the monetary level of risk that you will allow yourself. In essence your wager on UCHC 2) That duration of the burn period is subject to your total control and belief in what we are doing. What I mean is if you really believe in something and you are willing to risk something for it then you decide the level of risk your are willing to take. This might mean that you eat soup so that you can burn longer as the results of your efforts take longer to realize. Again it is a personal choice.
> >
> > I can say this. If no one is being paid and you run out of money before someone else you need to convince Neal, Ryan, Jeff, Rob and me to pay you even if we are not being paid. Do you think that is fair?
> >
> > Mark
> >
> > **From:** Paul OMara [mailto:pomara@uchc1.com]

**Sent:** Thursday, May 26, 2005 10:20 AM
**To:** Mark Donnelly; Ryan Donnelly; Jeff LaPointe; Neal O'Mara
**Subject:** Burn Period

Mark,

I wanted to reiterate that my major concern about the whole vesting thing is that I will hit the end of my own personal burn period (probably before everybody else, too, given my high cost of living) and have to go get another job. I think we are all in the same boat it's just that our burn periods differ. Eventually we all need money and if UCHC isn't pulling some in we'll have to get cash elsewhere. While it is possible that we will be pulling in enough money to pay us all within my burn period, it isn't all that likely. Would it be possible for us (meaning Ryan, Jeff, me and Neal) to start receiving salary if the company is still in business 6 months after launch, regardless of revenues?

Again, this isn't a trust thing, it's an affordability thing. It might take us 2 years to start making real money so that we can afford to pay ourselves. I certainly can't support myself for that long without pay, what about everybody else?

Thanks,
Paul