UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PAUL O'MARA and NEAL O'MARA, | ) ) ) | |
| Plaintiffs/ Defendants-in-Counterclaim, | ) ) ) ) | C.A. No: 05-11824-REK |
| v. | ) ) | |
| MARK J. DONNELLY, SEBAGO PARTNERS, INC, and UCOMPAREHEALTHCARE, LLC | ) ) ) ) | |
| Defendants/ Plaintiffs-in-Counterclaim. | ) ) ) | |

## MEMORANDUM OF LAW OF MARK J. DONNELLY, SEBAGO PARTNERS, INC., AND UCOMPAREHEALTHCARE, LLC IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

### i. Introduction

Plaintiffs-in-Counterclaim Mark J. Donnelly ("Mr. Donnelly"), Sebago Partners, Inc.

("Sebago"), and UCompareHealthCare, LLC ("UCHC") have brought claims in this action

against the Defendants-in-Counterclaim Paul and Neal O'Mara (the "O'Maras") for, among

other things, copyright infringement and misappropriation of its trade secrets and confidential

information. All of these claims are premised *inter alia* upon two binding agreements that each

of the O'Maras executed and agreed to abide by prior to their beginning work as independent

contractors for Sebago and UCHC, an assignee of certain of Sebago's assets (collectively,

"Sebago/UCHC"). Specifically, UCHC is a highly confidential start-up business venture that is

seeking to offer online comparative healthcare analyses to consumers, a variety of businesses,

and healthcare professionals. Mr. Donnelly required all persons working with him on this

venture, including the O'Maras, to execute and agree to abide by these agreements before commencing any work as independent contractors.

In clear and unambiguous terms, these agreements required the O'Maras to transfer and assign to Sebago/UCHC any and all rights they might acquire in any copyrightable or patentable works while working as independent contractors for Sebago/UCHC. As well, these agreements obligated the O'Maras to keep confidential and, ultimately, to return to Sebago/UCHC all materials concerning the trade secrets and confidential information of Sebago/UCHC that was given to the O'Maras in connection with their work for Sebago/UCHC.

Now, in blatant violation of these agreements – agreements unabashedly affixed to the O'Maras' own Complaint, see Complaint at Exhibits 2-5, the O'Maras have, among other things, (1) wrongfully claimed ownership in and copyrighted several works covered under the agreements (the "Works"); and (2) misappropriated and refused to return materials concerning virtually all of Sebago/UCHC's trade secrets and other confidential information. Sebago/UCHC now moves this Court for a preliminary injunction that would, in effect, compel the O'Maras immediately to comply with the terms of the binding agreements they signed by transferring their copyrights in the Works to Sebago/UCHC, by returning all confidential information to Sebago/UCHC, and by enjoining them from further violations of the agreements.

## ii. Relevant Facts

Mr. Donnelly is the President of Sebago and the manager, sole member, and sole owner of UCHC (an assignee of certain assets of Sebago). See Affidavit of Mark J. Donnelly (the "Donnelly Affidavit") at ¶ 2; Counterclaim at ¶ 3. He has over thirty years of business experience involving various aspects of the healthcare industry and UCHC is his current business venture. See Donnelly Affidavit at ¶ 3. With other personal, relevant medical data and

2

information, it will offer a web-based interactive site that will provide subscribers with additional information helpful in arriving at personal healthcare decisions and will also provide a comparative tool for a variety of healthcare institutions. See id. Over the last year, using solely his own money, Mr. Donnelly has assembled a small team of individuals to develop the UCHC venture. See id. at ¶ 4. During that time, Mr. Donnelly and the other members of the UCHC team have spent a significant amount of time developing the UCHC business concept, strategies, pricing structures, unique services, and other confidential business information, all of which are proprietary trade secrets of UCHC. See id.

One example of the unique copyrightable concepts that Mr. Donnelly personally developed was a Levy-Jennings Chart revised to allow the UCHC site to display on a single web page relevant parameters and comparative information on hospitals and healthcare providers UCHC covers in various, single views of the site. See id. at ¶ 5. The program is unique: nowhere else on the World Wide Web or elsewhere is comparative healthcare data collected and displayed in this manner. See id.

Paul O'Mara and Mr. Donnelly began working together in June 2004, what proved to be on a failed effort to develop software potentially valuable to the Laundromat industry. See id. at ¶ 6. Despite this failure, Mr. Donnelly thought he saw potential in Mr. O'Mara, a recent college graduate, and was willing to give him another opportunity. See id. at ¶ 7. Mr. O'Mara then became part of Mr. Donnelly and UCHC team developing the online healthcare service. See id.

As a condition to commencing work on UCHC, Mr. Donnelly, gave Mr. O'Mara a Confidentiality/Proprietary Information Agreement (the "General Confidentiality Agreement"), which Mr. O'Mara signed on September 16, 2004. See id. at ¶ 8; Exhibit 1 to the Complaint (the General Confidentiality Agreement executed by Paul O'Mara). Because his work with the

3

UCHC team involved valuable and highly confidential intellectual property, Mr. Donnelly insisted that every person assisting him on this project also sign a confidentiality agreement similar to the General Confidentiality Agreement. See Donnelly Affidavit at ¶ 9. In Mr. O'Mara's case, Mr. Donnelly expressly told him to review the General Confidentiality Agreement with an attorney of his own choosing before signing it. See id.

Paragraph 2 of the General Confidentiality Agreement states:

Paul O'Mara shall not disclose to any third party any Proprietary Information of [Sebago's] for a period of three years from the latter of the date of this Agreement or the date on which such Proprietary Information is disclosed for any purpose other than evaluation of its interest in entering into a business arrangement with [Sebago].

