UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PAUL O'MARA and NEAL O'MARA<br>Plaintiffs,<br>v.<br><br>MARK J. DONNELLY,<br>SEBAGO PARTNERS, INC., and<br>UCOMPAREHEALTHCARE, LLC<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-11824-REK |

## AFFIDAVIT OF NEAL O'MARA

I, Neal O'Mara, do depose and say as follows:

1.   I am a plaintiff in this case and reside at 2 Townsend Street, Apartment No. 4-0220, San Francisco, CA 94107. I have personal knowledge of the matters set forth in this affidavit.

2.   I am 22 years old. I graduated from Bucknell University in January, 2005, with a Bachelor of Arts degree in Computer Science and Economics. I am a highly skilled software programmer currently working as a Software Engineer in Emeryville, California. My responsibilities include designing and developing features for a high-traffic, interactive web application.

3.   In November, 2004, my brother Paul O'Mara asked if I was interested in working on part of the development of a new healthcare website on a fee for service basis. Paul provided me with a document entitled "Sebago Partners, Inc." (hereby referred to as the "Sebago Partners, Inc. Document (Neal O'Mara) ", a true and accurate copy of which is attached to the Complaint

as Exhibit 3, and told me that Mark Donnelly's counsel had advised him that the document covered inventions and did not cover the kind of work that Paul had been providing on the project. Based on that information and my understanding that the Sebago Partners, Inc., Document (Neal O'Mara) did not refer to or apply to any copyrights in works that I may create, I signed the document on or about November 26, 2004.

4.   In or about January, 2005, I entered into an agreement with Mr. Donnelly, Sebago Partners, and UCHC pursuant to which I agreed to perform certain programming, as defined in a "Specifications For Contractual Programming For Feasibility Phase Prototype" document, for which I would be paid $5,000 upon completion of the deliverable.

5.   As of January 25, 2005, Mr. Donnelly asked me to expand my role and become an owner of the business. Mr. Donnelly agreed to issue me 2.5% of the voting stock of UCHC upon incorporation of that entity and an additional 10% of such voting stock of the corporation at a later time in consideration for work designing UCHC's web page and web presence, continuing the VB.NET programming and maintenance, and certain "security" work. It was further agreed that the equity was to be provided in addition to the $5,000 payable to me pursuant to the prior agreement.

6.   I started work on the health care project on or around November 26, 2004. I received $2,500 on or about February 25, 2005 and the remaining $2,500 on completion of the deliverable defined in the "Specifications For Contractual Programming For Feasibility Phase Prototype" document, which occurred on or about March 9th.

7.   After March 9th, at Mr. Donnelly's request, I continued to work on the health care project, including designing UCHC's web page and web presence, continuing the

VB.NET programming and maintenance, and certain "security" work. I performed most of my work at my house on my own computer.

8. During the time period from November, 2004 through May, 2005, I worked approximately 1,200 hours. Paul and I were the only programmers working on the project during the time that we were involved. We created and documented the prototype of the website and also wrote the functional specifications for the production version.

9. I designed, developed, created, and authored the works identified in the document attached hereto as Exhibit A (hereinafter referred to as the "Works"). The Works contain my original ideas, source code, and writing. All of the source code that I copyrighted is mine. Much of my copyrighted code was never even on any of UCHC's computers.

10. Paul and I completed the initial version of the CAHPS survey (an integral part of the Corporate Module which was excluded from the prototype due to time and resource constraints) and made such components available to Mr. Donnelly on the morning of May 31, 2005. Mr. Donnelly then sent an email to Paul and me (at 10:38 a.m. on May 31, 2005) attaching various documents, including a memorandum (regarding "Membership Interests") from Pierce Atwood LLP of Portland, Maine, dated May 27, 2005, an offer letter, and a document entitled Non-Disclosure, Non-Solicitation and Non-Competition Agreement. A true and accurate copy of that email and its attachments is attached to Paul's affidavit.

