UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ———————————————— )<br>PAUL O'MARA and NEAL O'MARA )<br>　　　　　　　Plaintiffs, )<br>v. )<br>　 )<br>　 )<br>MARK J. DONNELLY, )<br>SEBAGO PARTNERS, INC, and )<br>UCOMPAREHEALTHCARE, LLC )<br>　 )<br>　　　　　　　Defendants. )<br>———————————————— ) | C.A. No. 05-11824-REK |

## AFFIDAVIT OF PAUL O'MARA

I, Paul O'Mara, do depose and say as follows:

1.    I am a plaintiff in this case and reside at 31 Boudreau Ave., Marlborough, Massachusetts.  I have personal knowledge of the matters set forth in this affidavit.

2.    I am 27 years old.  I graduated from Ithaca College in 2001, with a Bachelor of Arts degree.  I am a highly skilled software designer and developer, with experience in Technical Writing and Programming.  My career in Information Technology began in October of 2001, when I was hired by a subsidiary of Allstate Corporation, Sterling Collision Centers ("Sterling") as a Bilingual Technical Writer.  In October, 2003, I was promoted to Jr. Programmer, and in May, 2005 I was promoted to Programmer.  I reported directly to the CIO of Sterling.

3.    As I explain in more detail below, I have not received any payment, stock, equity, or other compensation from anyone for any of the work (in excess of 1,800 hours)

that I performed in connection with Mark Donnelly, Sebago Partners, Inc., and

UCompareHealthCare.

### Laundry Management Project

4.    In about June 2004, I was approached by Ryan Donnelly regarding the

possibility of working with his father, Mark Donnelly, on a project to design and develop

computer software that would manage day-to-day laundromat operations.  As of that

time, I had never met Mark Donnelly.

5.    I expressed interest in working on the project and met with Mark Donnelly in

June, 2004.  Mr. Donnelly and I agreed that I would design and develop the laundry

management software (using my own equipment and software development tools) and

that I would receive 20% of the proceeds from the software.  Mr. Donnelly later told me

that he would prepare a written document to memorialize our agreement.

6.    During the time period from June through October, 2004, I worked

approximately 330 hours on the development of the laundry management software,

including the development, creation, and authoring of original source code and design

documents.  Upon information and belief based upon my discussions with him, Mr.

Donnelly worked less than 20 hours on this project.  Mr. Donnelly did not develop,

create, or author any of the source code.

7.    Mr. Donnelly and I scheduled a meeting for September 16, 2004 to review

my work on the laundry management software. He told me on September 9 that he would

prepare a draft written agreement to reflect our agreement to split the proceeds from the

laundry management software and that we would discuss that draft at the meeting.  True

and accurate copies of our emails dated September 8 and 9, 2004 regarding that meeting are attached hereto as Exhibit A.

## On-Line Health Care Project

8.    I met with Mr. Donnelly at his home on September 16, 2004 as scheduled, but he did not give me a draft agreement regarding the laundry management software. Instead, he gave me a document entitled "Confidentiality / Proprietary Information Agreement," a copy of which is attached to the Complaint as Exhibit 1.  I was surprised by the document, as I had expected that we would be reviewing and discussing a written agreement regarding the proceeds from the laundry management software.  Mr. Donnelly gave the document to me to sign before he told me about a new opportunity.  I therefore signed the document at the meeting.

9.    Mr. Donnelly and I then discussed the new business (now known as UCompareHealthCare LLC, "UCHC") - the creation of a website that allows users to compare physicians, hospitals or nursing homes based on meaningful metrics. When I questioned him further about the laundry management agreement, Mr.Donnelly told me that a verbal agreement was just as good as a written one.

10.    As of October 21, 2004, I had agreed to perform software design and development and related services in connection with UCHC, and Mr. Donnelly (individually and, I believe, on behalf of Sebago Partners) had promised and agreed to issue me stock in the new corporation for those services.  More specifically, Mr. Donnelly promised and agreed to issue to me (as well as to each other team member) 2.5% of the voting stock in the new corporation immediately upon its incorporation and an additional 10% of voting stock in the corporation upon meeting certain specific goals.

11.  Mr. Donnelly told me that upon completion of the "feasibility" phase (the development of a prototype of the software) of the project, Mr. Donnelly's and Sebago Partners' counsel would prepare and issue formal written documents incorporating the business and issuing the stock.

### Start of Work on Health Care Project

12.  I started work on the health care project in September, 2004, including preparation of software specifications, proposals, and source code.  I also continued to work on the laundry management program at that time, but Mr. Donnelly "retired" further development of the laundry management software as of early November, 2004. At that time, the program was very close to being ready for QA and beta testing. At no time did Mr. Donnelly request that I assign any of the works created by me to him.

13.  I began meeting with Mr. Donnelly and others (generally including Jeff LaPointe, Brian Richardson, and Ryan Donnelly) regarding the health care project on an approximately weekly or bi-weekly basis as of October 21, 2004.  The initial meetings took place near Mr. Donnelly's residence in Framingham, Massachusetts.  Later meetings took place at UCHC's office.

14.  During those meetings, as is reflected in the corresponding minutes, the individuals discussed and agreed that decisions regarding the new venture would be made by agreement of Mr. Donnelly, Paul O'Mara, Jeff LaPointe, Brian Richardson, and Ryan Donnelly.

15.  Mr. Donnelly's and Sebago Partners' attorney, Rob Cohen, told me at a meeting on November 4, 2004 that the new entity would be incorporated as "UCompareHealthCare, Inc." and that they had registered the name

4

"UCompareHealthCare.com" for the corporation's website.   Mr. Cohen also gave me a

document at that meeting entitled "Sebago Partners, Inc."(referred to as the "Sebago

Partners, Inc. Document") a true and accurate copy of which is attached to the Complaint

as Exhibit 2.   The Sebago Partners, Inc. Document does not mention or refer to

copyrights, and I did not understand the document to refer to or apply to any copyrights

in works that I had created or may create.  Mr. Cohen stated at the meeting that the

Sebago Partners, Inc. Document "covered ownership of inventions."  Mr. Donnelly also

indicated that the purpose of the document was to "transfer" the old "Confidentiality /

Proprietary Information Agreement" from Sebago to UCHC.  Contrary to paragraph 13

of Mr. Donnelly's affidavit in which he asserts that he advised me to review the

document with an attorney of my own choosing, he actually told me at the meeting that I

should contact his attorney (Mr. Cohen) with any questions.  In response to my questions

about the document and whether it applied to the types of works that I had produced prior

to November 4 on the health care project, Mr. Cohen responded that I had not invented

anything yet and that, except for Mark Donnelly, it was not likely that any of us would

invent anything for UCHC.  As of that time, I had already produced some of the works

that are the subject of dispute in this lawsuit.  Based on the comments from Mr. Cohen, I

understood that these works were not inventions.  Moreover, all of the works that are in

dispute in this litigation are the same type as those produced by me prior to November 4,

2004.

16.   As of that time, I was working full time for Sterling at the rate of

approximately $52,000 per year.   Mr. Donnelly and I agreed that I would be

compensated at a comparable rate upon quitting Sterling and working full time for UCHC

and that the compensation was in addition to the stock to be provided to me. We subsequently agreed that the rate to be paid to me was $1,000 per week.

17. Based upon the agreement to issue me voting stock (2.5% immediately upon formation of the company and an additional 10% upon meeting certain milestones) and the understanding that I also would be paid upon working full time for UCHC, I signed the Sebago Partners, Inc. Document on or about November 16, 2004.

### The Works

18. I continued to work on the health care project after signing the Sebago Partners, Inc. Document. I performed almost all of my work at my house on my own computer aside from meetings and the programming of the CAHPS survey (part of the Corporate Module), which was done in UCHC's office over Memorial Day Weekend, 2005, while Jeff LaPointe, Ryan Donnelly and Mark Donnelly spent the weekend at Sebago Lake in Maine.

19. During the time period from September, 2004 through May, 2005, I worked approximately 1,500 hours designing, creating and documenting the prototype of the website and then writing the functional specifications for the production version. I designed, developed, created, and authored the works identified in the document attached hereto as Exhibit B (hereinafter referred to as the "Works"). The Works contain my original ideas, source code, and writing.

20. During the time that I worked on the health care project, my brother Neal O'Mara and I generally were the only people working on the project that designed, created and documented the prototype and wrote the functional specifications for the production version of the website. While Brian Richardson stated that he had certain

6

technical experience, he failed to make any contribution to the development of the prototype.

21.   Mr. Donnelly invested very little money into the venture during my active involvement.  I did not receive any payment for the work I performed.  To my knowledge, Mr. Donnelly also did not make any payments to any of the other individuals who were to be co-owners of UCHC (Rob Cohen (limited to 2.5% max), Ryan Donnelly, Jeff LaPointe, Brian Richardson and later Neal O'Mara) with the limited exception of $5,000 paid to my brother Neal for contract work that he did before the group decided that he would receive equity.

22.   During the project, I picked out parts (which cost approximately $500) and assembled the computer that ultimately was used in the UCHC office and loaned a video card and keyboard for that computer to UCHC. Mr. Donnelly has not returned the video card (which cost me $125) or keyboard that I loaned to him and UCHC for the project and also never reimbursed me for other expenses that I incurred (including, for example, copies that I had made of various documents I wrote and distributed).  Neal and I helped realize significant savings for Mr. Donnelly and UCHC by using free trial versions of Windows Server 2003 and SQL Server 2000 as well as Neal's personal version of Visual Studio 2003 for the development of the prototype. These three products alone would have otherwise cost UCHC thousands of dollars.

## UCHC Corporate Paperwork

23.   As of March 1, 2005, we had completed the feasibility phase through development of the website and demonstrated its successful operation.   Given Mr. Donnelly's prior promise that Mr. Donnelly's and Sebago Partners' counsel would

prepare and issue formal written documents incorporating the business and issuing the stock upon completion of the "feasibility" phase, I expected that the business would be incorporated and I would receive my stock. Mr. Donnelly acknowledged that the feasibility phase had been completed as of that date and distributed a vesting schedule regarding issuance of stock to the shareholders in the new entity.

24. At a meeting held on March 30, 2005, Mr. Donnelly stated that UCHC would be formed within ten days. Mr. Donnelly also stated at a meeting held on April 12, 2005 that the company had been formed and that he and corporate counsel would distribute "all appropriate paperwork and Company papers" to me, my brother Neal, and other team members.

25. My brother Neal and I completed the initial version of the CAHPS survey (an integral part of the Corporate Module which was excluded from the prototype due to time and resource constraints) and made such components available to Mr. Donnelly on the morning of May 31, 2005.

26. Shortly after we made the final design components available to him, Mr. Donnelly sent an email to me and my brother (at 10:38 a.m. on May 31, 2005) attaching various documents. A true and accurate copy of that email and its attachments is attached hereto as Exhibit C. Mr. Donnelly stated in his email that:

> Attached, please find the basis of our legal relationship. I expect to have the "Operating Agreement" by 3:00 PM today. At that point I will forward for your review.
>
> I ask you to remember that this is the 'Draft' and that I do not expect for you to have to sign these documents in Maine tomorrow. Instead our visit to Maine tomorrow will be for the benefit of meeting Jim and asking any questions that you think would help clarify any aspect of the relationship. After that and in concert with your own counsel you should have enough information to make your comments.

Thank you for your patience and I look forward to your comments.

27.   The documents attached to Mr. Donnelly's email included a memorandum (regarding "Membership Interests") from Pierce Atwood LLP of Portland, Maine, dated May 27, 2005, an offer letter, and a document entitled Non-Disclosure, Non-Solicitation and Non-Competition Agreement.   It is my understanding that Pierce Atwood was counsel for Donnelly, Sebago Partners, and UCHC.   The proposed Non-Disclosure Agreement contained an assignment provision that would provide for the assignment from me to UCHC of my copyright interests as "works made for hire."

28.   I told Mr. Donnelly at a meeting on May 31, 2005 that there were problems with the documents that would have to be corrected.  Mr. Donnelly stated that he agreed that the documents did not reflect our agreements and needed to be corrected.  He further stated that he had requested that his counsel change the documents.  Mr. Donnelly promised to forward the revised documents to me and my brother as soon as he received them from counsel.  Mr. Donnelly also stated to me that the vesting schedule in the documents was different from what we had previously discussed and that it should be changed. Mr. Donnelly further stated that he would pay me and my brother for our prior work if we were unable to reach agreement regarding the documents that he had presented to us earlier that day.

29.   Later that day, at 6:02 p.m., Mr. Donnelly forwarded an additional document to Neal and me, entitled UCompareHealthcare, LLC Operating Agreement.  Attached hereto as Exhibit D is a true and accurate copy of that email and its attachments.

30.  The memorandum and related documents provided to me by Mr. Donnelly on May 31 stated and/or provided that:

    a.  Rather than issuing voting stock in a corporation, membership units in a limited liability company would be issued.

    b.  The membership units would be issued to Neal and me "in exchange for future services", while Mr. Donnelly would have an "existing interest" based on the development efforts to date.

    c.  Mr. Donnelly would be issued "Class A membership units", which would "carry certain preferences and rights different from other classes of membership units" – including distribution and liquidation preferences, certain "special voting rights", and the ability to designate the manager of UCHC;

    d.  Mr. Donnelly would be the sole Class A member;

    e.  The other individuals, including my brother Neal and me, would be issued so called "profits" interests, designated as "Class B membership units,"  "in exchange for future services to the Company";

    f.  The Class B units would be subject to a four year vesting schedule;

    g.  The Class B units were subject to "forfeiture" if certain milestones were not met;

    h.  The Class B units were valued at zero as of the date of the grant and were "limited to future earnings and appreciation of the Company's value."

i.  The Class B units would only be entitled to distributions after such interests had vested and after Mr. Donnelly had received a return of his so- called "contributed capital preference amount."

j.  Distributions to Class A and B units would be made at the discretion of the manager of UCHC.

k.  No member would be entitled to "a salary, draw or other cash distribution for six months from the date of issuance."

l.  The Class B membership units would be granted only upon the commencement of full time service with UCHC, such grants to be subject to the vesting schedule.

m.  The Class B membership units would be forfeited if the member's status as an "Active Member" was terminated for cause;

n.  The units were subject to the right of the Company to repurchase the vested units "at fair market value as determined by the Management Committee if your status as an Active Member terminates for any reason other than termination for 'Cause.'"

o.  All unvested units would expire and be forfeited to UCHC if the status as an Active Member were terminated "for any reason whatsoever."

p.  The Class B units were subject to a "drag-along" right in favor of the Class A member, providing that the Class B member would be required to sell their interest in UCHC if the Class A member elected to sell his entire interest.

11

    q.   The Class B unit members would not be able to control the business and affairs of UCHC, would not be managers of UCHC, and would be subject to dilution of their interest.

    r.   The Class B unit members status as an "Active Member" was "at will," meaning that UCHC could terminate such status "at any time and for any reason, with or without cause."

    s.   The Class B unit members would be required to sign a Non-Disclosure, Non-Solicitation and Non-Competition Agreement, which provided for the assignment of copyright interests to UCHC.   Unlike the document entitled "Sebago Partners, Inc.," the Non-Disclosure, Non-Solicitation and Non-Competition Agreement referred to copyright interests and works made for hire.

31.    On June 1, 2005, my attorney, William O'Brien, expressed to Mr. Donnelly by email that Neal and I "are concerned that the agreements do not reflect the oral agreements between you and the them." (sic)  Mr. O'Brien further stated:  "I understand that you have not yet had an opportunity to fully review the documents. I kindly request that you review them and let me know if, in your view, the agreements reflect the oral agreements between you and the O'Maras."  Mr. O'Brien further notified Mr. Donnelly, Sebago, and UCHC that "[a]ny unauthorized use of the materials created by the O'Maras would be a violation of their intellectual property rights."  A true and accurate copy of my attorney's June 1 email, a copy of which was received by me, is attached hereto as Exhibit E.

32.  By letter dated June 9, 2005 addressed to my attorney, UCHC, by its counsel, asserted that "UCHC considers the relationship between the O'Maras and UCHC

terminated effective as of June 1, 2005." By its counsel, UCHC further stated that UCHC
was the successor entity to Sebago Partners and that the issuance of equity in UCHC was
"contingent on meeting both individual and group objectives, and subject to Mark
Donnelly's overall concurrence." UCHC, by its counsel's letter dated June 9, 2005,
further asserted that my brother and I had assigned to UCHC "all their rights to any of
their work on the project or on behalf of UCHC" and that such work was the property of
UCHC.

33.  By letter dated June 22, 2005, my counsel again advised and notified Mr.
Donnelly, Sebago Partners, and UCHC that my brother and I are the owners of all works
created by us during our association with Sebago Partners and UCHC as identified on the
exhibit attached to that letter. By my attorney's letter dated June 22, I also demanded that
UCHC cease and desist from all uses of the Works, return all Works to me and my
brother immediately, and destroy any and all copies in its possession. By my attorney, I
also further demanded compensation, issuance of the stock as promised and agreed upon,
and that UCHC provide an accounting and distribution of profits owed upon
commercialization of any property that is jointly owned by UCHC and my brother and
me.

### No Payment / Compensation / Stock

34.  Mr. Donnelly, Sebago Partners, and UCHC have failed and refused to pay
me for any of the services performed by me, to issue me any stock or other interest in
UCHC, or to engage in any discussion about the issues and concerns addressed in my
attorney's June 1 letter.

35.  I have not at any time received any payment, compensation, stock, or other consideration for any of the work I performed in connection with Mr. Donnelly, Sebago Partners, and UCHC, specifically including all of the Works.

## Copyright Registrations

36.    My brother and I have taken all necessary measures to protect and maintain the value of our Works and have filed registration applications and fees for the exclusive rights and privileges in and to the copyrights in the Works under the Copyright Act, 17 U.S.C. §§ 101, *et seq.*  We filed the registration applications with the United States Copyright Office after the defendants terminated our involvement in the project. We have received the following Certificates of Registration:  TXu1-244-572, TXu1-223-149, TXu1-223-148, TXu1-223-146, TXu1-223-147, TXu1-223-150, TXu1-223-296, and TXu1-244-125, TXu1-246-867, TXu1-247-724, TXu1-251-900.  We never agreed to assign ownership of the Works to Donnelly, UCHC, or anyone else.

## Response to Affidavit of Mark J. Donnelly

37.    I have reviewed the Affidavit of Mark J. Donnelly dated December 8, 2005 and further respond to the following numbered paragraphs as follows:

Paragraph 6:   The laundry management project did not fail but instead was, in his words at the time, "retired" by Mr. Donnelly before completion of the project and within approximately one month of commencing work on the health care project.

Paragraph 7:   Mr. Donnelly never informed me that he believed that I had in any way failed on the laundry management project.  To the contrary, he praised my work on the project.  For example, in an email to

14

me dated September 8, 2004, he stated: "I have reviewed what you have sent and think it is very well thought out." Similarly, Mr. Donnelly stated to me in an email dated September 26, 2004 regarding the design document for the laundry management program: "Fantastic documentation and it deserves my undivided attention which I will give on Monday afternoon."