Id. at ¶ 10. Proprietary Information is defined in the General Confidentiality Agreement as follows:

any secret, or private, or confidential information of [Sebago] concerning the intellectual property, design, manufacture, marketing methods, customers lists, use, purchase or sale of its products, services or materials such as may be contained in but not limited to [Sebago's] business methods, processes, techniques, research, development, marketing plans, mailing lists, customer lists, and proposals, all to the extent that (i) such information is not readily disclosed by inspection of [Sebago's] products and (ii) such party has expressly or impliedly protected such information from unrestricted use by others. Proprietary information shall include information regarding business plans.

Id. at ¶ 11.

On November 16, 2004, Paul O'Mara, like all other members of the UCHC team, executed an Employee/Contractor Confidentiality Agreement (the "Detailed Confidentiality Agreement") in which he agreed to assign all inventions he developed as part of the UCHC team to UCHC. See id. at ¶ 12. The Detailed Confidentiality Agreement afforded Mr. O'Mara the opportunity to exclude any preexisting inventions from the agreement by identifying them on an attached sheet. See id.; Exhibit 2 to the Complaint. Mr. O'Mara claimed no exclusions whatsoever in connection with his signing the Detailed Confidentiality Agreement. See

Donnelly Affidavit at ¶ 12; Exhibit 2 to the Complaint. As with the General Confidentiality Agreement, Mr. Donnelly has required the people with whom he is working on developing new inventions and intellectual property for UHCH to execute documents similar to the Detailed Confidentiality Agreement. See Donnelly Affidavit at ¶ 13. Once again, Mr. Donnelly suggested that Mr. O'Mara review the agreement with a lawyer before executing it. See id.

In November, 2004, Mr. O'Mara's brother, Neal O'Mara, began working with UCHC based on Paul O'Mara recommendations. See id. at ¶ 14. He executed the same form of General Confidentiality Agreement and Detailed Confidentiality Agreement that his brother Paul executed. See id. at ¶ 15; Exhibit 3 to the Complaint (a copy of the Detailed Confidentiality Agreement, as executed by Neal O'Mara); Exhibit 4 to the Complaint (a copy of the General Confidentiality Agreement, as executed by Neal O'Mara). Neal O'Mara, likewise, did not exclude any inventions or works from his agreement to assign all inventions and works to Sebago under the Detailed Confidentiality Agreement. See id. at ¶ 16.

Together, Paul and Neal O'Mara worked with the other members of the team on the start-up of UCHC with the same arrangements and understandings of several other members of the team – namely, that they were not to be paid, but rather were to perform services in exchange for equity in the event that the venture turned out to be successful, they discharged their obligations, and their efforts contributed materially to the overall success of the venture. See id. at ¶ 17. All members of the UCHC group agreed that, inasmuch as Mr. Donnelly was underwriting the entire cost of the venture, he would be the final arbiter of whether, and to what extent, each group member's efforts merited equity. See id.

The O'Maras' programming work ultimately turned out to be poor, and needed to be completely revised and corrected by outside professionals that UCHC retained at its own

expense. Irrespective of that, as late as May 25, 2005, Mr. Donnelly was still willing to let the O'Maras develop their skills and prove themselves going forward with UCHC, as confirmed by the initial draft of the UCompareHealthCare, LLC Operating Agreement (the "Draft Operating Agreement") that Mr. Donnelly forwarded to each of them around that time. See id. at ¶ 18. After receiving the Draft Operating Agreement, however, the O'Maras, through their counsel, responded by demanding unreasonable and unwarranted changes to the Draft Operating Agreement. See id. at ¶ 19. For the first time, the O'Maras also claimed ownership of various intellectual property which, given the Detailed Confidentiality Agreement and General Confidentiality Agreement, the O'Maras knew they had no right to claim. See id.

Seeing no common ground, and given the untenable posture the O'Maras had taken, Mr. Donnelly terminated UCHC's relationship with the O'Maras. See id. at ¶ 20. In plain violation of the General and Detailed Confidentiality Agreements, the O'Maras filed registration applications for the very inventions (as that term is defined in the Detailed Confidentiality Agreement) in which they know they have no rights. See id. at ¶ 21. In so doing, the O'Maras willfully misrepresented their ownership of these works, and have misappropriated them from UCHC. See id.

In addition to stealing and copyrighting UCHC's intellectual property, the O'Maras have also failed and refused to return to UCHC highly confidential and proprietary information containing UCHC's trade secrets. See id. at ¶ 22. These trade secrets include (a) binders containing detailed information on the UCHC business concept, intellectual property strategy, sales plans, corporate module strategy, market and competition analyses, data on healthcare institutions, and pricing structures; (b) UCHC-specific programming manuals and information relating to the UCHC Levy-Jennings chart and the specific, unique services to be offered to

customers; and (c) other corporate records and electronic files that may have been removed from UCHC by the O'Maras without UCHC's permission. See id. at ¶ 23. This highly confidential information that the O'Maras have refused to return to UCHC is known only to the small group of people that are working on the UCHC team and is unknown to anyone outside this venture. See id. at ¶ 24. As outlined above, UCHC has taken every reasonable and appropriate measure to safeguard the secrecy of these materials including strictly limiting the disclosure of this information to individuals who have executed the General Confidentiality Agreement and the Detailed Confidentiality Agreement. See id. at ¶ 25.

The value of the information that the O'Maras have misappropriated, whether it is among the materials they have improperly copyrighted or is among the confidential binders they retain in their possession, is incalculably great to UCHC. See id. at ¶ 26. Put simply, what they have stolen *is* UCHC in that what they have stolen is the entire "recipe" for the development and growth of the UCHC business. See id. If this information fell into the hands of UCHC's competitors or potential competitors, UCHC's competitive advantage would be irreparably damaged. See id. The confidential materials the O'Maras have stolen represents the work of no less than six (6) different members of the UCHC team who have worked tirelessly for the past year on this venture. See id. at ¶ 29.