11. Later that day, at 6:02 p.m., Mr. Donnelly forwarded an additional document to me and to Paul, entitled UCompareHealthcare, LLC Operating Agreement. A copy of that email and its attachments is attached to Paul's affidavit.

12. Before leaving the office on May 31, Paul and I told Donnelly that we did not agree with parts of the documents that he had given to us that morning. (As of the time that we left, we had not received the Operating Agreement. I received and reviewed that document that night after leaving the office.) Mr. Donnelly told me that he agreed there were items that needed to be changed with regard to some of the documents. He also told me that Rob Cohen had signed the agreements.

13. With the limited exception of the $5,000 payment for the contract work as referenced above, I have not at any time received any payment, compensation, stock, or other consideration for any of the work I performed in connection with Mr. Donnelly, Sebago Partners, and UCHC, specifically including all of the Works.

14. I have reviewed the Affidavit of Mark J. Donnelly dated December 8, 2005 and further respond to the following numbered paragraphs as follows:

> Paragraph 5: Mr. Donnelly did not personally develop the revised Levy-Jennings Chart. While he did come up with the idea of using a Levy-Jennings Chart for comparing hospital quality metrics, this is akin to deciding to use a bar graph or a pie graph to display a comparison. Mr. Donnelly presented his idea of using the Levy-Jennings Chart without any revisions – on his proposed chart, each horizontal line represents one standard deviation (SD), just like the definition of a Levy-Jennings Chart explains. I was the one who proposed that we modify the Levy-Jennings chart. I also was the one who prepared the revised chart, which I then distributed to the team by email on April 23, 2005. Up until my proposal,

the chart was nothing more than a standard, unrevised Levy-Jennings chart that was applied to hospital metrics.

The UCHC concept is not unique. While other websites may not use the Levy-Jennings chart, many websites (such as HealthGrades.com) display relevant parameters and comparative information on hospitals and healthcare providers. Mr. Donnelly even proposed that we follow a competitor's methodology, with the only differences being that UCHC would use different software and would display the results using a Levy-Jennings chart. For example, Mr. Donnelly, in an email (dated April 24, 2005) attaching a methodology summary regarding a competing website, stated: "I had found this long ago when we first started. I think we should do exactly what is in here and use 3M DRG Software and instead of ABC we use our graph."

Paragraph 16: I never considered any of the Works that I authored and copyrighted to be "inventions" and never understood that the document applied to copyrights.

Paragraph 17: Mr. Donnelly promised to issue equity to me and to pay me for my services, and I did not agree that Mr. Donnelly could decide whether I would receive the promised equity or compensation. It was only after we had completed almost all of our work that Mr. Donnelly started to assert the so-called "arrangements" referenced in paragraph 17 of his affidavit. Once Paul and I completed the prototype and the functional specifications for the production version of the website and Mr.

Donnelly received such work, Mr. Donnelly terminated our involvement in the project.

Paragraph 18: I was not informed of any actual review or of any claimed problem with any of my work or Paul's work at any time while we were working on the project. Copies of emails in which Mr. Donnelly praised our work are attached to Paul's affidavit.

Paragraphs 19/20: Paul and I, through our counsel, responded to the documents provided to us by Mr. Donnelly by saying that the Draft Operating Agreement did not represent our previous oral agreement. UCHC and Sebago, through their counsel, then terminated the relationship. Upon information and belief, they did so in an effort to avoid issuing the equity and compensation as promised. Only then did we file for copyrights.

On May 31, Mr. Donnelly repeated his intention to pay Paul and I for the work we did if we could not agree to the specific terms for equity. I do not believe that the purported assignment of "inventions" provided for the assignment of my copyright interests.

Paragraphs 21/22: Paul and I copyrighted our work and, because defendants claimed ownership to the works authored by us, filed the present action in order to obtain a declaration from the court regarding such claims. Neither Paul nor I have misrepresented our ownership of our works or taken anything from UCHC. Paul and I are the authors of the works at issue, and accordingly the copyrights belong to us regardless of

registration. We have not refused to return the materials claimed by defendants to be confidential and proprietary but instead have agreed to return the binders to UCHC.