Paragraph 9:   Mr. Donnelly did not at any time tell me to review the "Confidentiality / Proprietary Information Agreement" document with an attorney. To the contrary, the document was presented to me by surprise at the meeting on September 16, 2004 and was signed minutes later.

Paragraph 12:  I do not consider any of the works that I authored and copyrighted to be an "invention."

Paragraph 17:  As is set forth in more detail above, Mr. Donnelly promised to issue equity to me and to pay me for my services.   I did not agree that Mr. Donnelly could decide whether I would receive the promised equity.  It was only after we had completed almost all of our work that Mr. Donnelly started to assert the so-called "arrangements" referenced in paragraph 17 of his affidavit.  We also didn't actually work with the others very much- they were unable or unwilling to help in the development of the prototype.  Once my brother Neal and I completed the prototype and the functional specifications for the production version of the website and Mr. Donnelly received such work, Mr. Donnelly

terminated our involvement in the project.  Upon information and belief,

he did so in an effort to avoid issuing the equity and compensation as

promised.

Paragraph 18:  Along with my brother Neal, I successfully and quickly

developed a functional model of the website that could be used for market

research. We achieved this objective and successfully demonstrated the feasibility

of the project.  As I had said to Mr. Donnelly from the beginning of the project,

we intended and expected that our work on the functional and technical

specifications for the production version of the website would be reviewed by

outside consultants as part of a "peer review." I also noted in a Request for

Proposal dated April 28, 2005 that the coding used for the prototype would be

rewritten for the production version:  "Unless absolutely necessary, we will not

change any of the software components that were used for feasibility, with the

exception of the components developed by UCHC, which will be completely

rewritten based on what was learned during the feasibility phase."   I was not

informed of any actual review or of any claimed problem with any of my work or

Neal's work at any time while we were working on the project.  (While Mr.

Donnelly would point out "bugs" or things that he wanted changed, we made

these fixes and changes as needed.)  To the contrary, Mr. Donnelly praised our

work.  For example, Mr. Donnelly commended me as follows in an email to me

dated November 21, 2004:  "THIS IS AWESOME!!!!!  I am reviewing

everything (finishing) Spec and Flow charts.  Fantastic presentation!!!!!!  I will

have everything tonight.  Might be late but tonight. Thanks for your exceptional

efforts." Mr. Donnelly stated as follows in an email to me dated December 1, 2004: "You guys are unbelievable. I think I will start selling today so we can all start work next month. The way Neal does this stuff, I think I should just go sell! Glad to have you and your brother on board!" Mr. Donnelly similarly commended Neal and me for a "GREAT job!" in his email dated May 1, 2005. He also wrote as follows to Neal and me in an email he sent us on March 13, 2005: "YES I AM YELLING. IT IS UNBELIEVABLE!!!!!!!!!!!!!!!!!!!!!!!!!!! THE COLORS AND HOW EASY IT IS TO READ AND COMPARE!!!!!! Fantastic." I have attached copies of these emails as Exhibit F. The first time that I heard of any complaints by Mr. Donnelly regarding the technical quality of my work was in his attorney's letter dated June 9 written in response to my attorney's letter dated June 1.

Paragraph 19: On May 31, Mr. Donnelly repeated his intention to pay Neal and me for the work we did if we could not agree to the specific terms for equity. I do not believe that the purported assignment of "inventions" provided for the assignment of my copyright interests. In addition to the explanation provided by Mr. Donnelly's counsel, I noted that the document on which Mr. Donnelly now relies makes no mention of copyrights. Moreover, I did not at any time receive any payment, equity, or other consideration in exchange for executing the document on which defendants rely in claiming ownership of my works.

Paragraph 20: Mr. Donnelly made no effort to negotiate with me or my brother in response to my attorney's letter dated June 1 and instead

terminated our involvement in the project. Upon information and belief, Mr. Donnelly knew that Neal and I would not accept the proposed documents and in any event intended to terminate our involvement regardless of whether we signed those documents.

Paragraph 21: My brother Neal and I copyrighted our work and, because defendants claimed ownership to the works authored by us, filed the present action in order to obtain a declaration from the court regarding such claims. Neither Neal nor I have misrepresented our ownership of our works or taken anything from UCHC.

Paragraph 22: Neal and I are the authors of the works at issue, and accordingly the copyrights belong to us regardless of registration. We have not refused to return the materials claimed by defendants to be confidential and proprietary but instead have agreed to return the binders to UCHC.

Paragraphs 23-26: I did not take any corporate records or files without permission, have not stolen anything, have not disclosed the contents of any claimed confidential materials to any competitor of UCHC, and have in any event agreed to return the binders to UCHC. I am not aware of any programming manuals. While Mr. Donnelly would occasionally mark certain documents as "Confidential", none of these documents were copyrighted by us as we didn't author those documents. Moreover, the information and/or methodologies that Mr. Donnelly claims to be "highly confidential" are for the most part readily available on the

internet and otherwise would be known to anyone in the same industry as UCHC, including companies such as HealthGrades and WebMD. For example, the bulk of the binder contains pages downloaded from government and other companies' websites, all of which is publicly available. In fact, in an email to me dated December 3, 2004, Mr. Donnelly described the UCHC concept as follows: "We are simply gathering facts from all kinds of sources and "Creatively" displaying the information based on the desired format of the user. Pure and simple." The only information claimed by Mr. Donnelly to be confidential that is not common-knowledge are things such as naming and pricing. Upon information and belief, Mr. Donnelly and/or others working with him on the UCHC project have in any event disclosed the information that Mr. Donnelly now claims to be confidential to people who have not signed any non-disclosure agreement. For example, Mr. Donnelly directed me to issue a Request for Proposal dated April 28, 2005 (for the technical design and implementation of UCHC's computer hardware/infrastructure environment) to outside vendors who, to my knowledge, did not sign any type of non-disclosure agreement. The RFP described the company, along with the company's development environment and its hardware/infrastructure requirements. Mr. Donnelly also did not express any concern about the fact that Jeff LaPointe gave his friend Jonathan David a copy of a proposal containing information that Mr. Donnelly may now be claiming to be confidential without having Jonathan sign a non-

disclosure agreement.  Also, we were free to take all work home with us and there were no specific precautions that we were required to take to safeguard what might be considered confidential information.

Paragraphs 27-29:    My brother Neal and I are the authors and owners of the works for which we applied for registrations under the Copyright Act, 17 U.S.C. §§ 101, *et seq,* and neither Neal nor I assigned our copyright interests.  Neither Mr. Donnelly nor any other individuals are the authors or co-authors of those works.  For example, the works registered by Neal and me did not include the work of any consultants or "external professionals" that Mr. Donnelly or UCHC may have hired to review and/or revise our work.  I have not had any access to UCHC files/records or its offices since May 31, 2005 when I last worked on the project.  Mr. Donnelly confirms in paragraph 27 of his affidavit that UCHC is using our works notwithstanding that Neal and I are the authors of the works and notwithstanding that defendants claim in paragraphs 21 and 23 of their counterclaim that our work lacked "any usable work product" and was "largely useless and would have to be completely redone."

Paragraph 30:  Based on my review of the websites of UCHC's projected competitors, the services to be offered by UCHC are very similar to those already offered by those competitors.

Paragraph 31:  The market research reports depended on the successful completion of our prototype. I agreed that the market research

confirmed that the prototype developed by Neal and me was extremely useful for determining the wants and needs of users.

Paragraph 32: I have not misappropriated any claimed trade secrets, have not wrongfully registered any copyrights, and have not disclosed the contents of any claimed confidential materials to any competitor of UCHC.

Signed under the pains and penalties of perjury this 2 day of January, 2006:

Paul O'Mara

21

**Exhibit A**



pomara1@hotmail.com

Printed: Sunday, January 1, 2006 9:09 PM

| | |
|---|---|
| **From :** | Mark Donnelly <mdonnelly@SUPAWASH.com> |
| **Sent :** | Thursday, September 9, 2004 10:34 AM |
| **To :** | "'Paul O'Mara'" <pomara1@hotmail.com> |
| **Subject :** | RE: Meeting |

MIME-Version: 1.0
Received: from smtp-hub2.mrf.mail.rcn.net ([207.172.4.76]) by mc4-f38.hotmail.com with Microsoft SMTPSVC(5.0.2195.6824);
Thu, 9 Sep 2004 07:34:41 -0700
Received: from smtp01.mrf.mail.rcn.net ([207.172.4.60])by smtp-hub2.mrf.mail.rcn.net with esmtp (Exim 3.35 #7)id 1C5Q0W-
0005NI-00for pomara1@hotmail.com; Thu, 09 Sep 2004 10:34:40 -0400
Received: from 146-115-230-194.c3-0.frm-ubr2.sbo-frm.ma.cable.rcn.com ([146.115.230.194] helo=DELLL)by
smtp01.mrf.mail.rcn.net with esmtp (Exim 3.35 #7)id 1C5Q0V-0003Hf-00for pomara1@hotmail.com; Thu, 09 Sep 2004 10:34:40 -
0400
X-Message-Info: JGTYoYF78jHbrYc5LYqqhKRQ6DbyIAip
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook, Build 10.0.6626
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2800.1409
Return-Path: mdonnelly@supawash.com
X-OriginalArrivalTime: 09 Sep 2004 14:34:41.0651 (UTC) FILETIME=[248B6C30:01C4967A]

Dear Paul:

5:30 will be great on Thursday (9/16). I will plan to cook some hamburgers on the grill and of course some
beer! With regard to the CD, I can pick it up tomorrow or you can come by and drop it off. We live at 406
Windsor Drive in Framingham. It is off Edgell Road in Nobscot. Call me at (508)-523-3823 and I will give
you directions. With regard to an agreement. I can write one up and we can discuss the specifics when we
meet. Hope all is well with Married life!

Talk with you soon.

regards,
Mark

            -----Original Message-----
            **From:** Paul O'Mara [mailto:pomara1@hotmail.com]
            **Sent:** Wednesday, September 08, 2004 11:17 PM
            **To:** mdonnelly@SUPAWASH.com
            **Subject:** RE: Meeting

            Hi Mark,

            Next Thursday sounds great. I'm looking forward to discussing the scope and design of the application
            with you. If you like, I could drop by some time over the next few days and give you a CD with the
            latest version of the program for you to play around with before we get together.

            Also, I remember at first you mentioned writing up some sort of contract just to make everything
            official. This might be a good idea, even if it is very informal, just in case we are wildly successful or in
            case someone tries to take legal action against us for some reason (which would probably only happen
            if we were really successful).

I seem to remember Ryan saying that your condo is near Edgell road in Framingham...is this correct? If you are anywhere north of route 9 I can probably make it to your place by 5:30 or so.

Thanks!
Paul

>From: "Mark Donnelly" <mdonnelly@SUPAWASH.com>
>To: "Paul O'Mara" <pomara1@hotmail.com>
>Subject: Meeting
>Date: Wed, 8 Sep 2004 17:00:58 -0400
>MIME-Version: 1.0
>Received: from smtp-hub.mrf.mail.rcn.net ([207.172.4.107]) by mc5-f32.hotmail.com with Microsoft SMTPSVC
(5.0.2195.6824); Wed, 8 Sep 2004 14:01:10 -0700
>Received: from smtp01.mrf.mail.rcn.net ([207.172.4.60])by smtp-hub.mrf.mail.rcn.net with esmtp (Exim 3.35
#4)id 1C59Yz-0004c4-00for pomara1@hotmail.com; Wed, 08 Sep 2004 17:01:09 -0400
>Received: from 146-115-230-194.c3-0.frm-ubr2.sbo-frm.ma.cable.rcn.com ([146.115.230.194] helo=DELLL)by
smtp01.mrf.mail.rcn.net with esmtp (Exim 3.35 #7)id 1C59Yz-0000go-00for pomara1@hotmail.com; Wed, 08
Sep 2004 17:01:09 -0400
>X-Message-Info: JGTYoYF78jH5Ckqsk2LtptgMv6iA/eFA
>Message-ID: <000001c495e6$f328f1a0$c2e67392@DELLL>
>X-MSMail-Priority: Normal
>X-Mailer: Microsoft Outlook, Build 10.0.6626
>X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2800.1409
>Return-Path: mdonnelly@supawash.com
>X-OriginalArrivalTime: 08 Sep 2004 21:01:10.0640 (UTC) FILETIME=[F7D89700:01C495E6]
>
>Dear Paul:
>
>I have reviewed what you have sent and think it is very well thought out.  I
>can not comment on the way that the table are linked, however it appears
>that you have thought about much that will evolve over time.
>
>How about we get together on Thursday (9/16) at my place?  We can have a few
>beers, you can meet my wife and we can talk and review your progress.
>
>Let me know and look forward to seeing you soon.
>
>Regards,
>Mark

**Exhibit B**

## *Laundry Management (Computer Program)*

- Add Customer Module
- Add Utility Module
- Add Vendor Module
- Collection Module
- Employee Maintenance Module
- Gas Dryer Efficiency Module
- Graphics (excluding Supawash Trademarked Logo)
- Icons (excluding Supawash Trademarked Logo)
- Installation Kits
- Administrative Module
- Application Main Module
- Machine Maintenance Module
- Vend Price Management Module
- Reporting Components (including module and reports)
- Water Meter Reader Module

### *Misc. UCHC Website Design Documents and Flowcharts*

- About Us.doc
- Forgot Password.doc
- Hospitals.doc
- Employers.doc
- Individuals.doc
- MainPageContent.doc
- Welcome Page.doc
- AboutUs1-15-05.doc
- ContactUs.doc
- AboutUs.jpg
- CompareDoctorsV1.jpg
- CompareDoctorsV2.jpg
- CompareFacilitiesV1.jpg
- CompareFacilitiesV2.jpg
- SiteFlow1.jpg
- SiteFlow2.jpg
- SiteFlow3.jpg
- SiteMap1.jpg
- SiteMap2.jpg
- SiteMap3.jpg
- SiteMap4.jpg
- WebsiteMapV2.jpg
- WebsiteStructureV0c.jpg
- WelcomePageV1.jpg
- WelcomePageV2.jpg

## *UCHC Back-End Source Code*

- Stored Procedures
  _Dev_AnswerCAHPS
  _Dev_CAHPS_AddNewSurvey
  _Dev_CAHPS_UserStartSurvey
  _Dev_CAHPSClearQuestionsToTheRight
  _ErrorTrapExample
  _ErrorTrapExample2
  _LatLongGuessNTest
  am_NewUserLogin
  ApproxDistanceCalc
  ApproxDistanceCalc2
  ApproxDistanceCalc3
  ApproxDistanceCalc4
  ApproxDistanceCalc5
  ApproxDistanceCalc6
  ApproxDistanceCalc7
  ApproxDistanceCalc8
  ApproxDistanceCalc9
  BuildAMT7
  BuildDBObjectsList
  BuildFeas_HCUPAdvancedMetrics
  BuildFEAS_TestRptPOS
  BuildHCUPHCUPHCUP
  BuildHCUPHCUPHCUP2
  BuildPaulRules
  BuildProdNH
  BuildProdNHStaff
  BuildprodNHStaffAvgsAllStates
  BuildprodNHStaffAvgsByState
  BuildrefHCUPPayer_XCd
  BuildReflcd9DrgCd
  BuildReflcd9MdcCd
  BuildRefMarksPosHcupXWalk
  BuildRefPOSXWalkHCUP
  buildRptNHDetail
  BuildrptPhysician_MA
  BuildrptPhysician_MA2
  BuildStgNH
  BuildTablesUsedBySProcs
  CheckBoxesForFeas_HospReport
  CheckBoxesForFeas_PhysicianReport
  CheckBoxesForFeasNH_NHReport
  CheckBoxGroupsForFeas_HospReport
  CheckBoxGroupsForFeas_PhysicianReport
  CheckBoxGroupsForFeasNH_NHReport
  CheckForNewMassMedBoardFile
  CheckForPopStgMassMed

CheckForValidateMassMed
CheckForVerifyMassMed
CheckRecentReports
CheckUserAccess
CheckUserAccountType
CheckUserForCorp
CheckUserIsActive
CheckUserReportsRun
CrazyDonkeys
CrazyDonkeys2
CrazyDonkeys3
CreatePOSMassTable
CreateProdHCUP_MA
CreateProdHCUPCoreMA
CreateRptNH
DamnDOnkey
DamnDOnkeysGoneWild
DamnDOnkeysGoneWild_WOrks_4
DamnDOnkeysGoneWild2
DamnDOnkeysGoneWild3
DamnDOnkeysGoneWild4
Dev_GetPhysicianList
DoctorReport
DonkeysForChristmas
DonkeyTest2
DoNothing
DRReport
feas_CAHPSDone
feas_CAHPSGetResults
feas_CAHPSSubmitResults
Feas_CheckForNewMA_HCUP_CoreFile
Feas_CheckForNewMassMedBoardFile
Feas_CheckForNewNHFile
Feas_CheckForNewPOSFile
Feas_CheckForPopProdHCUPCoreMA
Feas_CheckForPopRptAdvMetHCUPCoreMA
Feas_CheckForPopStgHCUPCoreMA
Feas_GetHospList
Feas_GetHospList_BACKUP
Feas_GetHospList2
Feas_GetPhysicianList
Feas_GetPhysicianList_Backup
Feas_GetPhysicianList2
Feas_GetPhysicianSpecialtyList
feas_HospReport
feas_HospReport_BACKUP
feas_HospReport2
feas_HospSavedReport
feas_PhysicianReport
feas_PhysicianSavedReport

Feas_PopulateProdHCUPCoreMA
Feas_PopulateRptAdvMetHCUPCoreMA
Feas_PopulateStgHcupCore_MA
Feas_PopulatestgPOS
feasNH_GetNHList
feasNH_GetNHList_Backup
feasNH_GetNHList2
feasNH_NHDeficienciesReport
feasNH_NHReport
feasNH_NHSavedReport
FindCorpUser
FindUser
FindUserByEmail
FIX_rptNHDateOfLastInspection
FIX_rptNHDateOfLastInspection2
GetCorpEmployeeAccounts
GetCorpStatement
GetHospList
GetHospList_New
GetHospList_Original
GetHrrNum
GetMDList
GetMDListBackup
GetNHList
GetPTCAVolume
HospReport
HospReport_Original
ImGOingDonkeyCrazy
ImportNewData
LogErrors
LogLogin
LogStoredProcedure
LoopyLoop2
MassMedBoardDTSImportComplete
MDReport
MoreDonkeydom
NHGroupNames
Populate_idMMBPhysicianID
PopulateFiveMileCol100Thru999
PopulateFiveMileCol10Thru99
PopulateidMmbPhysId
PopulatePOSMass
PopulatePOSMaster
PopulaterefHcupAhalCoreID
PopulateRefPhysicianHospAssoc
PopulaterptHosp
PopulateRptMassMedBoard
PopulaterptPhysician_MA
PopulateStgMassMedBoard
PopulateStgUPIN