As the O'Maras were well aware, the intellectual property that UCHC was developing for comparative healthcare analyses was extremely difficult, complicated, and time-consuming to develop. See id. at ¶ 30. Nothing like it has been developed by any of UCHC's competitors or any other individual or group of individuals outside of UCHC. See id. The O'Maras were also aware of the tremendous business potential of the comparative healthcare intellectual property that UCHC developed, remarking to Mr. Donnelly several times how "unbelievable" the

applications UCHC developed would be from a business success standpoint. See id. at ¶ 31. Mr. Donnelly showed them the market research reports that he prepared which confirmed the enormous public need and demand for the kind of services that UCHC will be offering. See id. Therefore, if the O'Maras are not ordered to comply with the General Confidentiality Agreement and the Detailed Confidentiality Agreement by immediately transferring to UCHC the copyrights they have wrongfully registered and returning to UCHC the confidential trade secrets they have misappropriated, UCHC will be irreparably harmed by the loss of these trade secrets and their disclosure to UCHC's competitors and the general pubic, thereby undermining UCHC's competitive advantage and business model. See id. at ¶ 32.

### iii. **Legal Standard**

As is well settled, in order to prevail on a motion for a preliminary injunction, the moving party must show: "(1) a likelihood of success on the merits, (2) irreparable injury, (3) that such injury outweighs any harm to the defendant and (4) that the injunction would not harm the public interest." TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F.Supp.2d 23, 27 (D.Mass. 2004) (citing Lanier Professional Services, Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir.1999); Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 220 (1st Cir.1989). While the foregoing standard applies to preliminary injunction motions based upon most claims, the First Circuit has adopted a different standard when the underlying claim is for copyright infringement. Specifically, in Machinery Co. v. Classic Lawn Ornaments, 843 F.2d 600, 611 (1st Cir.1988), the First Circuit recognized the unique aspects of copyright infringement claims and made the following conclusions as to the preliminary injunction standard applicable to such claims:

> (1) if likelihood of success on the merits is shown, irreparable injury is presumed; (2) the public interest is not a 'genuine' issue because 'it is virtually axiomatic that the public interest can only be served by upholding copyright protections'; and (3) likelihood of

success on the merits should 'be placed in the scales when [the court] weighs the balance of the harms.'

Flomerics Ltd. v. Fluid Dynamics Intern., Inc., 880 F.Supp. 60, 61-62 (D. Mass. 1995) (citing

Machinery Co., 843 F.2d at 611-12). Accordingly, "the most important factor as to whether the

Court should issue a preliminary injunction in this case is [the moving party's] likelihood of

success on the merits of its copyright claim." Id.

Here, Sebago/UCHC is making claims based upon the O'Maras' open breach of the

General and Detailed Confidential Agreements, which breaches have resulted in the O'Maras

misappropriation and conversion of trade secrets and confidential information. The O'Maras

breaches of these Agreements, however, also involved their infringement of copyrights rightfully

belonging to Sebago/UCHC by, among other things, wrongfully claiming inventions belonging

to Sebago/UCHC were their own and copyrighting them. Accordingly, in order to prevail on

their motion, Sebago/UCHC must meet the modified standard for such motions when a copyright

infringement claim is at issue and they must meet the usual standard for all their other claims.

### iv. Argument

**I.     THIS COURT SHOULD ORDER THE O'MARAS TO TRANSFER THE COPYRIGHTS TO UCHC AND ENJOIN THE O'MARAS FROM FURTHER INFRINGING THOSE COPYRIGHTS**

Given that irreparable harm is presumed where the party moving for a preliminary

injunction establishes it is likely to succeed on the merits of its copyright infringement claim, and

given that the question of harm to the public interest is not in issue, the only matters the moving

party must show to obtain a preliminary injunction on an infringement claim are (1) that it is

likely to succeed on the merits; and (2) that the balance of the harms favors granting the

injunction. See Flomerics Ltd., 880 F.Supp. at 61-62. Sebago/UCHC readily can satisfy both of

these elements.

**A.    The UCHC Parties Are Likely To Succeed On The Merits of Their Copyright Infringement Claim**

As is well-established, "a party alleging copyright infringement must prove (1) ownership of a valid copyright, and (2) unauthorized copying of constituent elements of the work that are original." Accusoft Corp., 923 F.Supp. at 295 (citing Lotus Development Corp. v. Borland Int'l Inc., 49 F.3d 807, 813 (1st Cir. 1995), aff'd, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996)). In this case, the undisputed evidence establishes both that, pursuant to the Detailed Confidentiality Agreements, Sebago/UCHC owns the copyrights at issue and that the O'Maras are unquestionably attempting to make unauthorized use of the copyrighted material.

**1.    Pursuant to the Detailed Confidentiality Agreements, the UCHC Parties Own the Copyrights at Issue**

As the O'Maras readily concede in their Complaint, several valid copyrights are involved in this case and the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, applies. See Complaint at ¶¶ 48-49, 53. As that act expressly states, "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance[.]" Id. at § 201(d)(1). All that is needed to effect such a transfer is "an instrument of conveyance . . . in writing and signed by the owners of the rights conveyed[.]" Id. at § 204(a); Accusoft Corp., 923 F.Supp. at 295-96.

As is undisputed here, the O'Maras each executed a Detailed Confidentiality Agreement. See Complaint at ¶¶ 22, 24. That agreement concerns "inventions" in which the O'Maras play a role in developing during their work for Sebago and as part of the UCHC team. See id. at Exhibits 2, 3. The agreement defines "Inventions" as "any discoveries, improvements, programs or program architecture and ideas, whether patentable or not." Id. Thereafter, under the express

10

and unambiguous terms of the Detailed Confidentiality Agreement each of the O'Maras agreed to the following:

3.  [T]o disclose promptly to [Sebago] all INVENTIONS that are related to the actual or anticipated activities of [Sebago] conceived or made by me whether or not during the course of my rendering services on behalf of [Sebago] or with the use of [Sebago's] facilities, materials, or personnel, either solely or jointly with another or others at any time during my engagement as an independent contractor or otherwise by [Sebago]. Related to the actual or anticipated business or activities of [Sebago], or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of [Sebago], I assign and agree to assign my entire right, title, and interest therein to [Sebago].