Paragraphs 23-26: The only records and electronic files we have were either given to us by UCHC, emailed to us by UCHC, or emailed to us by ourselves while we were still a part of UCHC for use by us for our work on the project. UCHC has not strictly limited the disclosure of the information that Mr. Donnelly claims to be confidential. To the best of my knowledge, Jeff LaPointe's friend, who presented us with a proposal for IT hardware, did not sign a non-disclosure agreement prior to learning about UCHC's "confidential" information. Only at Paul's suggestion did Mr. Donnelly decide to make the friend sign a non-disclosure agreement.

I did not take any corporate records or files without permission, have not stolen anything, have not disclosed the contents of any claimed confidential materials to any competitor of UCHC, and have in any event agreed to return the binders to UCHC. While Mr. Donnelly would occasionally mark certain documents as "Confidential", none of these documents were copyrighted by us as we didn't author those documents. In fact, none of the documents registered by me (all of which were authored by me) were marked confidential. I was not made aware of any particular security measures that needed to be adhered to.

Paragraphs 27-29:    My brother Paul and I are the authors and owners of the Works for which we applied for registrations under the Copyright Act, 17 U.S.C. §§ 101, *et seq,* and neither Paul nor I assigned our copyright interests. Neither Mr. Donnelly nor any other individuals are the authors or co-authors of those works.

If Mr. Donnelly and the defendants are saying that we stole work from outside professionals before we were terminated, this is ridiculous. I was not aware we had any outside professionals working for us aside from Ken Wilson (web site designer), his friend (artist), a statistician, and an MD. While Mr. Donnelly had hired Tim Horgan in mid to late May, to the best of my knowledge, Tim Horgan never viewed or accessed any of my source code. To the best of my knowledge, I am not in possession of any work from any of these people. Also, the professionals they refer to are the ones they supposedly "had to pay to redesign the faulty, mistake-ridden work of the O'Maras after their termination." This implies that they are programmers. To the best of my knowledge, Tim Horgan did not program anything while I was there. He did bring in a database administrator, Dagmar, who gave Paul and I a one hour or so Q&A session without ever looking at any of our work. The works registered by Paul and I did not include the work of any consultants or "external professionals" that Mr. Donnelly or UCHC may have hired to review and/or revise our work. I have not had any access to UCHC files/records or its offices since May 31, 2005 when I last worked on the project.

8

Paragraph 30: The services to be offered by UCHC are very similar to those already offered by its competitors.

Paragraph 31: This market research consisted of allowing people to navigate throughout the prototype website that Paul and I created and writing down their comments. Clearly our prototype and work was valuable to UCHC.

Paragraph 32: I have not misappropriated any claimed trade secrets, have not wrongfully registered any copyrights, and have not disclosed the contents of any claimed confidential materials to any competitor of UCHC.

Signed under the pains and penalties of perjury this ___ day of January, 2006:

Neal O'Mara

**Exhibit A**

# Neal O'Mara Works

<u>Feasibility Phase Prototype</u>
- Web Application Source Code
- Web Page (except for content and pictures)
- Data Import Program Source Code

<u>Documents</u>
- Security Analysis
- Functional Specification for Web Site V1
- Functional Specification for Web Site V2
- Revised Levy-Jennings Chart

<u>Physician Data Website Extraction Programs</u>
Source code for programs that extract data for physicians licensed in the following states:
- AZ
- AR
- CA
- CO
- CT
- DE
- DC
- FL
- GA
- HI
- IL
- IN
- KS
- LA
- MA
- MI
- MS
- MO
- MT
- NE
- NV
- NH
- NJ
- NY
- NC
- OH
- OK
- PA
- SC
- SD
- TN
- VA
- WV
- WI