PopulateZipLatLongFromZCTA
POSConversion
RecentReports
RecentReports1000
RegisterCorp
RegisterUser
SelectCommand
SetCorpStatement
SetNewPW
ShrinkDBXXX
SpaceUsedXXX
TestDynamicColumnNaming
TestFeas_PhysicianReport
TestHospReport
TestRegisterUser
UniqueMassMedBoardPhysicians
UpdateidMassMedBoardPhysicianID
UpdateRptMassMedBoardPhysicianID
UpdateRptNHDateOfLastInspection
UpdateRptNHPhoneNumber
UpdateRptPhysician_MA2
UpdaterptPhysician_MAPhysicianID
ValidateMassMedBoard
VerifyMassMedBoard

## *UCHC Information Systems Design Documents and Flowcharts*

### Documents

- Advanced Metrics DB Object Flow
- From Text File to Advanced Metrics: Building the Back-End
- CAHPS Functionality
- CAHPS Notes 5-15-05
- Questions about CAHPS
- Critical Mistakes So Far
- Data Import Procedure
- Data Validation in Action
- Director of Information Services (Duties/Responsibilities)
- Introduction (about UCHC)
- UCHC Proposed Specification for Information Technology Architecture: Feasibility Phase
- UCHC Revised Specification for Information Technology Architecture Feasibility Phase: Final Status
- Hardware/Infrastructure Environment Request for Proposal (12-6-04)
- Org Chart for Information Technology
- Post-Feasibility Tasks for Information Technology
- Proposed Expedited Hardware Strategy
- User Accounts Business Logic
- UCHC Estimated Initial IT Costs
- UCHC Software Development Timeline
- Hardware/Infrastructure Request for Proposal (4-28-05)

### Flowcharts

- CAHPS Flow Overview
- CAHPS Initial Survey
- CAHPS Additional Surveys
- CAHPS Results Calculation Process
- Data Import Stage 1
- Data Import Stage 2
- Data Import Stage 3
- Data Import Stage 4
- Content Management: New Content Process
- Data Flow
- Network Diagram 1
- Network Diagram 2
- User Accounts Logic Table Descriptions & Relationships

## Paul O'Mara Works

- Laundry Management Database (LMDB.mdb)
- Look and Feel of Laundry Management Suite (screenshots: NewCollectionScreen.jpg, NewVendPriceScreen.jpg, VendMultiSelect.bmp)
- Proposed Technical Approach (Laundry Management Software.doc)
- Descriptions of Laundry Management Components (Modules) (LMComponents.doc)
- Database Structure (LMDBTables.doc)
- Laundry Management Flowchart (LMFlow.jpg)
- Add Customer Module
- Add Utility Module
- Add Vendor Module
- Collection Module
- Employee Maintenance Module
- Gas Dryer Efficiency Module
- Graphics (excluding Supawash Trademarked Logo)
- Icons (excluding Supawash Trademarked Logo)
- Installation Kits
- Administrative Module
- Application Main Module
- Machine Maintenance Module
- Vend Price Management Module
- Reporting Components (including module and reports)
- Water Meter Reader Module
- ContentManagementSpecV0-1.doc
- Logic for User Accounts Component.doc
- Revised User Accounts Business LogicV2.doc
- UserAccountsFeb21.jpg
- AccountActivationForCorporateModule.doc
- LogicUserAcctsV1_Draft1.doc
- Revised User Accounts Business Logic.doc
- HardwareRFPV1_Draft1.doc
- HardwareRFPV2.doc
- NetworkDiagram1.jpg
- NetworkDiagram2.jpg
- Draft0.doc
- InfrastructureRFPUpdate.doc
- UCHC_RFPV1.doc
- UCHC_RFPV1-1.doc
- Proposed Expedited Hardware Strategy.doc
- MockProposal.doc
- HardwareRFP_12-5-04.doc
- HardwareRFPV1_Draft2.doc
- HardwareRFPV1_Draft2b.doc
- HardwareRFPV1_Draft3.doc
- HardwareRFPV1_Draft3b.doc

- HardwareRFPV1_Draft4.doc

**"Specification for Information Technology Architecture: Feasibility Phase"**

- Draft1-0.doc
- Draft1-1.doc
- Draft1-2.doc
- Draft1-3.doc
- Draft1-4.doc
- Draft1-5.doc
- Draft1-6.doc
- Draft1-7.doc
- Draft1-8.doc
- Draft1-9.doc
- Draft1.doc
- Draft2-0.doc
- Draft2-1.doc
- Draft2-2.doc
- Draft2-3.doc
- Draft2-4.doc
- Draft3-0.doc
- Draft3-1.doc
- Draft3-2.doc
- Draft3-3.doc
- Draft3-4.doc
- Draft3-5.doc
- Draft3-6.doc
- Draft3-7.doc
- Draft3-8.doc
- Draft3-9.doc
- Draft4-0.doc
- Draft4-1.doc
- Draft4-2.doc
- Draft4-3.doc
- Draft4-4.doc
- Draft4-5.doc
- Draft4-6.doc
- **FeasibilityPhaseUpdateDraft1-0.doc**
- **FeasibilityPhaseUpdateDraft1-1.doc**
- **FeasibilityPhaseUpdateDraft1-2.doc**
- **FeasibilityPhaseUpdateDraft1-3.doc**
- **FeasibilityPhaseUpdateDraft1-4.doc**
- **FeasibilityPhaseUpdateDraft1-5.doc**
- **FeasibilityPhaseUpdateDraft1-6.doc**
- **FeasibilityPhaseUpdateDraft1-7.doc**
- **FeasibilityPhaseUpdateDraft1-8.doc**
- **FeasibilityPhaseUpdateDraft1-9.doc**
- **FeasibilityPhaseUpdateDraft2-0.doc**
- **FeasibilityPhaseUpdateDraft2-1.doc**

4/30/05

- About Us.doc

- Contact Us.doc
- Employers.doc
- Forgot Password.doc
- Hospitals.doc
- Individuals.doc
- Welcome Page.doc

1/14/05-1/15/05

- About Us.doc
- MainPageContent.doc

**Flowcharts/Diagrams**

- CompareDoctorsV1.jpg
- CompareDoctorsV2.jpg
- CompareFacilitiesV1.jpg
- CompareFacilitiesV2.jpg
- WebsiteMapV2.jpg
- WebsiteStructureV0c.jpg
- WelcomePageV1.jpg
- WelcomePageV2.jpg

**"Specification For Contractual Programming"**

- Required Programs for Feasibility Phase.doc
- SpecForContractProgrammingV1.doc
- SpecForContractProgrammingV2.doc
- SpecForContractProgrammingV2b.doc
- SpecForContractProgrammingV4.doc (co-authored with Brian Richardson)
- SpecForContractProgrammingV4_PaulComments.doc (co-authored with Brian Richardson)
- SpecForContractProgrammingV5.doc (co-authored with Brian Richardson)
- SpecForContractProgrammingV6.doc (co-authored with Brian Richardson)

**"From Text File to Advanced Metrics: Building the Backend"**

- BuildingTheBackendDraft1-0.doc
- BuildingTheBackendDraft1-1.doc
- BuildingTheBackendDraft1-2.doc
- BuildingTheBackendDraft1-3.doc
- BuildingTheBackendDraft1-4.doc
- BuildingTheBackendDraft1-5.doc
- BuildingTheBackendDraft1-6.doc
- BuildingTheBackendDraft1-7.doc
- xBuildingTheBackendDraft.doc

**"Functional Specification"**

- FuncSpecOutlineV1_BU.doc
- FuncSpecOutlineV1_bu2.doc
- FuncSpecOutlineV1.doc
- FuncSpecOutlineV2b.doc (co-authored with Mark Donnelly)
- FuncSpecOutlineV3.doc (co-authored with Mark Donnelly)
- FuncSpecOutlineV3b.doc (co-authored with Mark Donnelly)
- FuncSpecOutlineV3c.doc (co-authored with Mark Donnelly)
- FuncSpecOutlineV4.doc (co-authored with Mark Donnelly)
- FuncSpecDiscussionDraftV1.doc (co-authored with Mark Donnelly)
- FuncSpecDiscussionDraftV1-1.doc (co-authored with Mark Donnelly)
- FuncSpecDiscussionDraftV1-2.doc (co-authored with Mark Donnelly)

- FuncSpecDiscussionDraftV1-3.doc (co-authored with Mark Donnelly)
- FuncSpecDiscussionDraftV1-4.doc (co-authored with Mark Donnelly)
- FuncSpecDiscussionDraftV1-5.doc (co-authored with Mark Donnelly)
- FuncSpecDiscussionDraftV1-6.doc (co-authored with Mark Donnelly)
- FuncSpecDiscussionDraftV1-7.doc (co-authored with Mark Donnelly)
- FuncSpecDraft4-11-05.doc (co-authored with Mark Donnelly)
- FuncSpecDraftP1.doc (co-authored with Mark Donnelly)
- FuncSpecDraftP2.doc (co-authored with Mark Donnelly)
- FuncSpecLessCharts.doc (co-authored with Mark Donnelly)
- AdvancedMetricsDBObjectFlow.doc
- Database-Specific Flow Charts (appDataImport_Draft3_12-27-04.jpg, appDataImport_Draft3_12-27-04_P2.jpg, BackendDraft1P1_V1.tif, BackendDraft1P2_V1.tif)
- Database Design Specs.doc
- UCHC2_Data.MDF
- 6-1-05DBScript.sql
- UCHCDatabaseScripts.doc
- DTS Jobs
- SQL Database Object Naming Conventions.doc
- Stored Procedures
  _Dev_AnswerCAHPS
  _Dev_CAHPS_AddNewSurvey
  _Dev_CAHPS_UserStartSurvey
  _Dev_CAHPSClearQuestionsToTheRight
  _ErrorTrapExample
  _ErrorTrapExample2
  _LatLongGuessNTest
  am_NewUserLogin
  ApproxDistanceCalc
  ApproxDistanceCalc2
  ApproxDistanceCalc3
  ApproxDistanceCalc4
  ApproxDistanceCalc5
  ApproxDistanceCalc6
  ApproxDistanceCalc7
  ApproxDistanceCalc8
  ApproxDistanceCalc9
  BuildAMT7
  BuildDBObjectsList
  BuildFeas_HCUPAdvancedMetrics
  BuildFEAS_TestRptPOS
  BuildHCUPHCUPHCUP
  BuildHCUPHCUPHCUP2
  BuildPaulRules
  BuildProdNH
  BuildProdNHStaff
  BuildprodNHStaffAvgsAllStates
  BuildprodNHStaffAvgsByState
  BuildrefHCUPPayer_XCd
  BuildReflcd9DrgCd
  BuildReflcd9MdcCd

BuildRefMarksPosHcupXWalk
BuildRefPOSXWalkHCUP
buildRptNHDetail
BuildrptPhysician_MA
BuildrptPhysician_MA2
BuildStgNH
BuildTablesUsedBySProcs
CheckBoxesForFeas_HospReport
CheckBoxesForFeas_PhysicianReport
CheckBoxesForFeasNH_NHReport
CheckBoxGroupsForFeas_HospReport
CheckBoxGroupsForFeas_PhysicianReport
CheckBoxGroupsForFeasNH_NHReport
CheckForNewMassMedBoardFile
CheckForPopStgMassMed
CheckForValidateMassMed
CheckForVerifyMassMed
CheckRecentReports
CheckUserAccess
CheckUserAccountType
CheckUserForCorp
CheckUserIsActive
CheckUserReportsRun
CrazyDonkeys
CrazyDonkeys2
CrazyDonkeys3
CreatePOSMassTable
CreateProdHCUP_MA
CreateProdHCUPCoreMA
CreateRptNH
DamnDOnkey
DamnDOnkeysGoneWild
DamnDOnkeysGoneWild_WOrks_4
DamnDOnkeysGoneWild2
DamnDOnkeysGoneWild3
DamnDOnkeysGoneWild4
Dev_GetPhysicianList
DoctorReport
DonkeysForChristmas
DonkeyTest2
DoNothing
DRReport
feas_CAHPSDone
feas_CAHPSGetResults
feas_CAHPSSubmitResults
Feas_CheckForNewMA_HCUP_CoreFile
Feas_CheckForNewMassMedBoardFile
Feas_CheckForNewNHFile
Feas_CheckForNewPOSFile
Feas_CheckForPopProdHCUPCoreMA

Feas_CheckForPopRptAdvMetHCUPCoreMA
Feas_CheckForPopStgHCUPCoreMA
Feas_GetHospList
Feas_GetHospList_BACKUP
Feas_GetHospList2
Feas_GetPhysicianList
Feas_GetPhysicianList_Backup
Feas_GetPhysicianList2
Feas_GetPhysicianSpecialtyList
feas_HospReport
feas_HospReport_BACKUP
feas_HospReport2
feas_HospSavedReport
feas_PhysicianReport
feas_PhysicianSavedReport
Feas_PopulateProdHCUPCoreMA
Feas_PopulateRptAdvMetHCUPCoreMA
Feas_PopulateStgHcupCore_MA
Feas_PopulatestgPOS
feasNH_GetNHList
feasNH_GetNHList_Backup
feasNH_GetNHList2
feasNH_NHDeficienciesReport
feasNH_NHReport
feasNH_NHSavedReport
FindCorpUser
FindUser
FindUserByEmail
FIX_rptNHDateOfLastInspection
FIX_rptNHDateOfLastInspection2
GetCorpEmployeeAccounts
GetCorpStatement
GetHospList
GetHospList_New
GetHospList_Original
GetHrrNum
GetMDList
GetMDListBackup
GetNHList
GetPTCAVolume
HospReport
HospReport_Original
ImGOingDonkeyCrazy
ImportNewData
LogErrors
LogLogin
LogStoredProcedure
LoopyLoop2
MassMedBoardDTSImportComplete
MDReport

MoreDonkeydom
NHGroupNames
Populate_idMMBPhysicianID
PopulateFiveMileCol100Thru999
PopulateFiveMileCol10Thru99
PopulateidMmbPhysId
PopulatePOSMass
PopulatePOSMaster
PopulaterefHcupAhalCoreID
PopulateRefPhysicianHospAssoc
PopulaterptHosp
PopulateRptMassMedBoard
PopulaterptPhysician_MA
PopulateStgMassMedBoard
PopulateStgUPIN
PopulateZipLatLongFromZCTA
POSConversion
RecentReports
RecentReports1000
RegisterCorp
RegisterUser
SelectCommand
SetCorpStatement
SetNewPW
ShrinkDBXXX
SpaceUsedXXX
TestDynamicColumnNaming
TestFeas_PhysicianReport
TestHospReport
TestRegisterUser
UniqueMassMedBoardPhysicians
UpdateidMassMedBoardPhysicianID
UpdateRptMassMedBoardPhysicianID
UpdateRptNHDateOfLastInspection
UpdateRptNHPhoneNumber
UpdateRptPhysician_MA2
UpdaterptPhysician_MAPhysicianID
ValidateMassMedBoard
VerifyMassMedBoard
- Tables
  _Dev_CAHPS_AnswerID
  _Dev_CAHPS_QuestionID
  _Dev_CAHPSSurveyID
  _Dev_CAHPSSurveys
  _DevIssues
  _Hospitals
  _HospPOS
  _NewMasterHosp
  _TestHospTake1
  _TestHospTake2

AdvancedMetricsTest1
AdvancedMetricsTest3
AMT7
appCorpID
appCorpSubscription
appCorpSubscriptionTrans
appCorpSubscriptionTransUsers
appDataImport
appIdImport
appSubscription
appSubscriptionTrans
appUserAccount
appUserID
appUserLoginTrans
'CM4_20~1#DBF$'
Conditions1
Database
dbo_vwHQI_FTNT
dbo_vwHQI_HOSP
dbo_vwHQI_HOSP_MSR_XWLK
dbo_vwHQI_PCTL_MSR_XWLK
dbo_vwNHC_CMPLNT_DFCNCY
dbo_vwNHC_GEOGRPHY
dbo_vwNHC_MSR
dbo_vwNHC_NH
dbo_vwNHC_SRVY_DFCNCY
dbo_vwNHC_SRVY_DT
dbo_vwNHC_STF
DBObjectsList
dmCBSA
dmCBSAProvider
dmOldMSA
dmPhysiciansWithSanctionsOct04
dmProvider
dmSupplier
DRG_Cases1
DRGFreq
dtproperties
ErrorMessages
Feas_HCUPAdvancedMetrics
FEAS_TestRptPOS
FiveMileRadius
HCUPReportExperiment
Hosp1_FieldDesc
HospData1
hstReports
hstStoredProceduresRun
ICD9DiagnosticCode
ICD9DRG
ICD9MDC

ICD9ProcedureCode
idCorp
idMassMedBoardPhysicianID
idUser
LEIE1002
MA_HCUP
MA_SID_2002_AHAL
MA_SID_2002_CORE
MassMedBoard
md_rev
MedProcedures
memCorpSubscription
memUserSubscription
NewMSACodes
OCT04
Opl540904
OSCAR1
PaulRules
POSDataTable$
POSDataTable$Print_Area
POSMass
POSMaster
POSMasterMassachusetts
POSNewMexico
POSTestWithExcel
prodHCUPCore_MA
prodMassMedBoard
ProdNH
prodNHStaff
prodNHStaffAvgsAllStates
prodNHStaffAvgsByState
prodPOS
prodPOSMaster
profAccounts
ProvCasesCMI
rawHCUP_Core_MA
rawPOS
RawZipCodes03
refAHAID
refCAHPSTest
refHcupAcuteStrokeDiag
refHCUPAdrgRiskMortalityCd
refHcupAdrgSevCd
refHcupAhalCoreID
refHCUPAMIDiag
refHCUPASource_XCd
refHCUPAsourceCd
refHCUPASourceUb92Cd
refHCUPATypeCd
refHcupChfDiag

refHCUPDisp_XCd
refHCUPDispCd
refHCUPDispUb92Cd
refHCUPDispUniformCd
refHcupGasHemDiag
refHCUPHipDiag
refHcupHipFractDiag
refHCUPHospID
refHCUPNeoMatCd
refHCUPPay_XCd
refHCUPPayCd
refHCUPPayerCd
refHCUPPedHeartSurg_1P
refHCUPPedHeartSurg_2D
refHCUPPedHeartSurg_2P
refHCUPPedHeartSurg_6P
refHCUPPI_CbsaCd
refHCUPPI_Ruca4Cd
refHcupPneumDiag
refHCUPRaceCd
refHcupXPos
refHospFieldDescFind
refHospFieldDescReport
refHospFieldGroups
refHospID_ProviderID
refHospID_ProviderID_Changed
refICD9DRGCd
refIcd9MdcCd
refLoadStatusCodeDesc
refMarksPosHcupXWalk
refMmbProviderID
refNHFieldDesc
refNHFieldGroups
refPhysicianFieldDescFind
refPhysicianFieldDescReport
refPhysicianFieldGroups
refPhysicianHospAssoc
refPhysicianParams
refPhysicianSpecialty
refPOSAccred_Stat
refPOSCategoryID
refPOSCategorySubtypeID
refPOSInter_Carrier
refPOSMed_Schl_Aff
refPOSNon_Participating_Type
refPOSProgPartci
refPOSRecord_Type
refPOSRegionID
refPOSSRV
refPOSSwingbed_Size_CD

refPOSTerm_CD
refPOSType_Action
refPOSType_Control
refPOSTypeFacilityCD
refPOSXWalkHCUP
refReportCategoryDesc
refReportParameterGroups
refReportParameters
refSProcType
refSubscriptionType
refTransactionType
refUPINProvSpecCd
rptAdvMetHCUPCoreMA
rptAdvMetHCUPCoreMABackup
rptHCUP_PTCA
rptHosp
rptMassMedBoard
rptNH
rptNH_Backup
rptNH2
rptNHDetail
rptPhysician_MA
rptPhysician_MA2
SEP04
Sheet1$
stgHcupCore
stgHCUPCore_MA
stgMassMedBoard
stgNH
stgPOS
stgUPIN
TablesUsedBySProcs
testbit
TestPtcaVolume
UPIN
Wage_hist
xHCUPDataTable
xPOSDataTable
xProdHCUP_MA
xxxDonkeysGoneWild
xxxDonkeyTest
xxxrefMmbProviderQuery
zcta5
ZipCodes
ZipCodesFiveMileRadius
ZipHsa
ziphsahrr03
ziphsahrr03$
ZipLatLong