4.  I shall, whenever requested to do so by [Sebago], execute any applications, assignments or other instruments which [Sebago] shall consider necessary, to apply for and obtain letters of patent, trademarks, service marks, or the like in the United States, or any foreign country, or to protect otherwise [Sebago's] interests. These obligations shall continue beyond the termination of my engagement with [Sebago] with respect to INVENTIONS conceived or made by me during my period of relationship, and shall be binding upon my executors, administrators, or other legal representatives.

5.  I will not assert any rights under any inventions as having been made or acquired by me prior to my being employed by [Sebago] unless such INVENTIONS are identified on a sheet attached hereto and signed by me as of the date of this assignment.

Thus, in these three provisions, the O'Maras each unequivocally agreed to disclose any INVENTIONS in which they played a role in developing while working with Sebago/UCHC and to "assign and agree to assign my entire right, title, and interest therein to [Sebago/UCHC]," id. at ¶ 3, to cooperate and assist with any and all patent, trademark, or copyright activity related to such INVENTIONS to protect Sebago/UCHC interests in those INVENTIONS, id. at ¶ 4, and to refrain from claiming a right in any INVENTIONS unless the same were disclosed on a sheet attached to the agreement. Id. at ¶ 5. Given that the O'Maras did not exclude any INVENTIONS, and given that each of the copyrighted Works (other than the one related to the

failed Laundry Management Software) is indisputably related to UCHC work that the O'Maras

undertook for Sebago/UCHC, the Detailed Confidentiality Agreement is thus an enforceable

agreement by which the O'Maras agreed to assign all their right, title, and interest to the

copyrighted Works to Sebago/UCHC. See 17 U.S.C. § 204(a). Their failure to do so is a breach

of the agreement, but that does not prevent the agreement from operating anyway to immediately

vest title in the copyrighted Works in Sebago/UCHC. See id.; Accusoft Corp., 923 F. Supp. at

295-96. Accordingly, pursuant to the Detailed Confidentiality Agreement, Sebago/UCHC is the

rightful owner of the valid copyrights of the Works.[1]

> 2. The O'Maras are Engaged in the Unauthorized Copying and Use
>    of the Copyrights

There is no dispute here that the parties are trying to make use of the identical

copyrighted Works. Apart from the registration relating to the failed Laundry Management

Software, all the others concern the UCHC software for performing the unique comparative

healthcare analyses that UCHC will offer its customers. See Donnelly Affidavit at ¶ 27. Indeed,

some of the copyright registrations reference UCHC expressly and all (other than the Laundry

Management registration) contain constituent elements of the UCHC web page design. See

Donnelly Affidavit at ¶ 28.

---

[1] As is apparent from their Complaint, the O'Maras mistakenly believe that the so-called "work made for hire" doctrine somehow has applicability to this case. See Complaint at ¶ 51. It does not. As 17 U.S.C. § 101 states, a "work made for hire" is either "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution a collective work, as part of a motion picture or other audiovisual work" or other examples set forth in the definition. 17 U.S.C. § 101. As the Detailed Confidentiality Agreement expressly states, the O'Maras were not employees, but "independent contractors" and the projects on which they worked were neither specially ordered, nor commissioned, nor a contribution to a collective work, nor any of the other examples set forth in the second prong of the definition of "work made for hire." Regardless, whether or not the O'Maras are the "authors" of the copyrighted Works (and they are not) is irrelevant given that any rights they had in those works were indisputably transferred pursuant to a valid agreement under 17 U.S.C. § 204(a). Therefore, the "work made for hire" doctrine simply does not apply for purposes of determining who is the rightful owner of these copyrights.

Since the parties are disputing who has the right to copyright and make use of the identical Works, there is no dispute that Sebago/UCHC satisfies the second element of its copyright infringement claim. See Accusoft, 923 F. Supp. at 295. Therefore, given that the Detailed Confidentiality Agreements establish that Sebago/UCHC is the rightful owner of the valid copyrights of the Works, and given that the O'Maras are seeking to use the Works belonging to Sebago/UCHC, Sebago/UCHC has met its burden of establishing it is likely to succeed on the merits of its copyright infringement claim.

**B.     The Balance of The Harms Favors Granting The Injunction To The UCHC Parties**

With respect to balancing the harms in the copyright infringement context, "where the only hardship that a nonmoving party will suffer is 'lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" Accusoft Corp., 923 F.Supp. at 297 (quoting Concrete Machinery Co., 843 F.2d at 612 (citation omitted)). Even in the extreme case where the "nonmoving party's business is exclusively based upon the infringing activity and would be virtually destroyed by a preliminary injunction[,]" the balance of the harms still weighs in favor the party likely to succeed on the merits and, therefore, in favor of enjoining the infringing party. Id.

Here, the O'Maras simply cannot show any cognizable harm that will come to them if this Court orders them to comply with the terms of binding agreements. On the other hand, if the O'Maras are permitted to breach these agreements, Sebago/UCHC's copyrights will continue to be infringed by the O'Maras' further attempts to wrongfully assert ownership over and make use of these copyrights. In such a circumstance, irreparable harm is presumed. See Machinery Co., 843 F.2d at 611. Accordingly, Sebago/UCHC has not only established it is likely to succeed on the merits, but it has shown that the balance of the harms weighs in its favor. Therefore, this

Court should grant Sebago/UCHC's request for an order directing the O'Maras formally to transfer ownership of the copyrights of the Works to Sebago/UCHC and enjoin them from further infringing Sebago/UCHC's copyrights in the Works.