- Views

_BadMassMedBoard
_HospTake1
_MasterHospitals
AdvancedMetrics
AdvancedMetricsSums1
AdvancedMetricsTest2
AdvancedMetricsTest4
AdvancedMetricsWIthRatios1
AhaIIDs
BuildNHDetailReport
BuildNHReport
BuildRptNH
CBSAProvider
CheckMassMed_HospAssoc
Conditions
Feas_rptHospital
HCUPData
ICD9DiagCodeDesc
ICD9DRGCodeDesc
ICD9MDCCodeDesc
ICD9ProcCodeDesc
MarksView
MassachusettsPhysicians
MassMedBoardZip
MatchUPINLevel1
MatchUPINLevel2
MatchUPINToMassMed
MoreAdvancedMetricsJunk
NHAvgDefAll
NHAvgDefByState
OtherHospitals1
PhysiciansPerHospital
POSData
Procedures
ProvIderNumbers
Providers
RecentErrorMessages
RecentLoginActivity
RecentReportActivity
RecentStoredProcedures
rptMassMedBoardFieldLengths
StoredProcedureUsage
UniqueMassMedBoardPhysicianIDs
UPINLastName
WOrkOnReportingHCUP2

**Exhibit C**

 **Hotmail®**

pomara1@hotmail.com                                                    Printed: Sunday, January 1, 2006 9:41 PM

| | |
|---|---|
| **From :** | Paul OMara <pomara@uchc1.com> |
| **Sent :** | Tuesday, May 31, 2005 10:56 AM |
| **To :** | Paul OMara <pomara1@hotmail.com> |
| **Subject :** | Fwd: Agreements |

**Attachment :** ActiveMemberOfferLetter5-31-05.DOC (0.04 MB), ExhibitA-VestingSchedule5-31-05.DOC (0.02 MB), ExhibitB-Non-Disclosure,Non-Competition5-31-05.DOC (0.04 MB), MemofromJim5-27-05toUCHCLLC.doc (0.06 MB)

MIME-Version: 1.0
Received: from web310.biz.mail.mud.yahoo.com ([68.142.199.186]) by mc5-f6.hotmail.com with Microsoft SMTPSVC
(6.0.3790.211); Tue, 31 May 2005 07:56:35 -0700
Received: from [65.211.65.85] by web310.biz.mail.mud.yahoo.com via HTTP; Tue, 31 May 2005 07:56:33 PDT
X-Message-Info: JGTYoYF78JHpE7HIzGHq437KUO0GJVtOLVnRLcAyVk0=
Return-Path: pomara@uchc1.com
X-OriginalArrivalTime: 31 May 2005 14:56:35.0601 (UTC) FILETIME=[F0C64810:01C565F0]


Note: forwarded message attached.
From: Mark Donnelly <mdonnelly@uchc1.com>
To: "Jeff LaPointe" <jlapointe@uchc1.com>, <nomara@uchc1.com>, <pomara@uchc1.com>, "Ryan Donnelly"
<rdonnelly@uchc1.com>
Sent: Tuesday, May 31, 2005 10:37 AM
MIME-Version: 1.0
X-Originating-IP: [66.163.175.81]
Received: from 66.163.175.81 (HELO smtp004.bizmail.sc5.yahoo.com) (66.163.175.81) by mta108.biz.mail.re2.yahoo.com with
SMTP; Tue, 31 May 2005 07:37:36 -0700
Received: from unknown (HELO Administration) (mdonnelly@uchc1.com@71.243.20.224 with login) by
smtp004.bizmail.sc5.yahoo.com with SMTP; 31 May 2005 14:37:31 -0000
X-Apparently-To: pomara@uchc1.com via 68.142.199.186; Tue, 31 May 2005 07:37:36 -0700
Authentication-Results: mta108.biz.mail.re2.yahoo.com domainkeys=neutral (disabled)
Return-Path: <mdonnelly@uchc1.com>
X-Mailer: Microsoft Office Outlook, Build 11.0.6353
Thread-Index: AcVl7kXZYsmf8V5YRGeShKB1QWA4/w==
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.2180
Content-Length: 78473


Gentlemen:


Attached, please find the basis of our legal relationship. I expect to have the "Operating Agreement" by
3:00 PM today. At that point I will forward for your review.


I ask you to remember that this is the 'Draft" and that I do not expect for you to have to sign these
documents in Maine tomorrow. Instead our visit to Maine tomorrow will be for the benefit of meeting Jim
and asking any questions that you think would help clarify any aspect of the relationship. After that and in
concert with your own counsel you should have enough information to make your comments.


Thank you for your patience and I look forward to your comments.

Sincerely,


Mark J. Donnelly



**PIERCE ATWOOD**

*ATTORNEYS AT LAW*

# MEMORANDUM

**TO:**      UCompareHealthcare LLC

**FROM:**    Pierce Atwood LLP (Robert B. Ravenelle, James B. Zimpritch)

**RE:**      Membership Interests

**DATE:**    May 27, 2005

---

This memorandum is intended to summarize the nature of certain UCompareHealthcare LLC ("Company") membership units to be issued to five individuals in exchange for future services as well as the rights of Mark Donnelly's ("MJD") existing interest after the new interests are issued. It is also intended to summarize the economic and income tax ramifications of all these interests.

<u>MJD Interest</u>

MJD's interest has value as a result of the development efforts to date, the value of which has been set by MJD at $100,000. In addition, it is anticipated that MJD will contribute approximately $300,000-$500,000 in cash to the Company for operating expenditures to be incurred during roughly the next 24 months. We also anticipate that MJD will be a guarantor on any third party debt or similar obligations of the Company.

MJD's LLC interests will be designated as Class A membership units and will carry certain preferences and rights different from other classes of membership units as follows:

- Distribution and liquidation preference equal to the total amount of capital contributed by MJD from time to time. Thus the preference is expected to be at least $100,000 plus approximately $300,000-$500,000.

- Certain special voting rights and ability to designate the manager(s) of the Company.

Despite the distribution/liquidation preference, the Class A membership units will share in profits and losses of the Company in accordance with their ownership percentage in the Company, subject to special allocations relating losses. As a result

One Monument
Square

Portland, Maine
04101-1110

VOICE
207.791.1100

FAX
207.791.1350

E-MAIL
info@pierceatwood.com

WEB SITE
www.pierceatwood.com

{W0357267.6} 1

of the fact that he is the sole member making cash contributions and likely the sole guarantor of any loans and/or equipment financing leases, MJD will be the sole member subject to an economic risk of loss with respect to Company and hence will be allocated all operating losses of the Company up to the amount of his actual contributions and debts guaranteed. For similar reasons, profits will be allocated first to offset previous allocations of losses in reverse order of those previous allocations.

Other Members' Interests

The other members' interests will be issued as "profits" interests in the LLC in exchange for future services to the Company and will be designated as Class B membership units. Subject to the special allocations noted above, Class B units will share in the profits and losses of the Company in accordance with their ownership percentages. The Class B members' units will be subject to a four-year vesting schedule, pursuant to which Class B Membership Units will vest for members serving the Company full-time ("Active Members"). Class B Membership Units will vest over the period a holder is an Active Member, vesting 25% at the end of year 2, 35% at the end of year 3, and another 40% at the end of year 4. The units of Active Members will also vest on an accelerated basis on a Change of Control. Each Member is to be granted currently the full percentage interest obtainable if Milestone #3 is met (at approximately 22 months), although it is subject to a risk of forfeiture if Milestone #2 and/or Milestone #3 are not actually met[, and subject to the discretion of the manager to extend the dates for either Milestone].

These interests are being granted in full currently, as "profits" interests for income tax reasons. By issuing "profits" interests currently, Members will not incur any income tax liability on the value of the interests received, either now or when they vest, assuming that they each make timely Section 83(b) elections (30 days after the date of the grant). In the present circumstances, the value of the units can be considered to be zero on the date of grant because, if the Company liquidated immediately after the grants are made, MJD would receive all liquidation proceeds by way of his preference and other members would receive nothing. The other members' economic interests are limited to the future earnings and appreciation of the Company's value.

Class B units will only be entitled to distributions (other than any necessary tax distributions) after they have vested in the members and after MJD has received a return of his contributed capital preference amount. Thereafter, distributions to the Class A and B units will be at the discretion of the manager of the Company; provided, however, that they be made pro-rata to each member's ownership interest (Class A and Class B) in the Company.

Other Matters

The Operating Agreement will provide for mandatory distributions of available cash necessary for the payment of taxes on profits allocated to Class A and Class B members.

Per discussion with MJD, it is anticipated that no member will be entitled to a salary, draw or other cash distribution for six months from the date of issuance. When it is determined that Active Members should be compensated for services to the Company, other than through distributions on their membership units, all payments will be made as "guaranteed payments" rather than as a draw against profits. Guaranteed payments are payments made to members

without regard to the profits of the Company for services provided.  They are deductible and hence reduce the Company's taxable income.

## EXHIBIT A

On each of the dates listed below, the respective number of Units indicated below shall become Vested Units if recipient remains an active member of the Company on each such date.

| Vesting Date | Percentage of Units Becoming Vested | Cumulative Percentage Vested |
|---|---|---|
| _____ __, 2007 | 25% | 25% |
| _____ __, 2008 | 35% | 60% |
| _____ __, 2009 | 40% | 100% |

## EXHIBIT B

## NON-DISCLOSURE, NON- SOLICITATION AND NON-COMPETITION AGREEMENT

In consideration and as a condition of becoming an active member of UCompareHealthcare, LLC, (the "Company"), I hereby agree as follows:

1.    Best Efforts.  During the period of my status as an active member of the Company, I shall devote my full time and best efforts to the business of the Company, and I shall neither pursue any business opportunity outside the Company nor take any position with any organization other than the Company without the written approval of the President of the Company or his/her designee.

2.    Noncompetition.  During the period of my status as an active member of the Company and for one year following the termination of such status, regardless of the reasons for my termination, I shall not, directly or indirectly, alone or as a consultant, partner, officer, director, employee, joint venturer, lender or stockholder of any entity, (a) accept employment with any business or entity that is in competition with the products or services being conceived, designed, created, developed, manufactured, marketed, distributed or sold by the Company, or (b) engage in any business or activity that is in competition with the products or services being conceived, designed, created, developed, manufactured, marketed, distributed or sold by the Company.

3.    Nonsolicitation of Customers.  During the period of my status as an active member of the Company and for one year following the termination of such status, regardless of the reasons for my termination, I shall not, directly or indirectly, alone or as a consultant, partner, officer, director, employee, joint venturer, lender or stockholder of any entity, solicit or do business with any customer of the Company or any potential customer of the Company (a) with whom I have had contact or (b) about whom I obtained information, or became familiar with through Confidential Information (as defined in Paragraph 5), during the course of my status as a member of the Company.

4.    Nonsolicitation of Employees.

(a)    During the period of my status as a member of the Company and for one year following the termination of my status as a member of the Company, regardless of the reasons for the termination, I will not, in any manner, hire or engage, or assist any company or business organization by which I am employed or which is directly or indirectly controlled by me to hire or engage, any person who is or was employed by or a member of the Company (or is or was an agent, representative, contractor, project consultant or consultant of the Company) at the time of my termination or during the period of one year thereafter.

- 2 -

(b)     During the period of my status as an active member of the Company and for one year following the termination of such status, regardless of the reasons for the termination, I will not, in any manner, solicit, recruit or induce, or assist any company or business organization by which I am employed or which is directly or indirectly controlled by me to solicit, recruit or induce, any person who is or was employed by, or a member of, the Company (or is or was an agent, representative, contractor, project consultant or consultant of the Company) at the time of my termination or during the period of one year thereafter, to leave his or her employment, relationship or engagement with the Company.

5.     <u>Nondisclosure</u>. I shall not at any time, whether during or after the termination of my status as an active member of the Company, reveal to any person or entity any Confidential Information except to employees or members of the Company who need to know such Confidential Information for the purposes of their role with the Company, or as otherwise authorized by the Company in writing. The term "Confidential Information" shall include any information concerning the organization, business or finances of the Company or of any third party which the Company is under an obligation to keep confidential that is maintained by the Company as confidential. Such Confidential Information shall include, but is not limited to, trade secrets or confidential information respecting inventions, products, designs, methods, know-how, techniques, systems, processes, specifications, blueprints, engineering data, software programs, works of authorship, customer lists, customer information, financial information, pricing information, personnel information, business plans, projects, plans and proposals. I shall keep confidential all matters entrusted to me and shall not use or attempt to use any Confidential Information except as may be required in the ordinary course of performing my duties as an active member of the Company, nor shall I use any Confidential Information in any manner which may injure or cause loss or may be calculated to injure or cause loss to the Company, whether directly or indirectly.

6.     <u>Company Property</u>. I agree that during my status as an active member of the Company I shall not make, use or permit to be used any Company Property otherwise than for the benefit of the Company. The term "Company Property" shall include all notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, software code, data, computers, cellular telephones, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs and any other Company property in my possession, custody or control. I further agree that I shall not, after the termination of my status as an active member of the Company, use or permit others to use any such Company Property. I acknowledge and agree that all Company Property shall be and remain the sole and exclusive property of the Company. Immediately upon the termination of my status as an active member of the Company I shall deliver all Company Property in my possession, and all copies thereof, to the Company.

{W0358540.2}

- 3 -

7.    <u>Assignment of Developments.</u>

(a)    If at any time or times during my status as an active member of the Company, I shall (either alone or with others) make, conceive, create, discover, invent or reduce to practice any Development that (i) relates to the business of the Company or any customer of or supplier to the Company or any of the products or services being developed, manufactured or sold by the Company or which may be used in relation therewith; or (ii) results from tasks assigned to me by the Company; or (iii) results from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company, then all such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns, as works made for hire or otherwise. The term "Development" shall mean any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, know-how, trade secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes (including, but not limited to, the Semiconductor Chip Protection Act) or subject to analogous protection). I shall promptly disclose to the Company (or any persons designated by it) each such Development. I hereby assign all rights (including, but not limited to, rights to inventions, patentable subject matter, copyrights and trademarks) I may have or may acquire in the Developments and all benefits and/or rights resulting therefrom to the Company and its assigns without further compensation and shall communicate, without cost or delay, and without disclosing to others the same, all available information relating thereto (with all necessary plans and models) to the Company.

(b)    <u>Excluded Developments.</u>  I represent that the Developments identified in the Appendix, if any, attached hereto comprise all the Developments that I have made or conceived prior to becoming an active member of the Company, which Developments are excluded from this Agreement. I understand that it is only necessary to list the title of such Developments and the purpose thereof but not details of the Development itself. IF THERE ARE ANY SUCH DEVELOPMENTS TO BE EXCLUDED, THE UNDERSIGNED SHOULD INITIAL HERE; OTHERWISE IT WILL BE DEEMED THAT THERE ARE NO SUCH EXCLUSIONS. _____.

8.    <u>Further Assurances.</u>  I shall, during my status as an active member of the Company and at any time thereafter, at the request and cost of the Company, promptly sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized officers may reasonably require:

(a)    to apply for, obtain, register and vest in the name of the Company alone (unless the Company otherwise directs) patents, copyrights, trademarks or other analogous protection in any country throughout the world relating to a Development and when so obtained or vested to renew and restore the same; and

- 4 -

(b)     to defend any judicial, opposition or other proceedings in respect of such applications and any judicial, opposition or other proceeding, petition or application for revocation of any such patent, copyright, trademark or other analogous protection.

If the Company is unable, after reasonable effort, to secure my signature on any application for patent, copyright, trademark or other analogous protection or other documents regarding any legal protection relating to a Development, whether because of my physical or mental incapacity or for any other reason whatsoever, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such application or applications or other documents and to do all other lawfully permitted acts to further the prosecution and issuance of patent, copyright or trademark registrations or any other legal protection thereon with the same legal force and effect as if executed by me.

9.     Status. I understand that this Agreement does not constitute an implied or written employment contract and that the terms of my status as an active member are set forth in that certain offer letter agreement, dated as of _____, by and between the Company and me.

10.     Severability. I hereby agree that each provision and the subparts of each provision herein shall be treated as separate and independent clauses, and the unenforceability of any one clause shall in no way impair the enforceability of any of the other clauses of the Agreement. Moreover, if one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity, subject or otherwise so as to be unenforceable at law, such provision or provisions shall be construed by the appropriate judicial body by limiting or reducing it or them, so as to be enforceable to the maximum extent compatible with the applicable law as it shall then appear. I hereby further agree that the language of all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either of the parties.

11.     Amendments; Waiver. Any amendment to or modification of this Agreement, or any waiver of any provision hereof, shall be in writing and signed by the Company. Any waiver by the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach of such provision or any other provision hereof.

12.     Survival. This agreement shall be effective as of the date entered below. My obligations under this Agreement shall survive the termination of my status as an active member of the Company regardless of the manner of such termination and shall be binding upon my heirs, executors, administrators and legal representatives.

13.     Assignment. The Company shall have the right to assign this Agreement to its successors and assigns, and all covenants and agreements hereunder shall inure to the benefit of and be enforceable by said successors or assigns. I may not assign this Agreement.

{W0358540.2}

- 5 -

14.  Representations.

(a)  I represent that accepting the position as an active member of the Company and my performance of all of the terms of this Agreement do not and will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my becoming an active member of the Company. I have not entered into, and I shall not enter into, any agreement either written or oral in conflict herewith.

(b)  I agree that any breach of this Agreement by me will cause irreparable damage to the Company and that in the event of such breach the Company shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent the violation of my obligations hereunder. The Company may apply for such injunctive relief in any court of competent jurisdiction without the necessity of posting any bond or other security.

15.  Governing Law; Forum Selection Clause. This Agreement and any claims arising out of this Agreement (or any other claims arising out of the relationship between the parties) shall be governed by and construed in accordance with the laws of the State of Maine and shall in all respects be interpreted, enforced and governed under the internal and domestic laws of such state, without giving effect to the principles of conflicts of laws of such state. Any claims or legal actions by one party against the other shall be commenced and maintained in any state or federal court located in Maine, and I hereby submit to the jurisdiction and venue of any such court.