## II. THIS COURT SHOULD ORDER THE O'MARAS IMMEDIATELY TO RETURN ALL MATERIALS CONTAINING SEBAGO/UCHC'S TRADE SECRETS AND CONFIDENTIAL INFORMATION AND ENJOIN THE O'MARAS FROM DISCLOSING ANY OF SEBAGO/UCHC'S TRADE SECRETS AND CONFIDENTIAL INFORMATION TO ANY THIRD PARTY

In addition to seeking an injunction with respect to infringement of Sebago/UCHC's copyrights in the Works, Sebago/UCHC is also asking this Court to enforce the General and Detailed Confidentiality Agreements by ordering the O'Maras to return all materials containing Sebago/UCHC's trade secrets and confidential information. Agreements requiring a party not to disclose an entity's confidential information or trade secrets to a third party are routinely enforced. See, e.g., Shipley Co., LLC v. Kozlowski, 926 F. Supp. 28, 29 (D. Mass. 1996). To prevail on a misappropriation claim, a plaintiff must show: "(1) the existence of a trade secret [or confidential information], (2) reasonable steps to preserve secrecy, and (3) 'use of improper means in breach of a confidential relationship' to acquire the secret." TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp.2d 23, 27 (D. Mass. 2004) (quoting Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1165 (1st Cir.1994). "A trade secret may consist of 'any formula, pattern, device or compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it.'" TouchPoint Solutions, 345 F.Supp.2d at 27 (D.Mass. 2004) (quoting Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir.1985)). Importantly, then, "[a] trade secret need not have the novelty that is requisite for a patent, it must only confer a competitive advantage on its possessor." Id. at 29 (and authority cited).

**A.    Sebago/UCHC Is Likely To Succeed On The Merits Of All Their Contract-Based Claims For Misappropriation of Trade Secrets and Confidential Information**

Whether their claim is styled as a contract claim or a misappropriation claim, Sebago/UCHC readily can satisfy their burden of establishing likelihood of success on the merits. As set forth in detail above, the O'Maras each executed a General and a Detailed Confidentiality Agreement. Execution of these agreements was a prerequisite to Sebago/UCHC revealing trade secrets and confidential information to the O'Maras in connection with their work as independent contractors. See, e.g., Donnelly Affidavit at ¶ 13. There is no question that such agreements concerning the duty to safeguard and return such commercially sensitive information are enforceable and, routinely, are enforced. See, e.g., Shipley Co., LLC v. Kozlowski, 926 F. Supp. 28, 29 (D. Mass. 1996). Here, then, where it is undisputed that the O'Maras have executed binding agreements requiring them to keep confidential and, ultimately, return all trade secrets and confidential information they received in the course of the work as independent contractors, Sebago/UCHC has met its burden of establishing success on its breach of contract claim given that the O'Maras are now refusing to honor their agreements. See id.

The O'Maras cannot legitimately challenge whether or not the information they received from Sebago/UCHC was confidential or a trade secret. Indeed, as Mr. Donnelly states in his affidavit, the confidential information the O'Maras received included the following:

(a) binders containing detailed information on the UCHC business concept, intellectual property strategy, sales plans, corporate module strategy, market and competition analyses, data on healthcare institutions, and pricing structures; (b) UCHC-specific programming manuals and information relating to the UCHC Levy-Jennings chart and the specific, unique services to be offered to customers; and (c) other corporate records

and electronic files that may have been removed from UCHC by the O'Maras without UCHC's permission.

Donnelly Affidavit at ¶ 23.

This information was and "is known only to the small group of people that are working on the UCHC team and is unknown to anyone outside this venture." Id. at ¶ 24. Indeed, UCHC took all reasonable steps to ensure the secrecy of these materials by having all who worked with them execute the General Confidentiality Agreement and the Detailed Confidentiality Agreement. See id. at ¶ 25. Most importantly, the value of these materials to UCHC is incalculable – they literally *are* UCHC in that what the O'Maras have misappropriated is the entire recipe, so to speak, for the development and growth of the UCHC business. See id. at ¶ 26. If this information fell into the hands of UCHC's competitors, UCHC's competitive advantage would be destroyed. See id. Thus, over and above the plain violations of the General and Detailed Confidentiality Agreements that Sebago/UCHC has established, Sebago/UCHC is also capable of satisfying all the criteria that courts usually examine to determine whether it is a trade secret that has been misappropriated. See TouchPoint, 345 F.Supp.2d at 27-28.[2] Accordingly, Sebago/UCHC can meet its burden of establishing likelihood of success on the merits of its breach of contract and misappropriation claims.

---

[2] In TouchPoint, 345 F.Supp.2d at 27-28, the court reiterated the following standard:

> In determining what qualifies as a trade secret, the court considers:
> 1) the extent to which the information is known outside of the business; 2) the extent to which it is known by employees and others involved in the business; 3) the extent of measures taken by the employer to guard the secrecy of the information; 4) the value of the information to the employer and to his competitors; 5) the amount of effort or money expended by the employer in developing the information; and 6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id. (citing American Science and Engineering, Inc. v. Kelly, 69 F.Supp.2d 227, 238 (D.Mass. 1999) (quoting Restatement (Second) of Torts § 727)).

**B.    The UCHC Parties Will Suffer Irreparable Harm If The Requested
Injunctions Concerning The Confidential and Trade Secret Information
Misappropriated By The O'Maras**

It is well-settled that "[t]he loss of a trade secret is generally found to constitute

irreparable harm." TouchPoint, 345 F.Supp.2d at 32 ("'once the trade secret is lost, it is gone

forever.'") (and authority cited). Indeed, as this Court has observed, "[i]f confidential

information is allowed to be revealed, the damage will have already occurred . . . . [and] [t]here

is no way to assess the amount of loss that the plaintiff will sustain due to the dissemination of

. . . highly confidential material." Shipley Co., 926 F. Supp. at 29. Therefore, the party seeking

an injunction to protect against such disclosure "will suffer irreparable injury if the injunction is

not granted because the [party] does not have an adequate remedy at law." Id. Here, then, since

Sebago/UCHC has established that the requested injunction is necessary to compel the O'Maras

to comply with their agreement to return confidential materials to Sebago/UCHC and to ensure

they do not disseminate this information to others, Sebago/UCHC has also met its burden of

establishing that irreparable harm will result of the injunction is not granted. See id.