16.  Entire Agreement. This Agreement sets forth the complete, sole and entire agreement between the parties on the subject matter herein and supersedes any and all other agreements, negotiations, discussions, proposals, or understandings, whether oral or written, previously entered into, discussed or considered by the parties.

IN WITNESS WHEREOF, the undersigned has executed this Agreement as a sealed instrument as of the date first above written.

_____
Signature

_____
Name (Please Print)

Date:_____

Address:_____

_____

{W0358540.2}

## <u>APPENDIX – TITLE/PURPOSE OF DEVELOPMENTS</u>

**The following is a complete list of all Developments and the purpose of those Developments:**

          _____       **No Developments**

          _____       **See Below**

**<u>Developments and purpose:</u>**

_____

_____

_____

_____

_____

_____

[PA DRAFT 27 May 2005]

# UCompareHealthCare, LLC
## 801 Water Street, Suite 107
## Framingham, MA 01701

June __, 2005

[Name]
[Address]

Dear _____:

UCompareHealthCare, LLC (the "Company") is pleased to offer you the opportunity to be a member of the Company on the following terms:

1.    **Position**.  Your initial title will be _____, and you will initially report to the Company's President.  This is a full-time position, and as such you would be considered an "Active Member."  By signing this letter agreement, you confirm to the Company that you have no contractual commitments or other legal obligations that would prohibit you from accepting this position and performing your duties for the Company.  As noted below, the Company will issue Class B Membership Units to you, subject to a Restricted Unit Agreement.  As an owner of Membership Units, you will be a member of the Company and be subject to income taxation as a partner, not as an employee.

2.    **Cash Compensation**.  The Company will pay you a base amount, at a starting rate of $40,000 per year, in the form of guaranteed payments to you as an Active Member of the Company.  These guaranteed payments for services rendered to the Company will be subject to adjustment pursuant to the Company's compensation policies in effect from time to time.  Until _____, 2005, you will receive no guaranteed payments.  From _____, 2005 on, your guaranteed payments will accrue and, subject to the availability of cash in excess of that which is required for other business expenses, the Company will begin making guaranteed payments to you, first to satisfy all accrued amounts due you and then monthly at the rate set forth above, as it may be adjusted from time to time.

3.    **Benefits**.  As an Active Member of the Company, you will be eligible to participate in Company-sponsored benefits, when, as and if the Company offers such benefits, to the same extent as other senior executives of the Company.

4.    **Restricted Membership Units**. When you commence your full-time service with the Company, the Company will issue ___ Class B Membership Units to you.  Your

June __, 2005
Page 2

Class B Units will be subject to vesting as set forth in **Exhibit A**. The Class B Units will be issued pursuant to a Restricted Unit Agreement which provides for, among other things, (i) the forfeiture of the vested Units in your name if at any time your status as an Active Member is terminated by the Company for Cause, and (ii) the right of the Company to repurchase your vested Units at fair market value as determined by the Management Committee if your status as an Active Member terminates for any reason other than termination for "Cause." In addition, in the event your status as an Active Member is terminated for any reason whatsoever, all unvested Units will expire and be forfeited to the Company.

 For purposes of this paragraph 4, "Cause" means (a) an unauthorized use or disclosure of the Company's confidential information or trade secrets, (b) a material breach of any agreement between you and the Company, (c) a material failure to comply with the Company's written policies or rules, (d) conviction of, or plea of "guilty" or "no contest" to, a felony under the laws of the United States or any state thereof, (e) gross negligence or willful misconduct, or (f) a continued failure to perform assigned duties after receiving written notification of such failure from the Company's Management Committee. The foregoing, however, is not an exclusive list of all acts or omissions that the Company may consider as grounds for discharging you without Cause.

     5.     **Operating Agreement**. In connection with the Company's issuance of Class B Membership Units to you, you will be required as a condition of your becoming an Active Member, to execute the Operating Agreement of the Company (the "Operating Agreement") as a "Member". Pursuant to the Operating Agreement, your Class B Units will be subject to restrictions on transferability, including a right of first refusal in favor of the Company and the Class A Members in the event you propose to sell your Units. Your Class B Units will also be subject to a "drag-along" right in favor of the Class A Members which provides that in the event the Class A Members elect to sell their entire interest in the Company to a prospective buyer, if requested by the Class A Members, you will be required to sell your interest in the Company to the prospective buyer as well.

     The Operating Agreement will provide for co-sale rights for holders of Class B Units entitling such holders to participate in certain sales proposed by any Class A Member by selling the same percentage of Units held by such Class A Member.

     In addition, you understand and acknowledge that, as described in more detail in the Operating Agreement, the holders of the Class B Units will not be able to control the business and affairs of the Company, will not be managers of the Company, and will be subject to dilution in the event the Company issues additional Membership Units.

     6.     **Non-Disclosure, Non-Competition and Non-Solicitation Agreement**. You will be required, as a condition of your becoming an Active Member, to sign the Company's standard Non-Disclosure, Non-Competition and Non-Solicitation Agreement, a copy of which is attached hereto as **Exhibit B**.

     7.     **Relationship**. Your status as an Active Member of the Company is for no specific period of time. Your status as an Active Member with the Company will be "at will," meaning that either you or the Company may terminate your status as an Active

{W0356892.6}

June __, 2005
Page 3

Member at any time and for any reason, with or without cause. Any contrary representations that may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your duties, title, compensation and benefits, as well as the Company's policies and procedures, may change from time to time, the "at will" nature of your status as an Active Member may only be changed in an express written agreement signed by you and the President of the Company.

      8.      **Inactive Member**. If your status as an Active Member terminates, you may or may not become an Inactive Member, depending on whether you are the owner of any Class B Units that are vested and not repurchased by the Company.

      9.      **Taxes**. Any guaranteed payments made to you, and any profits allocated to you, will be self-employment income, with respect to which you will be solely responsible for payment of all income and self-employment taxes.

      10.      **Entire Agreement.** This letter agreement supersedes and replaces any prior agreements, representations or understandings, whether written, oral or implied, between you and the Company. However, in the event the terms and conditions of this letter agreement conflict in any manner with either the Operating Agreement and/or the Restricted Unit Agreement, the terms and conditions of the Operating Agreement and/or Restricted Unit Agreement, as applicable, shall control.

      11.      **Arbitration**. You and the Company agree to waive any rights to a trial before a judge or jury and agree to arbitrate before a neutral arbitrator any and all claims or disputes arising from or relating to your status as an Active or Inactive Member with the Company, including (but not limited to) claims against any current or former employee, member, manager, officer or agent of the Company, claims of wrongful termination, retaliation, discrimination, harassment, breach of contract, breach of any covenant of good faith and fair dealing, defamation, invasion of privacy, fraud, misrepresentation, constructive discharge or failure to provide a leave of absence, or claims regarding commissions, Membership Units, bonuses, infliction of emotional distress or unfair business practices.

      The arbitrator's decision must be written and must include the findings of fact and law that support the decision. The arbitrator's decision will be final and binding on both parties, except to the extent applicable law allows for judicial review of arbitration awards. The arbitrator may award any remedies that would otherwise be available to the parties if they were to bring the dispute in court. The arbitration will be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration will take place in Portland, Maine.

      You and the Company will share the costs of arbitration equally. Both the Company and you will be responsible for their own attorneys' fees, and the arbitrator may not award attorneys' fees unless a statute or contract at issue specifically authorizes such an award.

      This arbitration provision does not apply to (a) workers' compensation or unemployment insurance claims or (b) claims concerning the validity, infringement or enforceability of any trade secret, patent right, copyright or any other trade secret or

June __, 2005
Page 4

intellectual property held or sought by either you or the Company (whether or not arising under the Proprietary Information and Inventions Agreement between you and the Company).

       If an arbitrator or court of competent jurisdiction (the '"Neutral") determines that any provision of this arbitration provision is illegal or unenforceable, then the Neutral shall modify or replace the language of this arbitration provision with a valid and enforceable provision, but only to the minimum extent necessary to render this arbitration provision legal and enforceable.

* * * * *

       We hope that you will accept our offer to join the Company as an Active Member. You may indicate your agreement with these terms and accept this offer by signing and dating both the enclosed duplicate original of this letter agreement and the enclosed Proprietary Information and Inventions Agreement and returning them to me. This offer, if not accepted, will expire at the close of business on _____ ___, 2005. Your status as an Active Member is also contingent upon your starting full-time with the Company on or before _____ __, 2005.

       If you have any questions, please call me at _____.

                          Very truly yours,

                          UCompareHealthcare, LLC

                          By:_____
                          Title: President

I have read and accepted this offer.


_____


Dated: _____

4

**Exhibit D**

X-Apparently-To: pomara@uchc1.com via 68.142.199.188; Tue, 31 May 2005 15:02:04 -0700

Authentication-Results: mta103.biz.mail.re2.yahoo.com

 domainkeys=neutral (disabled)

X-Originating-IP: [66.163.170.74]

Return-Path: <mdonnelly@uchc1.com>

Received: from 66.163.170.74  (HELO smtp008.bizmail.sc5.yahoo.com) (66.163.170.74)

  by mta103.biz.mail.re2.yahoo.com with SMTP; Tue, 31 May 2005 15:02:03 -0700

Received: from unknown (HELO Administration) (mdonnelly@uchc1.com@71.243.20.224 with login)

  by smtp008.bizmail.sc5.yahoo.com with SMTP; 31 May 2005 22:02:00 -0000

From: "Mark Donnelly" <mdonnelly@uchc1.com>

To: "Jeff LaPointe" <jlapointe@uchc1.com>,

        <nomara@uchc1.com>,

        <pomara@uchc1.com>,

        "Ryan Donnelly" <rdonnelly@uchc1.com>

Subject: FW: Operating Agreement;  Restricted Unit Agreement

Date: Tue, 31 May 2005 18:01:58 -0400

MIME-Version: 1.0

Content-Type: multipart/mixed;

        boundary="----=_NextPart_000_00BA_01C5660A.D7BFE230"

X-Mailer: Microsoft Office Outlook, Build 11.0.6353

Thread-Index: AcVmKTYT4NsvDEDiQNOeIwgWIJ+axwAAxDrA

X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.2180

Content-Length: 62028


This is a multi-part message in MIME format.


------=_NextPart_000_00BA_01C5660A.D7BFE230

Content-Type: multipart/alternative;

       boundary="----=_NextPart_001_00BB_01C5660A.D7BFE230"


------=_NextPart_001_00BB_01C5660A.D7BFE230

Content-Type: text/plain;

       charset="us-ascii"

Content-Transfer-Encoding: 7bit


The "Operating Agreement"



Mark



  ------


From: James Zimpritch [mailto:jzimpritch@PierceAtwood.com]

Sent: Tuesday, May 31, 2005 5:40 PM

To: mdonnelly@uchc!.com

Subject: Operating Agreement; Restricted Unit Agreement



Mark,

Attached is the draft Operating Agreement.

I apologize for the delay.

I have asked my tax partner Rob Ravenelle to review it, but he cannot look

at it today.  Chuck Graceffa and I may have some further edits as well.

<<Operating Agreement for UCompareHealthcare, LLC (W0358600-4).DOC>> .

James B. Zimpritch

Pierce Atwood LLP

One Monument Square

Portland, ME  04101

207-791-1270 direct

207-791-1350 fax

mail to: jzimpritch@pierceatwood.com

http://www.pierceatwood.com/bios/zimpritch.html

**James B. Zimpritch**
Pierce Atwood LLP
One Monument Square
Portland, ME  04101
207-791-1270 direct
207-791-1350 fax
mail to: jzimpritch@pierceatwood.com
http://www.pierceatwood.com/bios/zimpritch.html

UCompareHealthcare, LLC

OPERATING AGREEMENT

# TABLE OF CONTENTS

ARTICLE I – DEFINITIONS

ARTICLE II – FORMATION OF LIMITED LIABILITY COMPANY
  2.1    Formation
  2.2    Company Name
  2.3    Articles of Organization
  2.4    Principal Business Office and Registered Agent
  2.5    Term of Company
  2.6    Purposes

ARTICLE III – MANAGEMENT BY MANAGEMENT COMMITTEE
  3.1    Powers of Management Committee
  3.2    Limitations on Authority of Management Committee
  3.3    Constitution and Election of Management Committee
  3.4    Meetings and Actions of the Management Committee
  3.5    Compensation of Managers
  3.6    Officers
  3.7    Compensation of Officers
  3.8    Indemnification

ARTICLE IV – CAPITALIZATION
  4.1    Units of Interest in the Company
  4.2    Capital Accounts
  4.3    Transfer of Capital Accounts
  4.4    Additional Members
  4.5    Deficit Capital Accounts

ARTICLE V – BOOKS; ACCOUNTING; TAX ELECTIONS; REPORTS
  5.1    Books and Records
  5.2    Financial Statements and Reports
  5.3    Tax Matters Member
  5.4    Reserves

ARTICLE VI – ALLOCATIONS
  6.1    Allocation of Profit and Loss
  6.2    Tax Allocations; Code Section 704(c); Special
         Basis Adjustment
  6.3    Allocations for Tax Purposes
  6.4    Certain Accounting Matters

ARTICLE VII – DISTRIBUTIONS

7.1    Distributions Other Than Proceeds of A
        Liquidating Transaction
7.2    Proceeds of A Liquidating Transaction

ARTICLE VIII – RIGHTS AND OBLIGATIONS OF MEMBERS AND MANAGER
8.1    Limited Liability
8.2    Member Control Rights
8.3    Evidence of Authority, Etc.
8.3    Agreements with Affiliates

ARTICLE IX – RESTRICTIONS ON TRANSFER; RIGHT OF FIRST REFUSAL; CO-SALE
RIGHT
9.1    Restrictions on Transfer
9.2    Transfers
9.3    Right of First Refusal
9.4    Co-Sale Option of Class B Members
9.5    Effect of Prohibited Transfers

ARTICLE X – RIGHTS AND OBLIGATIONS TO SELL
10.1    Drag-Along Rights
10.2    Procedure

ARTICLE XI – TERMINATION
11.1    Events of Dissolution
11.2    Application of Assets

ARTICLE XII – MISCELLANEOUS
12.1    Notices
12.2    Word Meanings
12.3    Binding Provisions
12.4    Title to Company Property
12.5    Applicable Law
12.6    Separability of Provisions
12.7    Section Titles
12.8    Further Assurances
12.9    Counterparts
12.10   Entire Agreement
12.11   Amendments
12.12   No Appraisal Rights

Schedule 3.1 – UCompareHealthcare, LLC

# UCompareHealthcare, LLC

## OPERATING AGREEMENT

This OPERATING AGREEMENT of UCompareHealthcare, LLC, dated as of _____, 2005, is entered into by and among UCompareHealthcare, LLC, LLC, a Maine limited liability company (the "Company"), Mark Donnelly, as member and the sole Manager on the date hereof, the Class A Members listed on Schedule A hereto (the "Class A Members"), the Class B Members listed on Schedule A hereto, and such other Members who become a party to this Agreement as either Class A Members or Class B Members pursuant to Section 4.1(c) below (each, a " Subsequent Member" and collectively with the Class A Members and the Class B Members, the "Members").

## RECITALS

WHEREAS, the parties hereto have determined that it would be advantageous for them henceforth to conduct business operations through a Maine limited liability company, and accordingly desire hereby to form a limited liability company (the "Company") under the Maine Limited Liability Company Act, 31 M.R.S.A. §§601 *et seq.* (as from time to time amended and including any successor statute of similar import, the "Act");

WHEREAS, the parties hereto desire by execution hereof to set out their respective rights, obligations and duties with respect to the business, management and operations to be conducted by the Company;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth below or in the section of this Agreement referred to below:

"Act" shall have the meaning assigned to such term in the Recitals to this Agreement.

"Active Member" shall have the meaning assigned to such term in Section 3.1.

"Affiliate" shall mean, when used with reference to a specified Person, (i) any Person that directly or indirectly controls, is controlled by or is under common control with, or is the parent, child, grandparent, grandchild, spouse, nephew, niece, aunt or uncle of the specified Person, and

(ii) any Person who is a responsible employee of, an officer of, a general partner in or a trustee of, or serves in a similar capacity with respect to, the specified Person or any Person described in clause (i) or of which the specified Person or an Person described in clause (i) is a responsible employee, officer, general partner or trustee, or with respect to which the specified Person or any Person described in clause (i) serves in a similar capacity.

"Agreement" shall mean this Operating Agreement, including all schedules and exhibits hereto, as it and they may be amended, restated or supplemented from time to time as herein provided.

"Articles" shall mean the Articles of Organization of the Company as provided for pursuant to the Act, as amended and restated from time to time as herein provided.

"Book Value" of an asset shall mean, as of any particular date, the value at which the asset is properly reflected on the books and records of the Company as of such date. The initial Book Value of each asset shall be its cost, unless such asset was contributed to the Company by a Member, in which case the initial Book Value shall be an amount established by the Manager. Such Book Value shall thereafter be adjusted for depreciation with respect to such asset, rather than for the cost recovery deductions to which the Company is entitled for Federal income tax purposes with respect thereto. The Book Values of all Company assets shall be adjusted to equal their respective fair market values, as established by the Manager, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis additional Capital Contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company assets, including money, if, as a result of such distribution, such Member's interest in the Company is reduced; and (iii) the termination of the Company for Federal income tax purposes pursuant to Code Section 708(b)(1)(B).

"Capital Account" shall have the meaning assigned to such term in Section 4.2.

"Capital Contributions" shall mean the total amount of cash and other property contributed to the Company by the Members, whether as Initial Capital Contributions or additional Capital Contributions.

"Class A Members" shall have the meaning assigned to such term in Section 4.1(b).

"Class B Members" shall have the meaning assigned to such term in Section 4.1(b).

"Class A Units" shall have the meaning assigned to such term in Section 4.1(b).

"Class B Units" shall have the meaning assigned to such term in Section 4.1(b).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any subsequent Federal law of similar import, and, to the extent applicable, any Treasury Regulations promulgated thereunder.

"Company" shall have the meaning assigned to such term in the Recitals to this Agreement.

"Company Interest" shall mean, with respect to a Member, the entire interest of such Member in the Company.

"Distributable Cash" means all cash, revenues and funds received by the Company, less the sum of the following to the extent paid or set aside by the Company: (a) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders, vendors or other creditors (including to Members in their capacities as lenders, vendors or other creditors); (b) all cash expenditures incurred incident to the normal operation of the Company's business; and (c) such Reserves as the Management Committee deems appropriate in its sole discretion.

"Distribution Preference" means $100,000.

"Entity" shall mean any general partnership, limited partnership, limited liability partnership, corporation, joint venture, trust, limited liability company, business trust, cooperative or association.