**C.    The Balance Of The Harms Favors The UCHC Parties**

Sebago/UCHC knows of no harm that would result to the O'Maras from entering the

requested injunction. The injunction would only require the O'Maras to comply with their

preexisting contractual obligations. Indeed, prior to commencing this litigation, the O'Maras,

through their counsel, simply demanded money from Sebago/UCHC – confirmation that no

irreparable harm would come to them if this Court orders them to comply with their agreements.

See Donnelly Affidavit of ¶ 28; Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir.

2003). Therefore, the balance of the harms weighs in favor of granting the requested injunction.

**D.    Granting The Requested Preliminary Injunction Is In The Public Interest**

As this Court recognized in a similar context, "[i]t is in society's best interest to

recognize and enforce agreements which [are] voluntarily entered into and accepted." Shipley,

926 F. Supp. at 30. "Allowing an individual to disregard such a promise would result in

behavior which should not be condoned or encouraged." Id.

Recognition and enforcement of Sebago/UCHC's binding agreements with the O'Maras

is all that Sebago/UCHC is seeking through its requested injunctions. Accordingly, granting the

requested injunction is in the public interest. See id.

### vi. Conclusion

For the foregoing reasons, Sebago/UCHC and Mr. Donnelly respectfully request that this

Court GRANT their Motion for a Preliminary Injunction in its entirety and issue an injunction

that:

(a)    Orders the O'Maras to immediately transfer and assign all copyrights in the
Works and to cooperate and assist in copyrighting any other materials covered
under the Detailed Confidentiality Agreement;

(b)    Orders the O'Maras to immediately return to Sebago/UCHC all materials
containing the trade secrets and other confidential information of Sebago/UCHC
and to refrain from disclosing the contents of such confidential materials to any
other persons in compliances with the General and Detailed Confidentiality
Agreements.

Respectfully submitted,

MARK J. DONNELLY, SEBAGO PARTNERS,
INC, and UCOMPAREHEALTHCARE, LLC,

By their attorneys,


_____/s/ TYLER E. CHAPMAN_____
Kevin T. Peters, BBO#550522
Tyler E. Chapman, BBO#637852
TODD & WELD LLP
28 State Street
Boston, MA 02109
(617) 720-2626

December 14, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PAUL O'MARA and NEAL O'MARA,          )
                                       )
        Plaintiffs and                 )
        Defendants-in-Counterclaim,    )
                                       )      C.A. No: 05-11824-REK
        v.                             )
                                       )
MARK J. DONNELLY,                      )
SEBAGO PARTNERS, INC, and             )
UCOMPAREHEALTHCARE, LLC               )
                                       )
        Defendants and                 )
        Plaintiffs-in-Counterclaim.    )

## AFFIDAVIT OF MARK J. DONNELLY

I, Mark J. Donnelly, under oath depose and state as follows:

1.      I am a Defendant and Plaintiff-in-Counterclaim in this action and I make
this affidavit in support of the *Motion for Preliminary Injunction of Mark J. Donnelly,
Sebago Partners, Inc. and UCompareHealthCare, LLC.*

2.      I reside at 406 Windsor Drive, Framingham, Massachusetts. I am the
President of Sebago Partners, Inc. ("Sebago") and manager, sole member, and sole owner
of UCompareHealthCare, LLC ("UCHC") (an assignee of certain of Sebago's assets).

3.      I have over thirty years of business experience involving various aspects
of the healthcare industry. UCHC is my current business venture and the concept behind
the business is that when used in connection with other personal relevant medical data
and information, it will offer a web-based interactive site that will provide subscribers
with additional information helpful in arriving at personal healthcare decisions.

4.      Over the last year, using solely my own money, I have assembled a small team of individuals to develop the UCHC venture. During that time, we have spent a significant amount of time developing the UCHC business concept, strategies, pricing structures, unique services and other confidential business information, all of which I regard as proprietary trade secrets of UCHC.

5.      For example, one of the unique copyrightable concepts that I personally developed was a modified Levy-Jennings Chart that I revised, uniquely in several different ways, to allow us to display relevant parameters and comparative information on hospitals and healthcare providers we cover in various, single views of the site. The program is unique: nowhere else on the World Wide Web or elsewhere is comparative healthcare data collected and displayed in this manner.

6.      My working interactions with Plaintiff/Defendant-in-Counterclaim Paul O'Mara began in or around June 2004, when he embarked on a failed effort to develop software potentially valuable to the Laundromat industry in which I was involved.

7.      Despite Mr. O'Mara's failure, I saw potential in this recent college graduate and was willing to give him another chance. Mr. O'Mara became part of the team that was working with me to develop an online healthcare service to permit consumers to compare doctors and other medical services.

8.      As a condition to commencing work on this new venture – UCHC – I presented Mr. O'Mara with a Confidentiality/Proprietary Information Agreement (the "General Confidentiality Agreement"), which he executed on September 16, 2004. A copy of the Confidentiality Agreement is attached as Exhibit 1 to the Complaint.

2

9.    Because the UCHC work involves valuable and highly confidential intellectual property, I always require every person assisting me on this project to sign a confidentiality agreement similar to the General Confidentiality Agreement. In Mr. O'Mara's case, I expressly told him to review the General Confidentiality Agreement with an attorney of his own choosing before signing it.

10.    Paragraph 2 of the General Confidentiality Agreement states:

Paul O'Mara shall not disclose to any third party any Proprietary Information of [Sebago's] for a period of three years from the latter of the date of this Agreement or the date on which such Proprietary Information is disclosed for any purpose other than evaluation of its interest in entering into a business arrangement with [Sebago].