"Fiscal Period" shall mean an accounting period for which the Profit or Loss of the Company is computed. Each Fiscal Period shall commence on the day immediately following the last day of the immediately preceding Fiscal Period. Each Fiscal Period shall end on the earliest to occur after the commencement of such Fiscal Period of (i) the end of a calendar year, (ii) immediately prior to (a) the "liquidation" (within the meaning of Treasury Regulations Sec. 1.704-1(b)(2)(ii)(g)) of a Member's Company Interest, or (b) a change in the interest in the Company of a Member, or (iii) the date on which the Company is terminated pursuant to the provisions of Section 9.1.

"Founding Member" shall mean Mark Donnelly.

"Founding Member Sale" shall have the meaning assigned to such term in Section 10.1.

"Guaranteed Payments" shall mean payments made to certain Members for services provided to the Company other than payments made as distributions on the Units held by such Members.

"Initial Capital Contribution" shall mean a Capital Contribution made in accordance with Section 3.1.

"Liquidating Transaction" shall have the meaning assigned to such term in Section 6.2.

"Majority Vote of the Class A Units" means the affirmative vote, assent, consent, or other action of Class A Members who own at least a majority of the Class A Units eligible to be voted at the time of the vote in question.

"Majority Vote of the Class B Units" means the affirmative vote, assent, consent, or other action of Class B Members who own at least a majority of the Class B Units eligible to be voted at the time of the vote in question.

"Management Committee" shall mean the Management Committee elected pursuant to the terms of Article 3 of this Agreement.

"Manager" means the members of the Management Committee. The Managers are each individually referred to herein as a "Manager".

"Member" shall mean each of the undersigned Members and any other Person who becomes a substituted or additional Member as herein provided.

"Permitted Equity Investment" means any equity investment in the Company in an aggregate amount of at least $100,000. The Units issued in exchange for the investment shall, after they are issued, be subject to the transfer restrictions set forth in Article IX.

"Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits.

"Preference Amount" shall have the meaning assigned to such term in Section 7.3(c).

"Profit" and "Loss" shall mean, for each Fiscal Period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (provided that for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Company that is exempt from Federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this provision shall be added to such taxable income or loss.

(b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profit or Loss pursuant to this provision, shall be subtracted from such taxable income or loss.

If the Company's taxable income or loss for a Fiscal Period, as adjusted in the manner provided above, is a positive amount, such amount shall be the Company's Profit for such year or period; and if a negative amount, such amount shall be the Company's Loss for such year or period.

If the Book Value of the Company assets is adjusted pursuant to the last sentence of the definition of Book Value, the amount of such adjustment shall be included in computing Profit or

Loss. If any Company asset is distributed in kind (whether in connection with the liquidation of the Company or otherwise), the Company shall be deemed to have realized Profit or Loss thereon in the same manner as if the Company has sold such asset for an amount equal to its fair market value on the date of distribution, as determined in good faith by the Manager.

"Reserves" means reserves set aside by the Company for working capital, capital improvements, payments of periodic expenditures, debt service, acquisitions, research and development, or other purposes determined to be appropriate by the Management Committee in its sole discretion.

"Sale Event" shall mean (i) the dissolution or liquidation of the Company, (ii) the sale of all or substantially all of the assets of the Company to an unrelated person or entity, (iii) a merger, reorganization or consolidation in which the holders of the Company's outstanding voting power immediately prior to such transaction do not own a majority of the outstanding voting power of the surviving or resulting entity immediately upon completion of such transaction, (iv) the sale of all of the Units of the Company to an unrelated person or entity or (v) any other transaction in which the Founding Member does not own at least 51% of the outstanding voting power of the relevant entity after the transaction.

"Tax Amount" means the excess of a Member's Tax Liability (as defined below) over the sum of all distributions made to the Member. A Member's "Tax Liability" for this purpose shall equal the cumulative excess of a Member's distributive share of the Company's net income, over the Member's distributive share of the Company's net loss, for all taxable years of the Company or portions thereof, multiplied by the highest marginal effective U.S. federal and Maine state income tax rate on such income applicable to individuals. In determining the Tax Liability of any Member, the Manager may in his discretion make reasonable assumptions regarding the varying tax rates applicable to different categories of income and loss and need not take any Member's individual circumstances into account.

"Tax Matters Member" shall have the meaning assigned to such terms in Section 5.3.

"Transfer" shall have the meaning set forth in Section 9.1.

"Treasury Regulations" shall mean the Federal income tax regulations, including any temporary or proposed regulations, promulgated under the Code, as such Treasury Regulations may be amended from time to time (it being understood that all references herein to specific sections of the Treasury Regulations shall be deemed also to refer to any corresponding provisions of succeeding Treasury Regulations.)

"Units" shall have the meaning assigned to such term in Section 4.1(a).

## ARTICLE II

## FORMATION OF LIMITED LIABILITY COMPANY

2.1    <u>Formation</u>.  The parties, by execution of this Agreement, hereby agree to form the Company as a limited liability company under and pursuant to the Act.  Each party represents and warrants that he or she is duly authorized to join in and execute this Agreement.

2.2    <u>Company Name</u>.  The name of the Company shall be "UCompareHealthcare, LLC."  The business of the Company shall be conducted under such name or such other names as may from time to time be selected by the Manager in its sole discretion.

2.3    <u>Articles of Organization</u>.  The Manager shall cause the Articles of Organization of the Company to be filed with the Secretary of State of the State of Maine.  The Members and the Manager hereby agree to execute, file and record all such other certificates and documents, including amendments to the Articles, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Maine and any other jurisdiction in which the Company may own property or conduct business.

2.4    <u>Principal Business Office and Registered Agent</u>.  The principal business office of the Company shall be located at 801 Water Street, Suite 87, Framingham, MA 01701 or at such other location as may hereafter be designated by the Manager.  The registered agent for service of process on the Company shall be James B. Zimpritch, Esq., One Monument Square, Portland, Maine 04101.  The office and the registered agent of the Company may be changed from time to time by the Manager and in accordance with the then applicable provisions of the Act and any other applicable laws.

2.5    <u>Term of Company</u>.  The term of the Company shall commence on the date of the initial filing of the Articles with the office of the Secretary of State of the State of Maine, and shall continue indefinitely, unless it is sooner dissolved pursuant to the provisions of Section 11.1.

2.6    <u>Purposes</u>.  The purpose of the Company is to develop and commercialize internet capabilities and uses for healthcare providers and to conduct such other businesses as permitted by law.

## ARTICLE III

## MANAGEMENT BY MANAGEMENT COMMITTEE

3.1    <u>Powers of Management Committee</u>.  Except to the extent otherwise specifically provided by the terms of this Agreement or the Act, the Management Committee shall have complete and exclusive authority to take, or to authorize the taking of, any and all actions

necessary, convenient, or desirable for the management of the Company and of its business. By way of illustration but not of limitation, it is intended that the Management Committee shall have all of the powers and authority of the Board of Directors of a Maine business corporation. Additionally, the Management Committee shall have the authority to (i) designate certain Members performing services for the Company as "Active Members", and (ii) negotiate compensation arrangements with such Active Members and make Guaranteed Payments in according with such arrangements.

      3.2    <u>Limitations on Authority of Management Committee</u>. In addition to any restrictions or limitations upon the authority of the Management Committee contained in the Act or elsewhere in this Agreement:

      (a)    The Management Committee shall have no authority to take any of the following actions, unless such actions are first authorized by a Majority Vote of the Class A Units:

> (i)    amend the Articles of Organization;
> (ii)    amend this Agreement;
> (iii)    sell, license, or otherwise dispose of all or substantially all of the Company's assets;
> (iv)    cause the Company to merge or consolidate with or into any corporation, firm or other entity;
> (v)    cause the Company to convert into a corporation or other entity by any means;
> (vi)    cause any reorganization, recapitalization, split-up or similar change in the structure of the Company;
> (vii)    cause the Company to be voluntarily dissolved or liquidated or consent to any act of bankruptcy.

      (b)    In addition to the vote of the Members required under Section 3.2(a) hereof, if any, the Management Committee shall have no authority unless first authorized by a Majority Vote of the Class B Units, to amend the Articles of Organization or this Agreement in a manner that has a material adverse effect on the rights or obligations associated with the Class B Units; <u>provided</u>, <u>however</u>, that (a) any amendment to the Articles of Organization or this Agreement in connection with a Permitted Equity Investment will not require the consent of the Class B Members pursuant to this Section 3.2(b) so long a such amendment does not have a material adverse effect on the rights or obligations associated with the Class B Units, (b) a reduction in the percentage of the Units represented by the Class B Members as a result of a Permitted Equity Investment shall not in itself be deemed to have a material adverse effect on the Class B Units, and (c) the creation of a new class of Units as a result of a Permitted Equity Investment with such Class having rights and preferences senior or equal to the Class B Members (including any voting rights) shall not itself be deemed to have a material adverse effect on the Class B Units;

      3.3    <u>Constitution and Election of Management Committee</u>. The Management Committee shall initially consist of one (1) Manager, but may be expanded in number by vote of

the Management Committee. The Managers will be elected by a Majority Vote of the Class A Members. Each Manager shall hold office until a successor shall have been duly elected or appointed and shall have qualified or until such Manager's death, disability, resignation, or removal pursuant to this Operating Agreement. A Manager may be removed at any time, for any reason or no reason, by a Majority Vote of the Class A Members. The initial Manager shall be Mark Donnelly.

3.4    Meetings and Actions of the Management Committee. Meetings of the Management Committee may be called by any Manager by giving notice to all Managers no less than forty-eight (48) hours before the time set for the meeting, unless such notice has been waived by the members of the Management Committee. The notice shall set forth the date, time, place, and purpose of the meeting. A majority of the Managers entitled to vote at a meeting of the Management Committee, present in person or by means of a telephone connection or other electronic means which allows full opportunity to both hear and to address the meeting shall constitute a quorum at any meeting of the Management Committee. Except where the Act specifically requires otherwise, action of the Management Committee shall require the affirmative vote, assent, consent, or other action of a majority of the Managers entitled to vote on the matter in question. Action taken without a meeting, and evidenced by unanimous written consents signed by all of the Managers serving as of the date the first such consent is signed, shall be as valid as the action of the Management Committee as if it had been taken at a meeting.

3.5    Compensation of Managers. Except as otherwise provided herein, the Company may, by unanimous consent of the Managers, compensate Managers in their capacity as such, but may reimburse them for any actual and necessary expenses incurred by the Managers in their capacity as such.

3.6    Officers. The Management Committee may designate one or more persons to be officers of the Company (collectively, the "Officers", and individually, an "Officer") and may remove any such person as an Officer. Any Officers so designated shall have such titles and, subject to the other provisions of this Agreement, have such authority and perform such duties as the Management Committee may delegate to them, including the power to execute documents, and shall serve at the pleasure of the Management Committee. Unless the authority of the person designated as the Officer in question is limited or expanded in the document appointing such Officer or is otherwise specified by the Management Committee, any Officer so appointed shall have the same authority to act for the Company as a corresponding officer of a Maine corporation would have to act for a Maine corporation in the absence of a specific delegation of authority; provided, however, that unless such power is specifically delegated to the Officer in question either for a specific transaction or generally, no such Officer shall have the power to act in a manner that is contrary to the provisions of Article VII hereof. The Management Committee, in its discretion, may ratify any act previously taken by an Officer acting on behalf of the Company. The names of the Officers of the Company shall be set forth on a schedule maintained at the Company's registered office. Such schedule may be modified from time to time to reflect changes thereto and shall be made available to any Member upon request. Notwithstanding anything contained herein to the contrary, the Management Committee shall appoint a Manager as the Chairman of the Management Committee. The Chairman of the Management Committee

shall be the President of the Company, shall preside at all meetings of the Members and the Management Committee, shall oversee the general and active management of the business of the Company, and shall see that all orders and resolutions of the Management Committee are carried into effect. Mark Donnelly shall be the initial President of the Company and the initial Chairman of the Management Committee, and he shall serve in such positions until his successor(s) shall be duly chosen and qualified.

3.7    <u>Compensation of Officers</u>. The compensation of the Officers shall be determined by the Management Committee.

3.8    <u>Indemnification</u>.

(a)    <u>General</u>. The Company shall in all cases indemnify any Person who is or was a Manager or Officer, and who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was a Manager or Officer, against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement, to the extent actually and reasonably incurred by that Person in connection with such action, suit or proceeding (collectively, "<u>Expenses</u>"); <u>provided</u>, that no indemnification may be provided for any Person with respect to any matter as to which that Person shall have been finally adjudicated:

(i)    not to have acted honestly or in the reasonable belief that that Person's action was in or not opposed to the best interests of the Company or its Members or, in the case of a Person serving as a fiduciary of an employee benefit plan or trust, in or not opposed to the best interests of that plan or trust, or its participants or beneficiaries;

(ii)    with respect to any criminal action or proceeding, to have had reasonable cause to believe that that Person's conduct was unlawful; or

(iii)    to have acted willfully and knowingly in violation of this Agreement.

The Company may, in the discretion of the Management Committee, indemnify any other Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he is or was an employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, trustee, partner, fiduciary, employee, or agent of a corporation, partnership, joint venture, trust, pension or other employee benefit plan, or other enterprise, against Expenses, subject to the foregoing proviso.

The termination of any action, suit or proceeding by judgment, order or conviction adverse to that Person, or by settlement or plea of *nolo contendere* or its equivalent, shall not of itself create a presumption that (i) that Person did not act honestly or in the reasonable belief that that Person's action was in or not opposed to the best interests of the Company or its Members or, in the case of a Person serving as a fiduciary of an employee benefit plan or trust, in or not opposed to the best interests of that plan or trust or its participants or beneficiaries, (ii) with

respect to any criminal action or proceeding, had reasonable cause to believe that that Person's conduct was unlawful, or (iii) that Person acted without authorization under or in violation of this Agreement.

(b)    <u>Derivative Actions</u>.  The Company shall not indemnify any Person with respect to any claim, issue or matter asserted by or in the right of the Company as to which that Person is finally adjudicated to be liable to the Company unless the court in which the action, suit or proceeding was brought shall determine that, in view of all the circumstances of the case, that Person is fairly and reasonably entitled to indemnity for such amounts as the court shall deem reasonable.

(c)    <u>Advancement of Expenses</u>.  Expenses (including, without limitation, reasonable attorneys fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding with respect to which indemnification exists under this Section 3.8 hereof, shall be paid by the Company in advance of the final disposition of that action, suit or proceeding, to the extent permitted by the Act and upon receipt by the Company of an undertaking by or on behalf of the Person seeking the advance to repay any such amount so advanced if it shall ultimately be determined that the Person is not entitled to be indemnified for such Expenses under the terms of this Section 3.8.

(d)    <u>Indemnification Rights Under Limited Liability Company Agreement Not Exclusive; Enforceable by Separate Action</u>.  The indemnification and entitlement to advances of expenses provided by this Section 3.8 shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any agreement, vote of the Members or otherwise, both as to action in that Person's official capacity and as to action in another capacity while holding such office, and shall continue as to a Person who has ceased to be a Manager, Officer, employee, agent, trustee, partner or fiduciary and shall inure to the benefit of the heirs, executors and administrators of such a Person.  A right to indemnification required by this Section 3.8 may be enforced by a separate action against the Company if an order for indemnification has not been entered by a court in any action, suit or proceeding in respect to which indemnification is sought.

(e)    <u>Insurance</u>.  The Company may purchase and maintain insurance on behalf of any Person who is or was a Manager, Officer, employee or agent of the Company, against any liability asserted against that Person and incurred by that Person in any such capacity, or arising out of that Person's status as such, whether or not the Company would have the power to indemnify that Person against such liability under this Section 3.8.

(f)    <u>Amendment</u>.  Any amendment, modification or repeal of this Section 3.8 shall not deny, diminish or otherwise limit the rights of any Person to indemnification or advance hereunder with respect to any action, suit or proceeding arising out of any conduct, act or omission occurring or allegedly occurring at any time prior to the date of such amendment, modification or repeal.

## ARTICLE IV

## CAPITALIZATION

4.1    <u>Units of Interest in the Company</u>.

(a)    <u>Classes of Units</u>.  Interests of Members in the net income and losses of the Company and the right of Members to distributions and allocations and a return of capital contributions and other amounts specified herein shall be evidenced by Units of interest in the Company ("Units").  Units may be issued in one or more Classes.

(b)    <u>Initial Classes of Units</u>.  There shall initially be two (2) classes of Units:

"Class A Units" will represent capital interests in the Company, having the rights and preferences described in this Agreement.  Those Members holding Class A Units shall be referred to as "Class A Members."

"Class B Units" will represent profits interests in the Company, will have no initial capital interest, and will otherwise have the rights and preferences described in this Agreement. Class B Units shall have no voting rights except as specifically set forth in this Agreement. Those Members holding Class B Units shall be referred to as "Class B Members."

(c)    <u>Additional Units</u>.  The Manager may from time to time cause the Company to issue additional Units (or options, warrants or other securities convertible into or exercisable for Units) to existing Members or new Members and may amend this Article IV and make other necessary conforming amendments to this Agreement to designate additional classes of Units having different relative rights, powers and preferences, including without limitation, rights and powers that are superior and/or prior to those of existing classes of Units, or the right to vote as a separate class or group on specified matters.

(d)    <u>Company Interest Schedule</u>.  The Members, and the number of Units of each Class that they hold shall be set forth on the Company Interest Schedule.  The Manager may amend the Company Interest Schedule from time to time without the consent of any Member to reflect the admission or withdrawal of any Member, the Transfer of Units, or the change in any Member's Units (including by reason of forfeiture or buy-back).  No Member shall be entitled to review the Company Interest Schedule in its entirety.  Each Member shall instead be entitled to review that portion of the Company Interest Schedule that relates to the number of Units the Member holds of each Class, and the total number of Units issued in each such Class.  The Company Interest Schedule may be maintained in several, separate parts to facilitate this limitation.

4.2    <u>Capital Accounts</u>.  A separate capital account (a "<u>Capital Account</u>") shall be established and maintained for each Member in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be credited the amount of cash and fair market value of the property actually contributed to the Company, such Member's allocable share of Profit and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company property distributed to such Member.

(b)    To each Member's Capital Account there shall be debited the amount of cash and the fair market value of any Company property distributed to such Member pursuant to any provision of this Agreement, such Member's allocable share of Loss and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)    The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations.  To the extent consistent with the terms of this Agreement, Capital Accounts shall be maintained and adjusted in a manner consistent with such Treasury Regulations.

(d)    A Member shall not be entitled to withdraw any part of his or her Capital Account or to receive any distributions from the Company except as provided in Article VII; nor shall a Member be entitled to make any loan or Capital Contribution to the Company other than as expressly provided herein.  No loan made to the Company by any Member shall constitute a Capital Contribution to the Company for any purpose.

(e)    Except as required by the Act, neither the Manager nor any Member shall have any liability for the return of the Capital Contribution of any Member.  A Member who has more than one Company Interest shall have a single Capital Account that reflects all such interests, regardless of the class of interest owned and regardless of the time or manner in which the interests were acquired.