11.    Proprietary Information is defined in the General Confidentiality Agreement as follows:

any secret, or private, or confidential information of [Sebago] concerning the intellectual property, design, manufacture, marketing methods, customers lists, use, purchase or sale of its products, services or materials such as may be contained in but not limited to [Sebago's] business methods, processes, techniques, research, development, marketing plans, mailing lists, customer lists, and proposals, all to the extent that (i) such information is not readily disclosed by inspection of [Sebago's] products and (ii) such party has expressly or impliedly protected such information from unrestricted use by others. Proprietary information shall include information regarding business plans.

12.    On November 16, 2004, Paul O'Mara, like all other members of the UCHC team, executed an Employee/Contractor Confidentiality Agreement (the "Detailed Confidentiality Agreement") in which he agreed to assign all inventions he developed as part of the UCHC team to UCHC. The Detailed Confidentiality Agreement affords Mr. O'Mara the opportunity to exclude any preexisting inventions from the agreement by identifying them on an attached sheet. A copy of the Detailed Confidentiality Agreement executed by Paul O'Mara is attached as Exhibit 2 to the Complaint. He claimed no

3

exclusions whatsoever in connection with his signing the Detailed Confidentiality Agreement.

13.    As with the General Confidentiality Agreement, with respect to the UCHC business I always have people with whom I am working on developing new inventions and intellectual property execute documents similar to the Detailed Confidentiality Agreement. Mr. O'Mara was advised by myself and legal counsel for UCHC to review the agreement with a lawyer of his own choosing before executing it.

14.    Subsequently, based on the recommendations of Plaintiff/Defendant-in-Counterclaim Paul O'Mara, in or around November 17, 2004, Sebago (as UCHC had not yet been formed) began working with Mr. O'Mara's brother, Plaintiff/Defendant-in-Counterclaim Neal O'Mara, as well.

15.    While the circumstances of Neal O'Mara's involvement with Sebago, and then UCHC, were different than Paul O'Mara's, he executed the same form of General Confidentiality Agreement and Detailed Confidentiality Agreement as did his brother.

16.    A copy of the Detailed Confidentiality Agreement, as executed by Neal O'Mara, is attached as Exhibit 3 to the Complaint and a copy of the General Confidentiality Agreement, as executed by Neal O'Mara, is attached as Exhibit 4 to the Complaint. Neal O'Mara, likewise, did not exclude any inventions or works from his agreement to assign all inventions and works to Sebago under the Detailed Confidentiality Agreement.

17.    Paul and Neal O'Mara worked with the other members of the team on the start-up of UCHC with the same arrangements and understandings of several other members of the team – namely, that they were not to be paid, but rather were to perform

4

services in exchange for equity in the event that the venture turned out to be successful, they discharged their obligations, and their efforts contributed materially to the overall success. All members of the UCHC group agreed that, inasmuch as I was underwriting the entire cost of the venture, I would be the final arbiter of whether, and to what extent, each group member's efforts merited equity.

18.    Although the work of the O'Maras ultimately turned out to be poor and needed to be completely revised and corrected by outside professionals that UCHC retained, as late as May 25, 2005, I was still willing to let them work to try to develop their skills and prove themselves going forward with UCHC as confirmed by the initial draft of the UCompareHealthCare, LLC Operating Agreement (the "Draft Operating Agreement") that I forwarded to them.

19.    After receiving the Draft Operating Agreement, however, the O'Maras, through their counsel, responded by demanding unreasonable and unwarranted changes to the Draft Operating Agreement and by, for the first time ever, claiming ownership of various intellectual property which, given the Detailed Confidentiality Agreement, the O'Maras knew they had no right to claim.

20.    In response, through counsel for UCHC and Sebago, I terminated the relationship of the O'Maras with the UCHC team.

21.    I have since learned that, in plain violation of the General and Detailed Confidentiality Agreement, the O'Maras have filed registration applications for various inventions (as that term is defined in the Detailed Confidentiality Agreement) in which they know they have no rights. See Exhibit A, hereto. It appears, then, that the O'Maras have willfully misrepresented their ownership of these works and stolen them from UCHC.

5

22.    In addition to stealing and trying to copyright for themselves intellectual property that belongs to UCHC, the O'Maras have also refused to return to UCHC highly confidential and proprietary information containing UCHC's trade secrets.

23.    These highly confidential and proprietary trade secrets include but are not limited to (a) binders containing detailed information on the UCHC business concept, intellectual property strategy, sales plans, corporate module strategy, market and competition analyses, data on healthcare institutions, and pricing structures; (b) UCHC-specific programming manuals and information relating to the UCHC Levy-Jennings chart and the specific, unique services to be offered to customers; and (c) other corporate records and electronic files that may have been removed from UCHC by the O'Maras without UCHC's permission.

24.    The highly confidential information that the O'Maras have refused to return to UCHC is known only to the small group of people that are working on the UCHC team and is unknown to anyone outside this venture.

25.    As outlined above, I, assisted by UCHC's counsel, have taken every reasonable and appropriate measure to safeguard the secrecy of these materials including strictly limiting the disclosure of this information to individuals who have executed the General Confidentiality Agreement and the Detailed Confidentiality Agreement.

26.    The value of the information that the O'Maras have misappropriated, whether it is among the materials they have improperly copyrighted or is simply among the confidential binders they retain in their possession, is incalculably valuable to UCHC. Put simply, what they have stolen *is* UCHC in that what they have stolen is the entire recipe, so to speak, for the development and growth of the UCHC business. If this

6

information fell into the hands of our competitors, UCHC's competitive advantage would be irreparably damaged.

27.    In reviewing the registration information I have located concerning the copyrights in dispute, see Exhibit A, hereto, it is apparent to me that the works the O'Maras have copyrighted are identical to ones that UCHC is currently using and intended to copyright. Apart from a copyright that appears related to the failed Laundry Management Software, all the registrations concern the UCHC software for performing the unique comparative healthcare analyses that UCHC will offer its customers. Indeed, some of the copyright registrations reference UCHC expressly and all (other than the Laundry Management registration) contain constituent elements of the UCHC web page design.