4.3    Transfer of Capital Accounts.  The original Capital Account established for each substituted Member shall be in the same amount as the Capital Account of the Member which such substituted Member succeeds, at the time such substituted Member is admitted to the Company.  The Capital Account of any Member whose interest in the Company shall be increased by means of the transfers to it of all or part of the interest in the Company of another Member shall be appropriately adjusted to reflect such transfer.  Any reference in this Agreement to a Capital Contribution of or distribution to a then Member shall include a Capital Contribution or distribution previously made by or to any prior Member on account of the interest in the Company of such then Member.

4.4    Additional Members.  No additional Members may be admitted to the Company other than pursuant to Section 4.1(c) above.

4.5    Deficit Capital Accounts.  No Member shall be obligated to restore a deficit balance in his or her Capital Account or to make a Capital Contribution to the Company solely by reason of such deficit.

## ARTICLE V

## BOOKS; ACCOUNTING; TAX ELECTIONS; REPORTS

5.1    <u>Books and Records</u>.  Unless otherwise required by the Code, the fiscal year of the Company for tax and accounting purposes shall be the calendar year.  The accounting records of the Company shall be kept on the cash receipts and disbursements method of accounting or in accordance with generally accepted accounting principles, at the discretion of the Manager.  All books, records, accounts, papers, and memoranda in any manner relating to the Company (including those records required by the Act) shall be kept at the principal office of the Company.  Each Member at all reasonable times during regular office hours shall have access to the records for purposes of inspection and copying, at the Member's expense (unless otherwise required by the Act).

5.2    <u>Financial Statements and Reports</u>.  The Manager shall, within ninety (90) days after the end of each calendar year, cause to be delivered to each Member the following:

(a)    an unaudited balance sheet and statement of operations, Members' equity and changes in financial position, which shall be prepared in accordance with the accounting method chosen for the Company by the Manager;

(b)    U.S. federal income tax Form K-1 and any similar forms required by any state or local taxing authority; and

(c)    any other information concerning the Company reasonably necessary for the preparation of the Member's federal and state income tax returns.

The Manager, upon showing good cause, shall be entitled to a reasonable extension of the ninety (90) day period applicable to the items described in subsections (b) and (c).  All financial statements and tax returns and reports shall be prepared at the expense of the Company.

5.3    <u>Tax Matters Member</u>.  The "Tax Matters Member" of the Company for federal income tax purposes shall be the Member designated by the Manager for the taxable year or, failing such designation, as determined under Code Section 6231.

5.4    <u>Reserves</u>.  The Company may establish and maintain such reserves as the Manager shall from time to time determine to be appropriate for the needs of the Company.

## ARTICLE VI

## ALLOCATIONS

6.1    Allocation of Profit and Loss.  The Profit and Loss of the Company for each Fiscal Period shall be allocated among the Members in proportion to their respective Capital Accounts as of the beginning of such Fiscal Period.

6.2    Tax Allocations; Code Section 704(c); Special Basis Adjustment.

(a)    In accordance with Code Section 704(c) and the Treasury Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any asset contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such asset to the Company for Federal income tax purposes and its fair market value at the time of contribution. In the event that the Book Value of any Company asset is subsequently adjusted in accordance with the last sentence of the definition of Book Value, any allocation of income, gain, loss or deduction with respect to such asset shall thereafter take account of any variation between the adjusted tax basis of such asset to the Company and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations promulgated thereunder.  Any elections or other decisions relating to such allocations shall be made by the Manager in a manner that reasonably reflects the purpose and intention of this Agreement.

(b)    In the event of (i) a Transfer of all or any part of the Company Interest of any Member (on account of the death of a Member or by reason of a sale or exchange), or (ii) the distribution of assets by the Company within the meaning of Code Section 734, the Manager, in his sole discretion, may cause the Company to elect pursuant to Code Section 754 to adjust the basis of Company assets.

(c)    Allocations or special basis adjustments pursuant to this Section are solely for purposes of Federal, state and local taxes.  The determination of Profit or Loss, distributions and Capital Accounts shall be made without taking into account any such special allocation or special basis adjustment.  Each Member shall furnish the Company with all information necessary to give effect to such election.

6.3    Allocations for Tax Purposes.  Except as otherwise provided herein, any allocation to a Member for a Fiscal Period of a portion of the Profit or Loss shall be determined to be an allocation to that Member of the same proportionate part of each item of income, gain, loss, deduction or credit, as the case may be, as is earned, realized or available by or to the Company for Federal tax purposes.

6.4    Certain Accounting Matters.  For purposes of determining Profit, Loss or any other items allocable to any Fiscal Period, Profit, Loss and any such other items shall be determined on a daily, monthly or other basis, as determined by the Manager using any

permissible method under Code Section 706 and the Treasury Regulations promulgated thereunder.

## ARTICLE VII

## DISTRIBUTIONS

7.1    <u>Tax Distributions</u>.  The Manager shall use its best efforts to make distributions to the Members from time to time in amounts at least equal to their Tax Amounts ("Tax Distributions") provided that Company has Distributable Cash available.  Tax Distributions shall be made to the Members in proportion to their Tax Amounts. Tax Distributions shall not be made with respect to the year in which the Company liquidates.  Any Tax Distribution to a Member shall be treated as an advance against future distributions (other than future distributions to the Founding Member until such time as the Preference Amount has been paid in full to the Founding Member) under Section 7.2 and Section 7.3 below, and shall therefore reduce the amount of any future distributions to the Member under these sections by the same amount.  By executing this Agreement and any counterpart signature page, each Member acknowledges that he, she or it may be allocated a share of the taxable income of the Company without a corresponding distribution, and may therefore incur tax obligations without receiving distributions sufficient to pay those taxes.

7.2    <u>Distributions Other Than Proceeds of a Liquidating Transaction</u>.  Subject to the applicable provisions of the Act and except as otherwise provided herein, Distributable Cash shall be distributed from time to time, as the Manager shall determine, in its sole discretion, to all Members in proportion to their respective Capital Accounts as of the date of such distribution; provided, however, the Company shall not, without the consent of the Founding Member, make any distributions to any of the Members (other than the Founding Member) until the Founder Member has received an amount equal to the Preference Amount.  The Members hereby expressly acknowledge and agree that they are not entitled to any distributions, except from distributions received by the Company from the Investments, if any, and then only to the extent the Manager determines, in its sole discretion, whether and to what extent to make distributions to Members of Distributable Cash.

7.3    <u>Proceeds of a Liquidating Transaction</u>.  Upon the occurrence of a transaction (a "<u>Liquidating Transaction</u>") involving the sale or other disposition of all or substantially all of the assets of the Company, all Distributable Cash resulting therefrom (or from any other source during the period of winding up of the Company) shall be applied in the following manner:

(a)    <u>First</u>, to the payment of, or the making of reasonable provisions for payment of, any debts or liabilities of the Company to creditors;

(b)    <u>Second</u>, to fund reserves for debts or liabilities not then due and owing and for contingent liabilities to the extent deemed reasonable by the Manager, provided that, upon the expiration of such period of time as the Manager shall determine, the balances of such reserves shall be distributed in the manner hereinafter set forth in this Section 7.2; and,

(c)    <u>Third</u>, to the Founding Member in an amount equal to the sum of (i) the Distribution Preference, and (ii) the Initial Capital Contribution of the Founding Member (such sum referred to herein as the "Preference Amount"), to the extent such Preference Amount has not been previously distributed to the Founding Member pursuant to Section 7.2 above.

(d)    <u>Fourth</u>, to the Members in proportion to and to the extent of the positive balances of the Capital Accounts (after reflecting in such Capital Accounts all adjustments thereto necessitated by (i) all other Company transactions for the Fiscal Period in which such Liquidating Transaction occurs prior to or simultaneously with such Liquidating Transaction, and (ii) such Liquidating Transaction).

All payments under this Section 7.3 shall be made as soon as reasonably practicable and in any event by the end of the taxable year in which such Liquidating Transaction occurs or, if later, within ninety (90) days after the date of such Liquidating Transaction.

## ARTICLE VIII

## RIGHTS AND OBLIGATIONS OF MEMBERS; EVIDENCE OF AUTHORITY OF MANAGERS

8.1    <u>Limited Liability</u>.  Except as otherwise provided by the Act, the contracts, debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the contracts, debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such contract, debt, obligation or liability of the Company solely by reason of being the manager or a member of the Company.  The Members shall not be required to lend any funds to the Company.  Each of the Members shall only be liable to make payment of his or her respective contributions as and when due hereunder and other payments as expressly provided in this Agreement.  If and to the extent a Member's Initial Capital Contribution shall be fully paid, such Member shall not, except as required by Section 3.2(a) of this Agreement or by the express provisions of the Act regarding repayment of sums wrongfully distributed to Members, be required to make any further Capital Contributions.

8.2    <u>Member Control Rights</u>.  The Members, in their capacity as such:  (i) shall not participate in the management or control of the business of, or transact any business for or on behalf of, the Company; (ii) shall have no voting rights, except as specifically provided in this Agreement; and (iii) shall have no power to sign for or bind the Company.  The Members shall, however, have the approval rights expressly set forth elsewhere in this Agreement or specifically required by the Act.

8.3    <u>Evidence of Authority, Etc.</u>  Any Person dealing with the Company may rely on a certificate signed by the Manager as to:

(a)    who are the Members, the Manager or the officers, employees or agents of the Company;

(b)    the existence or nonexistence of any fact or facts which constitute conditions precedent to acts by the Members, such Manager, or any such officer, employee or agent or are in any other manner germane to the affairs of the Company;

(c)    who is authorized to execute and deliver any instrument or document on behalf of the Company;

(d)    the authenticity of a copy of this Agreement and amendments hereto;

(e)    any act or failure to act by the Company or as to any other matter whatsoever involving the Company, any Member, the Manager, or any officer, employee or agent; or

(f)    the authority of the Manager or any officer, employee or agent or other Person to act on behalf of the Company.

8.4    _Agreements with Affiliates_.  The Company may enter into transactions, financial arrangements or other agreements with any Member or Manager, or any Affiliate of a Member or Manager, including for the acquisition of property or rendition of services, but only if either:  (i) the terms are at least as favorable to the Company as may reasonably be expected to be obtained from unrelated third parties; or (ii) such transaction, financial arrangement or other agreement is approved by all Members.

## ARTICLE IX

## RESTRICTIONS ON TRANSFER; RIGHT OF FIRST REFUSAL; CO-SALE RIGHT

9.1    _Restrictions on Transfer_.  Each Member agrees that such Member will not, without the prior written consent of the Management Committee, transfer all or any portion of the Units now owned or hereafter acquired by such Member (a "Transfer"), except in connection with, and strictly in compliance with the conditions of this Article IX.

9.2    _Transfers_.

(a)    _Prohibited Transfers_.  No Transfer of the interest of a Member shall be made if such Transfer (i) may not be affected without registration under the Securities Act, (ii) would result in the violation of any applicable state securities laws, or (iii) is not made in compliance with this Article IX.

(b)    _Permitted Transfers_. Notwithstanding anything herein to the contrary, the provisions of Section 9.1 shall not apply to either of the Transfers listed below, provided that in each case the transferee (a "Transferee") shall have entered into a Joinder Agreement in

substantially the form attached hereto as <u>Exhibit A</u> providing that all Units so Transferred shall continue to be subject to all provisions of this Agreement as if such Units were still held by such Member, except that no further Transfer shall thereafter be permitted hereunder except in compliance with this Article IX:

       (i)     Transfers by any Member to the spouse, children or siblings of such Member or to a trust or family limited partnership for the benefit of any of them; and

       (ii)    Transfers upon the death of any Member to such Member's heirs, executors or administrators or to a trust under such Member's will, or Transfers between such Member and such Member's guardian or conservator.

Notwithstanding anything to the contrary in this Agreement or any failure by a Transferee under this Section 9.2 to execute a Joinder Agreement, such Transferee shall take any Units so Transferred subject to all provisions of this Agreement as if such Units were still held by the Member making such Transfer, whether or not they so agree in writing.

       9.3    <u>Right of First Refusal</u>. In the event that any Class B Member entertains a bona fide offer to purchase all or any portion of the Units held by such Member (a "Transaction Offer") from any other person (a "Buyer"), such Class B Member (a "Transferring Member") may, subject to the provisions of Section 9.4 hereof, Transfer such Units pursuant to and in accordance with the following provisions of this Section 9.3:

       (a)    <u>Offer Notice</u>. The Transferring Member shall cause the Transaction Offer and all of the terms thereof to be reduced to writing and shall promptly notify the Company of such Transferring Member's desire to effect the Transaction Offer and otherwise comply with the provisions of this Section 9.3 (such notice, the "Offer Notice"). The Transferring Member's Offer Notice shall constitute an irrevocable offer to sell all but not less than all of the Units which are the subject of the Transaction Offer (the "Offered Units") to the Company on the basis described below, at a purchase price equal to the price contained in, and on the same terms and conditions of, the Transaction Offer. The Offer Notice shall be accompanied by a true copy of the Transaction Offer (which shall identify the Buyer and all relevant information in connection therewith).

       (b)    <u>Company Option</u>. The Company shall have the option to purchase all or a portion of the Offered Units. At any time within ten (10) days after receipt by the Company of the Offer Notice (the "Company Option Period"), the Company may elect to accept the offer to purchase with respect to any or all of the Offered Units and shall give written notice of such election (the "Company Acceptance Notice") to the Transferring Member within the Company Option Period, which notice shall indicate the number of Units that the Company is willing to purchase. The Company Acceptance Notice shall constitute a valid, legally binding and enforceable agreement for the sale and purchase of the Offered Units covered by the Company Acceptance Notice. If the Company accepts the offer to purchase any or all of the Offered Units, the closing for such purchase of the Offered Units by the Company under this Section 9.3(b) shall take place within thirty (30) days following the expiration of the Company Option Period, at the offices of the

Company or on such other date or at such other place as may be agreed to by the Transferring Member and the Company.

If the Company fails to purchase all of the Offered Units, the Transferring Member shall send the Offer Notice (the "Additional Offer Notice") to each Class A Member.

    (c)    <u>Class A Members' Option</u>. If the Company fails to purchase all of the Offered Units under Section 9.3(b) above, at any time within thirty (30) days after receipt by the Class A Members of the Additional Offer Notice (the "Class A Option Period"), each Class A Member may elect to accept the offer to purchase with respect to any or all of the Remaining Units and shall give written notice of such election (the "Class A Acceptance Notice") to the Transferring Member and each Class A Member within the Class A Option Period, which notice shall indicate the maximum number of Units that the Class A Member  is willing to purchase, including the number of Units it would purchase if one or more other Class A Members do not elect to purchase their Pro Rata Fractions (as defined in paragraph (d) below). The Class A Acceptance Notice shall constitute a valid, legally binding and enforceable agreement for the sale and purchase of the Units covered by the Class A Acceptance Notice. The closing for any purchase of Units by the Class A Members under this Section 9.3(c) (along with the purchase by the Company of any Units under paragraph (b) above if the Company is purchasing less than all of the Offered Units) shall take place within thirty (30) days following the expiration of Class A Option Period, at the offices of the Company or on such other date or at such other place as may be agreed to by the Transferring Member and such Class A Members. The Transferring Member shall notify the Class A Members promptly if any Class A Member fails to offer to purchase all of its Pro Rata Fraction.

    (d)    <u>Allocation of Units among Class A Members</u>.  Upon the expiration of the Class A Option Period, the number of Units to be purchased by each Class A Member shall be determined as follows:  (i) first, there shall be allocated to each Class A Member electing to purchase, a number of Units equal to the lesser of (A) the number of Units as to which such Class A Member accepted as set forth in its respective Class A Acceptance Notice or (B) such Class A Member's Pro Rata Fraction (as defined below), and (ii) second, the balance, if any, not allocated under clause (i) above, shall be allocated to those Class A Members who within the Class A Option Period delivered a Class A Acceptance Notice that set forth a number of Units that exceeded their respective Pro Rata Fractions, in each case on a *pro rata* basis in proportion to the number of Units held by each such Class A Member up to the amount of such excess.  A Class A Member's Pro Rata Fraction shall be equal to the product obtained by multiplying the total number of Remaining Units by a fraction, the *numerator* of which is the total number of Units owned by such Class A Member, and the *denominator* of which is the total number of Units held by all Class A Members, in each case as of the date of the Additional Offer Notice.

    (e)    <u>Valuation of Property</u>.  In the event that the price set forth in the Offer Notice is stated in consideration other than cash or cash equivalents, the Management Committee shall determine the fair market value of such consideration, reasonably and in good faith, and the Company may effect a purchase under this Section 9.3 by payment of such fair market value in cash or cash equivalents.

(f)    <u>Sale to Third Party</u>. In the event that the Company does not elect to exercise the rights to purchase under this Section 9.3 with respect to all of the Units proposed to be sold, the Transferring Member may sell the remaining balance of such Units to the Buyer on the terms and conditions set forth in the Offer Notice, subject to the provisions of Section 9.4. Promptly after such Transfer, the Transferring Member shall notify the Company of the consummation thereof and shall furnish such evidence of the completion and time of completion of the Transfer and of the terms thereof as may reasonably be requested by the Management Committee. Prior to the effectiveness of any Transfer to a Buyer hereunder, such Buyer shall have entered into a Joinder Agreement in substantially the form attached hereto as <u>Exhibit A</u>, and such Buyer shall have all the rights and obligations. If the Transferring Member's sale to a Buyer is not consummated in accordance with the terms of the Transaction Offer on or before sixty (60) calendar days after the latest of: (i) the expiration of the Company Option Period and (ii) the satisfaction of all governmental approval or filing requirements, the Transaction Offer shall be deemed to lapse, and any Transfers of Units pursuant to such Transaction Offer shall be in violation of the provisions of this Agreement unless the Transferring Member sends a new Offer Notice and once again complies with the provisions of this Section 9.3 with respect to such Transaction Offer.

9.4    <u>Co-Sale Option of Class B Members</u>. Subject to Article X below, in the event that the Founding Member entertains a bona fide offer to purchase all the Units held by such Member, the Founding Member (a "Transferring Founding Member") may Transfer such Units only pursuant to and in accordance with the following provisions of this Section 9.4:

(a)    <u>Co-Sale Notice</u>. As soon as practicable following receipt of the Transaction Offer, the Transferring Founding Member shall provide notice to each of the other Members (the "Co-Sale Notice") of its right to participate in the Transaction Offer with the Transferring Founding Member (the "Co-Sale Option") by selling all Units held by such Member. Such Co-Sale Notice shall provide the terms of the Transaction Offer in writing and state the Transferring Founding Member's desire to effect the Transaction Offer. To the extent one or more Members exercise their Co-Sale Option in accordance with this Section 9.4, the Transferring Founding Member must use its reasonable best efforts to negotiate with the Buyer in order to make provisions for the sale of the additional Units.

(b)    <u>Co-Sale Acceptance</u>. Each of the Members shall have the right to exercise its Co-Sale Option by giving written notice of such intent to participate (the "Co-Sale Acceptance Notice") to the Transferring Founding Member within ten (10) days after receipt by such Member of the Co-Sale Notice (the "Co-Sale Election Period"). Each Co-Sale Acceptance Notice shall indicate that such Member wishes to sell all of the Units presently owned by such Member.