28.    By letter from their counsel, William E. O'Brien, dated June 22, 2005, the O'Maras demanded that they be paid $250,000 to turn over these copyrights (in addition to $100,000 per O'Mara brother as additional compensation), even though they had already agreed to turn over these copyrights pursuant to the Detailed Confidentiality Agreements.

29.    The confidential materials the O'Maras have stolen represent the work of no less than six (6) different members of the UCHC team, including myself, who have worked tirelessly for the past year on this venture. In addition, the materials also represent the work of outside professionals whom UCHC had to pay to redesign the faulty, mistaken-ridden work of the O'Maras after their termination.

30.    As the O'Maras were well aware, the intellectual property we were developing for comparative healthcare analyses was extremely difficult, complicated, and time-consuming to develop and, to my knowledge, nothing like it has been developed by any of our competitors or any other individual or group of individuals outside of UCHC.

31.    The O'Maras were also aware of the tremendous business potential of the healthcare comparative intellectual property that UCHC developed, remarking to me several times how "unbelievable" the applications UCHC developed would be from a business success standpoint. I showed them the market research reports that I prepared which confirmed the enormous public need and demand for the kind of services that UCHC will be offering.

32.    Therefore, if the O'Maras are not immediately ordered to comply with the General Confidentiality Agreement and the Detailed Confidentiality Agreement by immediately transferring to UCHC the copyrights they have wrongfully registered and returning to UCHC the confidential trade secrets they have misappropriated, UCHC will be irreparably harmed by the loss of these trade secrets and their disclosure to UCHC's competitors and the general pubic, thereby undermining UCHC's competitive advantage and business model.

Signed and sworn to this 8th day of December, 2005.

Mark J. Donnelly

8

Registered Works Database (Author Search)
**Search For:** O'MARA, PAUL, 1978-/O'MARA, PAUL
*4 Items*

| 1. Registration Number: | TXu-1-244-572 |
|---|---|
| Title: | UCHC estimated initial IT costs. |
| Description: | Sheets. |
| Claimant: | acPaul O'Mara , 1978- |
| Created: | 2005 |
| Registered: | 22Jun05 |
| Title on © Application: | UCompareHealthCare information systems design documents and flowcharts; UCHC information systems design documents and flowcharts. |
| Special Codes: | 1/B |

| 2. Registration Number: | TXu-1-246-867 |
|---|---|
| Title: | Laundry management : SOS. |
| Note: | Cataloged from appl. only. Computer program. |
| Claimant: | acPaul O'Mara , 1978- |
| Created: | 2005 |
| Registered: | 28Jun05 |
| Special Codes: | 1/C |

| 3. Registration Number: | TXu-1-247-724 |
|---|---|
| Title: | Comparative healthcare analysis Website backend database program. |
| Description: | Computer program. |
| Note: | Cataloged from appl. only. |
| Claimant: | acPaul O'Mara |
| Created: | 2005 |
| Registered: | 1Jul05 |
| Special Codes: | 1/C |

| 4. Registration Number: | TXu-1-251-900 |
|---|---|
| Title: | UCHC web site design and content drafts. |
| Note: | Cataloged from appl. |
| Claimant: | acPaul O'Mara , 1978- |
| Created: | 2005 |
| Registered: | 24Jun05 |
| Special Codes: | 1/B |

| 1. Registration Number: | TXu-1-223-146 |
|---|---|
| Title: | Mass med board date miner. |
| Note: | Cataloged from appl. only. |
| Claimant: | acNeal O'Mara |
| Created: | 2005 |
| Registered: | 28Jun05 |
| Miscellaneous: | Rights & permissions info. on original appl. in C.O. |
| Special Codes: | 1/B |

| 2. Registration Number: | TXu-1-223-147 |
|---|---|
| Title: | Mass med board date miner updater. |
| Note: | Cataloged from appl. only. |
| Claimant: | acNeal O'Mara |
| Created: | 2005 |
| Registered: | 28Jun05 |
| Miscellaneous: | Rights & permissions info. on original appl. in C.O. |
| Special Codes: | 1/B |

| 3. Registration Number: | TXu-1-223-148 |
|---|---|
| Title: | Web page functional specification. |
| Note: | Cataloged from appl. only. |
| Claimant: | acNeal O'Mara |
| Created: | 2005 |
| Registered: | 28Jun05 |
| Miscellaneous: | Rights & permissions info. on original appl. in C.O. |
| Special Codes: | 1/B |

| 4. Registration Number: | TXu-1-223-149 |
|---|---|
| Title: | Arizona physician data miner. |
| Note: | Cataloged from appl. only. |
| Claimant: | acNeal O'Mara |
| Created: | 2005 |
| Registered: | 28Jun05 |

| Miscellaneous: | Rights & permissions info. on original appl. in C.O. |
| Special Codes: | 1/B |

| 5. Registration Number: | TXu-1-223-150 |
| Title: | Medical data miners. |
| Note: | Cataloged from appl. only. |
| Claimant: | acNeal O'Mara |
| Created: | 2005 |
| Registered: | 28Jun05 |
| Miscellaneous: | Rights & permissions info. on original appl. in C.O. |
| Special Codes: | 1/B |

| 6. Registration Number: | TXu-1-223-296 |
| Title: | Hospital companion : chart and explanation. |
| Note: | Cataloged from appl. only. |
| Claimant: | acNeal O'Mara |
| Created: | 2005 |
| Registered: | 27Jun05 |
| Miscellaneous: | Rights & permissions info. on original appl. in C.O. |
| Special Codes: | 1/B/D |

| 7. Registration Number: | TXu-1-244-125 |
| Title: | Healthcare comparison Web application source code. |
| Note: | Cataloged from appl. only. |
| | Printout only deposited. |
| Claimant: | acNeal O'Mara |
| Created: | 2005 |
| Registered: | 27Jun05 |
| Miscellaneous: | Rights & permissions info. on original appl. in C.O. |
| Special Codes: | 1/C |