(c)    <u>Co-Sale Closing</u>. Within ten (10) calendar days after the end of the Co-Sale Election Period, the Transferring Founding Member shall promptly notify each participating Member the date on which the Transaction Offer will be consummated, which shall be no later than the later of (i) thirty (30) calendar days after the end of the Co-Sale Election Period and (ii) the satisfaction of any governmental approval or filing requirements, if any. Each participating

Member may effect its participation in any Transaction Offer hereunder by delivery to the Buyer, or to the Transferring Founding Member for delivery to the Buyer, of one or more instruments or certificates, properly endorsed for transfer, representing the Units it elects to sell pursuant thereto. At the time of consummation of the Transaction Offer, the Buyer shall remit directly to each participating Member that portion of the sale proceeds to which the participating Member is entitled by reason of its participation with respect thereto.  No Units may be purchased by the Buyer from the Transferring Founding Member unless the Buyer simultaneously purchases from the participating Members all of the Units that they own and have elected to sell pursuant to this Section 9.4.

    (c)   <u>Liability of Members</u>.  Each participating Member shall be liable to the Buyer only to same extent as the Transferring Founding Member with respect to representations and warranties regarding the Company or its business, on a several basis for each such Member's pro rata portion, provided that each such Member's liability with respect to such representations and warranties shall not exceed the value of the proceeds received by such Member upon the consummation of the Transaction Offer.

    (d)   <u>Sale to Third Party</u>.  Any Units held by a Transferring Founding Member that are the subject of the Transaction Offer and that the Transferring Founding Member desires to Transfer following compliance with this Section 9.4, may be sold to the Buyer only during the period specified in Section 9.4(d) and only on terms no more favorable to the Transferring Founding Member than those contained in the Co-Sale Notice.  Promptly after such Transfer, the Transferring Founding Member shall notify the Company, which in turn shall promptly notify all the Members, of the consummation thereof and shall furnish such evidence of the completion and time of completion of the Transfer and of the terms thereof as may reasonably be requested by the Transferring Founding Member.  Prior to the effectiveness of any Transfer to a Buyer hereunder, such Buyer shall have entered into a Joinder Agreement in substantially the form attached hereto as <u>Exhibit A</u>, and such Buyer shall have all the rights and obligations hereunder as if such Buyer were a Class A Member or Class B Member, as applicable.  In the event that the Transaction Offer is not consummated within the period required by this Section 9.4 or the Buyer fails timely to remit to each participating Member its respective portion of the sale proceeds, the Transaction Offer shall be deemed to lapse, and any Transfer of Units pursuant to such Transaction Offer shall be in violation of the provisions of this Agreement unless the Transferring Founding Member sends a new Co-Sale Notice, and once again complies with the provisions of this Section 9.4 with respect to such Transaction Offer.

    9.5   <u>Effect of Prohibited Transfers</u>.  If any Transfer by any Member is made or attempted contrary to the provisions of this Agreement, such purported Transfer shall be void *ab initio*; the Company and the other parties hereto shall have, in addition to any other legal or equitable remedies which they may have, the right to enforce the provisions of this Agreement by actions for specific performance (to the extent permitted by law); and the Company shall have the right to refuse to recognize any Transferee of any Member for any purpose.

## ARTICLE X

## RIGHTS AND OBLIGATIONS TO SELL

10.1    Drag-Along Rights.  In the event the Founding Member elects to effect a Sale Event or a Transfer of all of his Class A Units (each hereinafter referred to as a "Founding Member Sale"), if requested by the Founding Member, each other Member agrees to (i) sell, transfer and deliver, or cause to be sold, transferred and delivered, to the Buyer all of his, her or its Units on substantially the same terms applicable to the Founding Member; and (ii) execute and deliver such instruments of conveyance and transfer and take such other action, including voting such Units (to the extent required by this Agreement or the Act) in favor of any Founding Member Sale proposed by the Founding Member and executing any purchase agreements, merger agreements, indemnity agreements, escrow agreements or related documents, as such Founding Member or the Buyer may reasonably require in order to carry out the terms and provisions of this Article X (the "Drag-Along Right"); provided that, the Members shall not be required to undertake obligations that are disproportionately more onerous than those imposed upon the Founding Members.

10.2    Procedure.  Not less than fifteen (15) days prior to the date proposed for the closing of any Founding Member Sale, the Founding Member shall give notice to the other Members, setting forth in reasonable detail the name or names of the Buyer, the terms and conditions of the Founding Member Sale, including the purchase price and the proposed closing date. Following such notice, in the event that there are any material change(s) to the terms and conditions of the Sale Event, the Founding Member shall give the other Members notice of such change(s) not less than two (2) days prior to the proposed closing date. Each Member shall, upon request of the Founding Member, deliver to the Buyer, or to the Founding Member for delivery to the Buyer, one or more instruments or certificates, properly endorsed for transfer, representing the Units to be sold pursuant to the Drag-Along Right. At the time of the consummation of the Founding Member Sale, the Buyer shall remit directly to each participating Member that portion of the sale proceeds to which the participating Member is entitled by reason of its participation with respect thereto.

## ARTICLE XI

## TERMINATION

11.1    Events of Dissolution.

(a)    The Company shall be dissolved and the affairs of the Company wound up upon the occurrence of any of the following events:

(i)    a unanimous vote of the Members to dissolve the Company;

(ii)     the entry of a decree of judicial dissolution under Section 702 of the Act; or

(iii)     the sale, transfer or other disposition of all, or substantially all, of the assets of the Company.

(b)     Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the assets of the Company shall have been distributed as provided herein and a certificate of cancellation of the Company has been filed with the Secretary of State of the State of Maine.

11.2     Application of Assets.  In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in this Agreement.  No Member shall have the right to require the distribution of the assets of the Company in kind.

## ARTICLE XII

## MISCELLANEOUS

12.1     Notices.

(a)     Any and all notices, consents, offers, elections and other communications required or permitted under this Agreement shall be deemed adequately given only if in writing and the same shall be delivered either in hand or by mail or Federal Express or similar expedited commercial carrier, addressed to the recipient of the notice, postage prepaid and registered or certified with return receipt requested (if by mail), or with all freight charges prepaid (if by Federal Express or similar carrier).

(b)     All notices, demands and requests to be sent hereunder shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal.

(c)     All such notices, demands and requests shall be addressed as indicated on Schedule A hereto or to such other address as any party may have designated for itself by written notice to the others in the manner herein prescribed, except that notices of change of address shall be effective only upon receipt.

12.2     Word Meanings.  The words such as "herein", hereinafter", "hereof", and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  The singular shall include the plural and masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

12.3    Binding Provisions. The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, executors, administrators and legal representatives or successors and assigns, as the case may be, of the respective parties hereto.

12.4    Title to Company Property. All property owned by the Company, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, individually, shall have any ownership of such property. The Company may hold any of its assets in its own name or in the name of its nominee, which nominee may be one or more Persons.

12.5    Applicable Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Maine. In the event of a conflict between any provision of this Agreement and any non-mandatory provision of the Act, the provision of this Agreement shall control and take precedence.

12.6    Separability of Provisions. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

12.7    Section Titles. Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

12.8    Further Assurances. The Members and the Manager shall execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

12.9    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

12.10    Entire Agreement. This Agreement constitutes the entire agreement between the parties hereto with respect to the transactions contemplated herein and supersedes all prior understandings or agreements between the parties or their respective Affiliates.

12.11    Amendments. Except as otherwise provided herein, neither this Agreement nor the Articles shall be amended except with written consent of the Class A Members.

12.12    No Appraisal Rights. In no event shall any Member have appraisal rights in connection with any amendment of this Agreement, any merger or consolidation in which the Company is a constituent party, or any sale of all or substantially all of the Company's assets.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement under seal as of the day and year first above written.

UCompareHealthcare, LLC

By: _____

Title:_____

MANAGER:

MARK DONNELLY

By: _____

CLASS A MEMBER:

By: _____
   Name: Mark Donnelly

CLASS B MEMBERS:

By: _____
   Name:

By: _____
   Name:

By: _____
   Name:

By: _____
   Name:

By: _____
   Name:

.

**Exhibit E**


**Hotmail®**

pomara1@hotmail.com                                    Printed: Sunday, January 1, 2006 9:38 PM

| | |
|---|---|
| **From :** | william E. O'Brien, Esq. <william@masstechlawyer.com> |
| **Sent :** | Wednesday, June 1, 2005 12:43 PM |
| **To :** | <mdonnelly@uchc1.com> |
| **CC :** | "Paul O'Mara" <pomara1@hotmail.com>, <neal.omara@gmail.com> |
| **Subject :** | The O'Maras |

MIME-Version: 1.0
Received: from 3000k.com ([69.20.122.51]) by mc11-f7.hotmail.com with Microsoft SMTPSVC(6.0.3790.211); Wed, 1 Jun 2005 09:43:26 -0700
Received: (qmail 25629 invoked from network); 1 Jun 2005 16:43:25 -0000
Received: from 68-116-173-212.dhcp.oxfr.ma.charter.com (HELO toshibauser) (68.116.173.212) by web.3000k.com with SMTP; 1 Jun 2005 16:43:25 -0000
X-Message-Info: JGTYoYF78jHWTx8cm/H3lzUg6No8CuRh5nfBWZpiBPA=
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook IMO, Build 9.0.2416 (9.0.2910.0)
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.2180
Return-Path: william@masstechlawyer.com
X-OriginalArrivalTime: 01 Jun 2005 16:43:26.0528 (UTC) FILETIME=[0865DC00:01C566C9]

Dear Mr. Donnelly,

Please be advised that I represent Paul and Neal O'Mara (the "O'Maras"). The O'Maras requested that I contact you regarding the proposed agreements that were recently provided to them. Specifically, they are concerned that the agreements do not reflect the oral agreements between you and the them.

I understand that you have not yet had an opportunity to fully review the documents. I kindly request that you review them and let me know if, in your view, the agreements reflect the oral agreements between you and the O'Maras.

Until the form and amount of compensation for the past and future work product provided by the O'Maras has been clarified, the O'Maras will not contribute further work product to the project. Any unauthorized use of the materials created by the O'Maras would be a violation of their intellectual property rights.

In closing, the O'Maras have asked me to stress that they are interested in a constructive dialog with you regarding fair compensation for their significant contributions to the success of the project with you. They are prepared to have such a dialog at any mutually convenient time.

With best regards,


William E. O'Brien, L.L.M.


In the United States:
Tel: (508) 829.5185
William@masstechlawyer.com
www.masstechlawyer.com

In Germany:
Tel:(0421) 2031285
Email:wobrien@usrechtsanwalt.de
www.usrechtsanwalt.com


This e-mail may contain proprietary and confidential information and is intended for the recipient(s) only.  If an addressing or transmission error

has misdirected this e-mail, please notify the author by replying to this
e-mail and delete it from your system.  If you are not the intended
recipient(s) disclosure, distribution, copying or printing of this e-mail is
strictly prohibited by copyright law.

Bitte benachrichtigen Sie uns umgehend, falls diese E-Mail oder ihre Anlagen
unvollständig oder unlesbar übermittelt wurden. Diese E-Mail kann
vertrauliche Informationen enthalten, die nur für den Adressaten bestimmt
sind und der Geheimhaltung unterliegen. Eine Kenntnisnahme oder Verwendung
durch Dritte ist unzulässig.

**Exhibit F**



pomara1@hotmail.com                                                    Printed: Monday, January 2, 2006 12:59 PM

**From :**     Mark Donnelly <mdonnelly@SUPAWASH.com>
**Sent :**     Sunday, November 21, 2004 7:32 AM
**To :**       "'Paul O'Mara'" <pomara1@hotmail.com>
**Subject :**  RE: Flowcharts

MIME-Version: 1.0
Received: from smtp-hub.mrf.mail.rcn.net ([207.172.4.107]) by mc12-f22.hotmail.com with Microsoft SMTPSVC(5.0.2195.6824);
Sun, 21 Nov 2004 04:32:54 -0800
Received: from smtp03.mrf.mail.rcn.net ([207.172.4.62])by smtp-hub.mrf.mail.rcn.net with esmtp (Exim 3.35 #4)id 1CVqti-
000422-00for pomara1@hotmail.com; Sun, 21 Nov 2004 07:32:54 -0500
Received: from 209-6-81-63.c3-0.frm-ubr2.sbo-frm.ma.cable.rcn.com ([209.6.81.63] helo=DELLL)by smtp03.mrf.mail.rcn.net with
esmtp (Exim 3.35 #7)id 1CVqth-0000kt-00for pomara1@hotmail.com; Sun, 21 Nov 2004 07:32:54 -0500
X-Message-Info: JGTYoYF78jESuoGDgagw/HbDcdEwKtt0
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook, Build 10.0.6626
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.2180
Return-Path: mdonnelly@supawash.com
X-OriginalArrivalTime: 21 Nov 2004 12:32:54.0821 (UTC) FILETIME=[397D6550:01C4CFC6]

Paul:

THIS IS AWESOME!!!!!  I am reviewing everything (finishing) Spec and Flow charts.  Fantastic
presentation!!!!!!  I will have everything tonight.  Might be late but tonight.

Thanks for your exceptional efforts.

Mark

     -----Original Message-----
     **From:** Paul O'Mara [mailto:pomara1@hotmail.com]
     **Sent:** Saturday, November 20, 2004 6:02 PM
     **To:** mdonnelly@SUPAWASH.com
     **Cc:** pomara1@hotmail.com
     **Subject:** Flowcharts

     Hi again,

     I'm just about done with these. There were a few areas where I couldn't read your handwriting, so I
     just put (unreadable) to remind us to go back and reconcile these items later. I took a few liberties here
     and there, hopefully for the better, and entered a few questions throughout the charts. Let me know if
     you would like me to swing by with your originals at some point so you can compare.

     Paul



msn® ® **Hotmail®**

pomara1@hotmail.com                                              Printed: Monday, January 2, 2006 1:00 PM

| | |
|---|---|
| **From :** | Mark Donnelly <mdonnelly@SUPAWASH.com> |
| **Sent :** | Wednesday, December 1, 2004 6:01 AM |
| **To :** | "'Paul O'Mara'" <pomara1@hotmail.com> |
| **Subject :** | RE: What Neal did on Friday night |

MIME-Version: 1.0
Received: from smtp-hub.mrf.mail.rcn.net ([207.172.4.107]) by mc10-f21.hotmail.com with Microsoft SMTPSVC(5.0.2195.6824);
Wed, 1 Dec 2004 03:01:40 -0800
Received: from smtp03.mrf.mail.rcn.net ([207.172.4.62])by smtp-hub.mrf.mail.rcn.net with esmtp (Exim 3.35 #4)id 1CZSEu-
0004rj-00for pomara1@hotmail.com; Wed, 01 Dec 2004 06:01:40 -0500
Received: from 209-6-81-63.c3-0.frm-ubr2.sbo-frm.ma.cable.rcn.com ([209.6.81.63] helo=DELLL)by smtp03.mrf.mail.rcn.net with
esmtp (Exim 3.35 #7)id 1CZSEu-0002rl-00for pomara1@hotmail.com; Wed, 01 Dec 2004 06:01:40 -0500
X-Message-Info: JGTYoYF78jFWD/cTXKi9CTYk/xYxS1kW
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook, Build 10.0.6626
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.2180
Return-Path: mdonnelly@supawash.com
X-OriginalArrivalTime: 01 Dec 2004 11:01:40.0991 (UTC) FILETIME=[22F6B8F0:01C4D795]

You guys are unbelievable. I think I will start selling today so we can all start work next month. The way
Neal does this stuff, I think I should just go sell!

Glad to have you and your brother on board!

Mark

        -----Original Message-----
        **From:** Paul O'Mara [mailto:pomara1@hotmail.com]
        **Sent:** Tuesday, November 30, 2004 11:29 PM
        **To:** mdonnelly@SUPAWASH.com; nomara@bucknell.edu
        **Cc:** pomara1@hotmail.com
        **Subject:** What Neal did on Friday night

        Hi Mark,

        I almost forgot to show you what Neal and I threw together on Friday night when discussing his role in
        programming the front-end application. This isn't much, but it shows how quickly Neal can put
        something functional together to query stored procedures from a web-based front-end. This was
        originally for hospitals but I changed the stored proc to look at nursing homes since I have better data
        for them. Oh, and the county field is really city but a valid zip overrides city/state. It's a bit buggy, but
        what can you expect from something written in a few hours by someone new to the concept and
        relatively new to the programming language (he had about a week head start on VB.Net). You can start
        a query over by simply closing internet explorer and starting it up again.

        Neal says that the only thing he can't do is design a good-looking web page. If Brian can deliver a
        "shell" of a website to Neal, Neal can implement it in the web app.

        http://24.60.59.110/hospital/webform1.aspx

        (if this link doesn't work it's because I've lost my internet connection or taken the server down for some
        reason. don't worry, nobody knows about it except for you, me, Neal and maybe Ryan)

        -Paul



pomara1@hotmail.com

Printed: Monday, January 2, 2006 1:00 PM

| | |
|---|---|
| **From :** | Mark Donnelly <mdonnelly@SUPAWASH.COM> |
| **Sent :** | Sunday, May 1, 2005 10:15 PM |
| **To :** | "'Neal O'Mara'" <neal.omara@gmail.com>, "Paul O'Mara" <pomara1@hotmail.com> |
| **Subject :** | RE: RFP |

MIME-Version: 1.0
Received: from smtp04.mrf.mail.rcn.net ([207.172.4.63]) by MC8-F20.hotmail.com with Microsoft SMTPSVC(6.0.3790.211); Sun, 1
May 2005 19:15:49 -0700
Received: from 209-6-253-9.c3-0.frm-ubr2.sbo-frm.ma.cable.rcn.com (HELO delil) (209.6.253.9) by smtp04.mrf.mail.rcn.net with
ESMTP; 01 May 2005 22:15:39 -0400
X-Message-Info: JGTYoYF78JHVaYvFvo4no2DFStDlsBuJYwmnaZsk85w=
X-IronPort-AV: i="3.92,143,1112587200"; d="scan'208,217"; a="29093964:sNHT47487640"
X-MSMail-Priority: Normal
X-Mailer: Microsoft Outlook, Build 10.0.6626
X-MimeOLE: Produced By Microsoft MimeOLE V6.00.2900.2180
Return-Path: mdonnelly@SUPAWASH.COM
X-OriginalArrivalTime: 02 May 2005 02:15:49.0100 (UTC) FILETIME=[DB5C3AC0:01C54EBC]

Neal and Paul:

This is a GREAT job!  Thank you for caring so much.  I have read it 4 times and think it is just great!  I look
forward to hearing back from them.

Neal we can talk about the Dell and HP thing in the AM.

Thanks

Mark

-----Original Message-----
**From:** Neal O'Mara [mailto:neal.omara@gmail.com]
**Sent:** Friday, April 29, 2005 9:49 AM
**To:** neal.omara@gmail.com; nomara@uchc1.com; Mark Donnelly
**Subject:** RFP

Mark,

Here is the Request For Proposal Paul drew up.  I will forward this on to Terry at IBM if you do

not respond to this email by this afternoon.


- Neal